1  JOHN T. JASNOCH (CA 281605)
   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
2  600 W. Broadway, Suite 3300
   San Diego, CA 92101
3  Tel.: (619) 233-4565
   Fax: (619) 233-0508
4  jjasnoch@scott-scott.com

5  *Counsel for Plaintiff Yen Hoang and the Proposed Class*

6  [Additional counsel on signature page]
7

8              **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
9               **SAN FRANCISCO DIVISION**

10 | YEN HOANG, Individually and on Behalf of | Case No. ___3:21-cv-3930___
11 | All Others Similarly Situated, |

12 |                    Plaintiff, | **CLASS ACTION COMPLAINT**
13 |          v. |

14 | CONTEXTLOGIC, INC., PETER
   | SZULCZEWSKI, RAJAT BAHRI, BRETT
15 | JUST, JULIE BRADLEY, ARI EMANUEL, | JURY TRIAL DEMANDED
   | JOE LONSDALE, TANZEEN SYED,
16 | STEPHANIE TILENIUS, HANS TUNG,
   | JACQUELINE RESES, GOLDMAN SACHS &
17 | CO. LLC, J.P. MORGAN SECURITIES LLC,
   | BOFA SECURITIES, INC., CITIGROUP
18 | GLOBAL MARKETS INC., DEUTSCHE
   | BANK SECURITIES INC., UBS SECURITIES
19 | LLC, RBC CAPITAL MARKETS, LLC,
   | CREDIT SUISSE SECURITIES (USA) LLC,
20 | COWEN AND COMPANY, LLC,
   | OPPENHEIMER & CO. INC., STIFEL,
21 | NICOLAUS & COMPANY, L.L.C.,
   | ACADEMY SECURITIES, INC., LOOP
22 | CAPITAL MARKETS LLC, and R. SEELAUS
   | & CO., LLC,
23 |                    Defendants.
24

25

26

27

28

Plaintiff Yen Hoang ("Plaintiff") makes the following allegations, individually and on behalf of all other similarly situated, by and through Plaintiff's counsel, upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included, among other things, review and analysis of: (i) regulatory filings made by ContextLogic Inc. ("ContextLogic" or the "Company") with the SEC; (ii) press releases and media reports issued by and disseminated by the Company; and (iii) analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **INTRODUCTION**

1.     Plaintiff brings this class action for violations of the federal securities laws.

2.     Plaintiff brings this federal securities class action under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased ContextLogic Inc. ("ContextLogic" or the "Company") securities between December 16, 2020 to May 12, 2021, inclusive (the "Class Period"), and who were damaged thereby (the "Exchange Act Class").  The Exchange Act claims are brought against Defendants ContextLogic, Peter Szulczewski ("Szulczewski"), and Rajat Bahri ("Bahri") (collectively, "Exchange Act Defendants").

3.     Plaintiff also brings this federal class action under §§11, 12, and 15 of the Securities Act of 1933 ("Securities Act"), and rules promulgated thereunder, on behalf of all persons or entities that purchased or acquired ContextLogic common stock pursuant or traceable to the Company's Registration Statement on Form S-1, including amendments made thereto, (the "Securities Act Class" and together, with the Exchange Act Class, the "Class"), which was filed initially with and declared effective by the SEC on November 20 and December 15, 2020, respectively (the "Registration Statement").  On December 17, 2020, the final Prospectus for the

1  Company's Initial Public Offering ("IPO"), which forms part of the Registration Statement, was

2  filed with the SEC (together, the "Offering Materials").  Plaintiff brings these Securities Act claims

3  against Defendants ContextLogic, Szulczewski, Bahri, the Director Defendants (defined below),

4  and the Underwriter Defendants (defined below) (collectively, "Securities Act Defendants" and

5  together, with the Exchange Act Defendants, "Defendants").

6  **SUMMARY OF THE ACTION**

7  4.     ContextLogic is a mobile ecommerce company that operates the Wish platform,

8  which connects value-conscious customers with merchants across the globe.  Since being founded

9  in 2010, the Wish platform now connects "more than 100 million monthly active users in over 100

10  countries to over 500,000 merchants offering approximately 150 million items."

11  5.     In the Registration Statement and Prospectus used to effectuate its IPO and

12  throughout the Class Period, Defendants made materially false and misleading statements about:

13  (1) the "differentiated user experience," ContextLogic repeatedly credited as driving the wide-

14  adoption of the Wish platform by customers who are offered access to ***high-quality*** merchants,

15  selling affordable, ***high-quality*** products, and merchants who are offered ***reliable*** logistical

16  services; (2) the Company's sales and marketing engine, which ContextLogic said it would

17  "continue to invest in" and that purportedly serves as a competitive advantage in attracting new

18  users and increasing user engagement on the Wish platform; and (3) the Company's monthly active

19  user (MAU) growth, which it considered "a key indicator of user engagement and awareness of

20  [its] brand."

21  6.     On December 16, 2020, ContextLogic completed its IPO, issuing 46 million shares

22  of common stock at $24 per share, raising more than $1.1 billion in gross proceeds.  The Offering

23  Materials consistently flaunted the Company's "policies which, in combination with [its] robust

24  user-generated content, ***promote higher-quality merchants and products*** on [its] platform."

25  Central to ContextLogic's "superior engagement" with users was its ability to "offer [customers]

26  a vast selection of ***high-quality*** items at competitive prices[,]" its "***set of reliable*** cross-border

27  logistics solutions [for merchants,]" and its commitment to both "expand product selection to

28  provide more diversified products at competitive prices[,]" and "expand its logistics platform and

2

optimize its proprietary logistics programs . . . to become an integrated part of the cross-border logistics value chain . . . and ***provide faster and more reliable*** delivery to [the Company's] buyers."

7.  Additionally, the Offering Materials repeatedly claimed that ContextLogic would "continue to invest in" its sales and marketing engine, considered a "core competency [ ] essential to the success of the Wish platform," to "acquire new users and re-engage existing users" in both existing and ***select*** new markets, including in "countries in Africa, Latin America, and Eastern Europe," which served as "key growth markets with large and growing populations as a well as a significant portion of the population with lower average household incomes."  In so doing, as suggested by the Offering Materials, the number of monthly average users of ContextLogic's platform, which had purportedly grown from 21 million in fiscal year 2015 to 108 million by the end of September 2020, would continue to grow.

8.  Yet, when ContextLogic reported its fourth quarter and fiscal year 2020 financial results for the period ended December 31, 2020 ("4Q20" and "FY20"), it was revealed that, in reality, ***at the time of the IPO***, a material number of ContextLogic customers had complained ***to the Company*** about the quality of the products, protracted delivery times that, in some cases, stretched out longer than two months, or orders that never were received, that "the customer experience [was] so bad the [C]ompany pulled back ads in India, Brazil, the Philippines and other countries[,]" and that "decreased advertising" and "shipping problems," caused the Company's 4Q20 MAU's to ***decline 10%*** from the same period a year earlier.  On this news, ContextLogic's stock declined more than 10%.

9.  To make matters worse, on May 12, 2021, after ContextLogic announced its 1Q21 financial results which revealed that its MAUs had declined another 7% to just 101 million, ContextLogic's stock cratered again, closing on May 13, 2021 at $8.11 per share, or down over 29%, on unusually high trading volume.

## JURISDICTION AND VENUE

10.  The Exchange Act claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

11.     The Securities Act claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o, and SEC rules promulgated thereunder.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, §22 of the Securities Act, 15 U.S.C. §77v, and/or §27 of the Exchange Act, 15 U.S.C. §78aa.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), §22 of the Securities Act, 15 U.S.C. §77v, and/or §27 of the Exchange Act, 15 U.S.C. §78aa, because the acts and transactions giving rise to the violations of law complained of occurred, in part, in this District, including the dissemination of false and misleading statements into this District, certain Defendants reside and/or transact business in this District, and the Company maintains its corporate headquarters in this District.

14.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

### A.     **Plaintiff**

15.     Plaintiff, as set forth in her accompanying certification, purchased ContextLogic common shares during the Class Period and was damaged as a result of the violations of the federal securities law as alleged herein.

### B.     **Defendants**

#### 1.     **The Company**

16.     Defendant ContextLogic is a San Francisco, California-based global ecommerce provider, incorporated under the law of the state of Delaware.   ContextLogic maintains its headquarters at One Sansome Street, 40th Floor, San Francisco, CA 94104, and its common stock is listed on the NASDAQ under the ticker symbol "WISH."

2.      **The Individual and Director Defendants**

17.     Defendant Szulczewski was, throughout the Class Period and at all relevant times, Founder, CEO and Chairperson of the Board of Directors (the "Board"). Defendant Szulczewski reviewed, approved, and participated in making statements in the Registration Statement, which he signed. He also reviewed, edited, and approved the IPO's road show PowerPoint presentation, road show talking points and script, and participated in making the materially inaccurate, misleading, and incomplete statements alleged herein as ContextLogic's CEO.

18.     Defendant Bahri was, throughout the Class Period and at all relevant times, ContextLogic's CFO. Defendant Bahri reviewed, approved, and participated in making statements in the Registration Statement, which he signed. He also reviewed, edited, and approved the IPO's road show PowerPoint presentation, road show talking points and script, and participated in making the materially inaccurate, misleading, and incomplete statements alleged herein as ContextLogic's CFO.

19.     Defendant Brett Just ("Just") was, throughout the Class Period and at all relevant times, ContextLogic's Chief Accounting Officer ("CAO"). Defendant Just reviewed, approved, and participated in making statements in the Registration Statement, which he signed. He also reviewed, edited, and approved the IPO's road show PowerPoint presentation, road show talking points and script, and participated in making the materially inaccurate, misleading, and incomplete statements alleged herein as ContextLogic's CAO.

20.     Defendants Szulczewski, Bahri, and Just are collectively referred to herein as the "Individual Defendants." During the Class Period, the Individual Defendants ran the Company as hands-on executives and/or managers, overseeing ContextLogic's operations, finances, and business. The Individual Defendants made the materially false and misleading statements described herein and each had intimate knowledge about core aspects of ContextLogic's financial and business operations. The Individual Defendants were also intimately involved in deciding which disclosures would be made by ContextLogic. Because of their positions and access to material non-public information available to them during the Class Period, the Individual Defendants knew that the adverse facts specified herein had not been disclose to, and were being

concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants, because of their positions at ContextLogic, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers, institutional and individual investors, and industry experts and/or practitioners at conferences and other events.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

21.    At all relevant times, Defendant Julie Bradley ("Bradley") served as a director on the Board.  Defendant Bradley participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

22.    At all relevant times, Defendant Ari Emanuel ("Emanuel") served as a director on the Board.  Defendant Emanuel participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

23.    At all relevant times, Defendant Joe Lonsdale ("Lonsdale") served as a director on the Board.  Defendant Lonsdale participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

24.    At all relevant times, Defendant Tanzeen Syed ("Syed") served as a director on the Board.  Defendant Syed participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

25.    At all relevant times, Defendant Stephanie Tilenius ("Tilenius") served as a director on the Board.  Defendant Tilenius participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

26.    At all relevant times, Defendant Hans Tung ("Tung") served as a director on the Board.  Defendant Tung participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

27.     Defendant Jacqueline Reses ("Reses") was identified as an incoming director in the Registration Statement and was named a member of the Board on December 18, 2020 and was made Chairperson of the Board on May 12, 2021.

28.     Defendants Bradley, Emanuel, Lonsdale, Syed, Tilenius, Reses, and Tung are collectively referred to herein as the "Director Defendants."

### 3.     The Underwriter Defendants

29.     The Underwriter Defendants were also instrumental in soliciting investors and in making the ContextLogic shares that were offered and sold in or traceable to the IPO available to the members of the Securities Act Class.  The table below lists each of the Underwriter Defendants, together with the number of allotted shares that each sold to the Securities Act Class members in the IPO:

| Name | Number of Shares |
|---|---|
| Goldman Sachs & Co. LLC | 16,169,000 |
| J.P. Morgan Securities LLC | 11,615,000 |
| BofA Securities, Inc. | 7,015,000 |
| Citigroup Global Markets Inc. | 1,932,000 |
| Deutsche Bank Securities Inc. | 1,932,000 |
| UBS Securities LLC | 1,932,000 |
| RBC Capital Markets, LLC | 1,840,000 |
| Credit Suisse Securities (USA) LLC | 1,380,000 |
| Cowen and Company, LLC | 460,000 |
| Oppenheimer & Co. Inc. | 460,000 |
| Stifel, Nicolaus & Company, Incorporated | 460,000 |
| William Blair & Company, L.L.C. | 460,000 |
| Academy Securities, Inc. | 115,000 |
| Loop Capital Markets LLC | 115,000 |
| R. Seelaus & Co., LLC | 115,000 |

30.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  Goldman Sachs acted as a representative of all the underwriters.  Goldman Sachs also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Goldman Sachs' participation in and its solicitation of offers in connection with

1  the IPO was motivated by its financial interests.  Defendant Goldman Sachs conducts business in

2  this District.

3     31. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the

4  Company's IPO, serving as a financial advisor for and assisting in the preparation and

5  dissemination of the Company's material inaccurate, misleading, and incomplete Offering

6  Materials.  J.P. Morgan acted as a representative of all the underwriters.  J.P. Morgan also

7  participated in conducting and promoting the roadshow for the IPO and paying for the expenses

8  of the Director Defendants who participated in the roadshow, including lodging and travel, among

9  other expenses.  J.P. Morgan's participation in and its solicitation of offers in connection with the

10  IPO was motivated by its financial interests.  Defendant J.P. Morgan conducts business in this

11  District.

12     32. Defendant BofA Securities, Inc. ("BofA") was an underwriter of the Company's

13  IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the

14  Company's material inaccurate, misleading, and incomplete Offering Materials.  BofA acted as a

15  representative of all the underwriters.  BofA also participated in conducting and promoting the

16  roadshow for the IPO and paying for the expenses of the Director Defendants who participated in

17  the roadshow, including lodging and travel, among other expenses.  BofA's participation in and

18  its solicitation of offers in connection with the IPO was motivated by its financial interests.

19  Defendant BofA conducts business in this District.

20     33. Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the

21  Company's IPO, serving as a financial advisor for and assisting in the preparation and

22  dissemination of the Company's material inaccurate, misleading, and incomplete Offering

23  Materials.  Citigroup participated in conducting and promoting the roadshow for the IPO and

24  paying for the expenses of the Director Defendants who participated in the roadshow, including

25  lodging and travel, among other expenses.  Citigroup's participation in and its solicitation of offers

26  in connection with the IPO was motivated by its financial interests.  Defendant Citigroup conducts

27  business in this District.

28

34.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  Deutsche Bank participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Deutsche Bank's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Deutsche Bank conducts business in this District.

35.     Defendant UBS Securities LLC ("UBS") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  UBS participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses.  UBS's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant UBS conducts business in this District.

36.     Defendant RBC Capital Markets, LLC ("RBC") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  RBC participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses.  RBC's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant RBC conducts business in this District.

37.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  Credit Suisse participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow,

including lodging and travel, among other expenses.  Credit Suisse's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Credit Suisse conducts business in this District.

38.     Defendant Cowen and Company, LLC ("Cowen") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  Cowen participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Cowen's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Cowen conducts business in this District.

39.     Defendant Oppenheimer & Co., Inc. ("Oppenheimer") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  Oppenheimer participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Oppenheimer's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Oppenheimer conducts business in this District.

40.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  Stifel participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Stifel's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Stifel conducts business in this District.

41.     Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  William Blair participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses.  William Blair's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant William Blair conducts business in this District.

42.     Defendant Academy Securities, Inc. ("Academy Securities") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  Academy Securities participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Academy Securities' participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Academy Securities conducts business in this District.

43.     Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  Loop Capital participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Loop Capital's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Loop Capital conducts business in this District.

44.     Defendant R. Seelaus & Co., LLC ("R. Seelaus") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials.  R. Seelaus participated in conducting and promoting the roadshow for the IPO and

1  paying for the expenses of the Director Defendants who participated in the roadshow, including

2  lodging and travel, among other expenses. R. Seelaus' participation in and its solicitation of offers

3  in connection with the IPO was motivated by its financial interests. Defendant R. Seelaus conducts

4  business in this District.

5      45. Defendants listed in ¶¶30-44 are collectively referred to herein as the "Underwriter

6  Defendants."

7      46. Pursuant to the Securities Act, each Underwriter Defendant is liable for the

8  materially inaccurate, misleading, and incomplete statements in the Offering Materials. In

9  addition, although not an element of Plaintiff's claims and an issue on which each Underwriter

10  Defendant bears the burden of proof to the extent it seeks to assert it as an affirmative defense, no

11  Underwriter Defendant conducted an adequate due diligence investigation in connection with the

12  matters alleged herein and will accordingly be unable to establish a statutory "due diligence"

13  affirmative defense under the Securities Act. Each Underwriter Defendant committed acts and

14  omissions that were a substantial factor leading to the harm complained of herein.

15      47. Each Underwriter Defendant named herein is an investment banking firm whose

16  activities include, *inter alia*, the underwriting of public offerings of securities. As the underwriters

17  of the IPO, the Underwriter Defendants earned lucrative underwriting fees.

18      48. As underwriters, the Underwriter Defendants met with potential investors in the

19  IPO and presented highly favorable, but materially incorrect and/or materially misleading,

20  information about the Company, its business, products, plans, and financial prospects, and/or

21  omitted to disclose material information required to be disclosed under the federal securities laws

22  and applicable regulations promulgated thereunder.

23      49. Representatives of the Underwriter Defendants also assisted ContextLogic and the

24  Director Defendants in planning the IPO. They further purported to conduct an adequate and

25  reasonable investigation into the business, operations, products, and plans of the Company, an

26  undertaking known as a "due diligence" investigation. During the course of their "due diligence,"

27  the Underwriter Defendants had continual access to confidential corporate information concerning

28  the Company's business, financial condition, products, plans, and prospects.

50.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to ContextLogic's management, directors, and lawyers to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which ContextLogic's common stock would be sold; (iii) the language to be used in the Offering Materials; (iv) what disclosures about ContextLogic would be made in the Offering Materials; and (v) what responses would be made to the SEC in connection with its review of the Offering Materials.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and ContextLogic's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of ContextLogic's undisclosed then-existing problems and plans and the Offering Materials' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

51.     The Underwriter Defendants also demanded and obtained an agreement from ContextLogic under which ContextLogic agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

52.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the IPO, so that they, and the Director Defendants, could offer to sell, and sell, ContextLogic shares to Plaintiff and the members of the Securities Act Class pursuant (or traceable) to the Offering Materials.

**SUBSTANTIVE ALLEGATIONS**

53.     On August 28, 2020, ContextLogic filed with the SEC a confidential draft registration statement on Form S-1, which would be used for the IPO following a series of amendments in response to SEC comments.  On December 7, 2020, ContextLogic filed its final amendment to the Registration Statement, which registered over 52 million ContextLogic shares for public sale.  The SEC declared the Registration Statement effective on December 15, 2020. On December 17, 2020, more than five-sixths of the way through ContextLogic's 4Q 2020, Defendants priced the IPO at $24 per share and filed the final Prospectus for the IPO, which forms part of the Registration Statement.

54.     According to the Offering Materials, since its founding in 2010, ContextLogic's vision has been to unlock ecommerce for all users, by providing consumers access to a vast selection of affordable products and by providing merchants access to hundreds of millions of consumers globally.  To achieve this end, ContextLogic is fixated on "revolutionizing e-commerce with a user experience that is mobile-first, discovery-based, deeply personalized and entertaining." Through its "Wish" platform, which was purportedly the "most downloaded global shopping app" over the last three years and "one of the largest and *fastest growing* global ecommerce platforms," ContextLogic connects "more than 100 million monthly active users ["MAUs"] in over 100 countries to over 500,000 merchants offering approximately 150 million items."  Of these 500,000 merchants, most are based in China.

55.     Unfortunately, the Registration Statement contained untrue statements of material fact and omitted to state material facts, both required by governing regulations and necessary to make the statements made not misleading.  In particular, the Registration Statement misrepresents the *then-existing* truth about: (1) the "differentiated user experience," ContextLogic repeatedly credits as driving the wide-adoption of the Wish platform by customers who are offered access to high-quality merchants, selling affordable, high-quality products, and merchants who are offered reliable logistical services; (2) the Company's sales and marketing engine, which ContextLogic said it would "continue to invest in" and that purportedly serves as a competitive advantage in attracting new users and increasing user engagement on the Wish platform; and (3) the Company's seemingly exponential MAU growth, which it considered "a key indicator of user engagement and awareness of [its] brand."

56.     According to the Registration Statement, ContextLogic employs "a number of policies which, in combination with [its] robust user-generated content, *promote higher quality merchants and products* on [its] platform."  For example, by connecting users directly to merchants who directly source their products, ContextLogic "offer[s] [customers] a vast selection of *high-quality* items at competitive prices."  And, by offering a "number of logistics programs" ContextLogic purportedly provides merchants "a *set of reliable* cross-border logistics solutions at competitive costs."  Not surprisingly, ContextLogic notes how expanding both these policies are

central to the Company's growth strategy.  Specifically, ContextLogic commits to "expand product selection to provide more diversified products at competitive products" and "expand its logistics platform and optimize its proprietary logistics program . . . to become an integrated part of the cross-border logistics value chain . . . and ***provide faster and more reliable*** delivery to [the Company's] buyers."

57.   ContextLogic's ability to capture and analyze data also purportedly enhances its user experience.  According to the Offering Materials, the Company "collect[s], analyze[s], and utilize[s] data across over 100 million monthly active users, over 500,000 merchants, and approximately 1.8 million items sold per day ***to improve the shopping experience for users and the selling experience for merchants***."  ContextLogic's data science capabilities also purportedly "enable[] personalization at the individual user level at a massive scale and drive significant advantages across all aspects of [the] business [ ], including user acquisition, ***user experience***, pricing strategies, user-generated content, merchant insights, and user and merchant support."

58.   The Company's sales and marketing engine, which ContextLogic considers a "core competency that is essential to the success of the Wish platform," and which ContextLogic leverages to "acquire new users and re-engage existing users on the Wish platform" was also important to enhancing the user experience.  Indeed, it is this aspect of ContextLogic's "user acquisition expertise" that the Company says it "need[s] to continue to invest in…to attract new users and increase user engagement."  Moreover, it is this "data-driven sales and marketing" expertise that has "allowed [the Company] to reduce [its] net losses from $207 million in 2017 compared to $129 million in 2019[,]" and, further, positions the Company to "take advantage of economies of scale to further improve [its] operational efficiency."

59.   And, with respect to ContextLogic's MAU growth over the years, from 21 million in fiscal year 2015, to 30 million in fiscal year 2016, to 49 million in fiscal year 2017, to 73 million in fiscal year 2018, to 90 million in fiscal year 2019, and to 108 million by the end of September 2020, the Offering Materials consistently signaled that ContextLogic expected this upward trend to continue.  Especially with ContextLogic committing to "expand [its] global footprint and enter new geographies and acquire new users" in "countries in Africa, Latin America, and Eastern

Europe," which served as "key growth markets with large and growing populations as a well as a significant portion of the population with lower average household incomes."

60.    In truth, however, at the time of the IPO, a material number of ContextLogic customers had panned their experience with the Wish platform, with many complaining **to the Company** about the quality of the products, protracted delivery times that, in some cases, stretched out longer than two months, or orders that never were received.  In fact, as was later revealed by ContextLogic when it released its 4Q20 financial results, which represented the time during which the Company went public, "the customer experience [was] so bad the [C]ompany pulled back ads in India, Brazil, the Philippines and other countries."  Thus, the actual user experience and the Company's commitment to "target people . . . [that] have a higher propensity to engage with [the] platform and buy," was far from what the Registration Statement made both out to seem. Moreover, this "decreased advertising" and these "shipping problems," caused the Company's 4Q20 MAU's to **decline 10%** from the same period a year earlier, a far cry from the Registration Statement's consistent message that MAU growth was (and would remain) on the rise.  Because the Registration Statement did not disclose the truth about ContextLogic's poor user experience, its decision to terminate sales and marketing efforts in critical new markets, and its declining MAUs, as well as the impact each was already having on the Company's financial health, Plaintiff and other Class Members had no opportunity to adequately assess the value of the shares offered in connection with the IPO.

61.    Defendants were required to disclose this material information in the Registration Statement, for at least three independent reasons.  First, SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required disclosure of any known events or uncertainties that at the time of the IPO had caused, or were reasonably likely to cause, ContextLogic's disclosed financial information not to be indicative of future operating results.  At the time of the IPO, ContextLogic knew of, or in the exercise of reasonable care should have known, that it was no longer experiencing MAU growth and, further, that its MAUs from earlier periods were not indicative of its 4Q20 MAU, which had declined year-over-year.  Likewise, ContextLogic knew of, or in the exercise of reasonable care should have known, that logistical woes and quality-control issues were playing

havoc on its user's experience not only globally, but in critical new markets that the Company identified as being essential to its "growth strategy." These undisclosed, materially negative events and trends were likely to (and in fact did) materially and adversely affect ContextLogic's financial state, and rendered the disclosed results and trends in the Registration Statement misleading and not indicative of the Company's future operating results.

62.   Second, SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factor" section of the Registration Statement, a discussion of the most significant factors that make the offering risky or speculative, and that each risk factor adequately describe the risk. ContextLogic's discussion of risk factors did not adequately describe the risk posed by its customers' dissatisfaction with the quality of products sold on the Wish platform or their overall user experience, its merchants' inability to deliver products to users in a timely manner or at all, ContextLogic's declining MAUs, the negative impact these were already having on ContextLogic's business, nor the other already occurring negative results and trends, nor the likely and consequent materially adverse effects on the Company's future results, share price, and prospects.

63.   Third, Defendants' failure to disclose ContextLogic's declining MAUs, the mounting customer dissatisfaction over the quality of products sold on the Wish platform, and the extraordinary length of time merchants required to deliver products, which led to the Company pulling ads in critical new markets, rendered false and misleading the Registration Statement's many references to known risks that, "if" occurring "might" or "could" affect the Company. As the Company eventually revealed, these "risks" had already materialized at the time of the IPO.

64.   Nonetheless, Defendants went forward with the IPO, with the foregoing misrepresentations and omissions in the Registration Statement. Through the IPO, Defendants issued and sold approximately 46 million ContextLogic shares, all pursuant to the Registration Statement, and generated ***over $1.1 billion*** in gross proceeds.

65.   But when the truth of Defendants' misrepresentations and omissions began to emerge, the price of ContextLogic's shares suffered sharp declines. For example, on January 14, 2021, the Company's slowing growth and fulfillment issues were featured in an article published

on *Investorplace.com* entitled "With Slowing Growth and Mounting Losses, Give ContextLogic a Pass." On this news, ContextLogic's stock declined nearly 11.7%, falling from $28.13 per share on January 14, 2021 to close at $24.84 per share on January 15, 2021.

66. Then, on March 8, 2021, ContextLogic reported its 4Q20 and FY20 financial results for the period ended December 31, 2020, disclosing that, by the time of its December 2020 IPO, its MAUs had already "declined 10% YoY during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America where WISH temporarily de-emphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year." Undeterred, the Company also reported strong future demand, providing 1Q21 sales guidance of $735 to $750 million, representing year-over-year growth of 67% to 70%.

67. The media was quick to analyze the Company's announcement. For example, in "Wish Revenue Beats Estimates, Worries Linger About Growth," published on *Bloomberg,* the author noted how investors were focusing "on **the decline** in the website's users," evidenced by the fact that ContextLogic's stock retreated after "WISH [disclosed it] had 104 million MAU in the fourth quarter, down 10% from the same period a year earlier." In addition, the article republished Defendant Bahri's admission that "delivery times that stretched out longer than two months in some cases made the customer experience so bad the company pulled back ads in India, Brazil, the Philippines and other countries."

68. On this news, ContextLogic's stock declined more than 10%, falling from $17.77 per share on March 5, 2021 to close at $15.94 per share on March 8, 2021.

69. Then, on May 12, 2021, ContextLogic announced its 1Q21 financial results for the interim period ended March 31, 2021. Again, ContextLogic's MAUs declined, this time by an additional 7% to just 101 million. Likewise, the Company's forward sales guidance fell short, with its 2Q21 revenue guidance of just $715 million to $730 million coming in significantly below the guidance of $735 to $750 million provided for 1Q21.

70. On this news, ContextLogic's stock cratered more than 29%, falling from $11.47 per share on May 12, 2021 to close at $8.11 per share on May 13, 2021.



**CLASS ACTION ALLEGATIONS**

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.     Plaintiff brings this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, the common stock of ContextLogic between December 16, 2020, the first day ContextLogic common stock traded publicly, and May 12, 2021, both dates inclusive (the "Class Period"), including in, pursuant to, and/or traceable to the IPO (the "Class").

73.     Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of ContextLogic, members of the ContextLogic's Board, and members of their immediate families (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of ContextLogic.

74.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on the NASDAQ, a national securities exchange.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the Class.  Millions of ContextLogic shares were publicly traded during the Class Period on the NASDAQ.  Record

owners and other members of the Class may be identified from records maintained by ContextLogic or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

75.     Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.  Further, Plaintiff will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

76.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the members of the Class are:

(a)  whether Defendants violated the Exchange Act;

(b)  whether Defendants violated the Securities Act;

(c)  whether Defendants' statements to the investing public during the Class Period omitted and/or misrepresented material facts;

(d)  whether Defendants' statements to the investing public during the Class Period omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)  whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)  whether the price of ContextLogic's common stock was artificially inflated; and

(g)  the extent of damage sustained by Class members and the appropriate measure of damages.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**For Violations of §10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against Defendant ContextLogic and the Individual Defendants)**

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     This Count is asserted on behalf of all members of the Class against ContextLogic and the Individual Defendants for violations of §10(b) of the Exchange Act, 15 U.S.C. §78(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

80.     These Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; and (ii) caused Plaintiff and the other members of the Class to purchase ContextLogic securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, each of these Defendants took the actions set forth herein.

81.     During the Class Period, these Defendants disseminated or approved the false statements specified herein, among others, which they knew, or deliberately disregarded, were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ContextLogic securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83.     These Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities or interstate commerce and/or of the mails, engaged and

21

1  participated in a continuous course of conduct to conceal adverse material information about the

2  business and future prospects of ContextLogic, as specified herein.

3      84.    These Defendants employed devices, schemes, and artifices to defraud while in

4  possession of material, adverse nonpublic information and engaged in acts, practices, and a course

5  of conduct, as alleged herein, in an effort to assure investors of ContextLogic's value and

6  performance and continued substantial growth, which included the making of, or participation in

7  the making of, false statements of material facts and omitting to state material facts necessary in

8  order to make the statements made about ContextLogic and its business operations and future

9  prospects, in the light of the circumstances under which they were made, not misleading, as set

10  forth more particularly herein, and engaged in transactions, practices, and a course of business that

11  operated as a fraud and deceit upon the purchasers of ContextLogic securities.

12      85.    As described above, these Defendants acted with scienter throughout the Class

13  Period in that they either had actual knowledge of the misrepresentations and omissions of material

14  facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain

15  and to disclose such facts, even though such facts were available to them.  These Defendants'

16  material misrepresentations and/or omissions were done knowingly or recklessly and, for the

17  purpose and effect of concealing the Company's results and growth prospects, thereby artificially

18  inflating the price of its securities.  As demonstrated by these Defendants' omissions and

19  misstatements of the Company's business strategy, these Defendants, if they did not have actual

20  knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such

21  knowledge by deliberately refraining from taking those steps necessary to discover whether those

22  statements were false or misleading.

23      86.    As a result of the dissemination of the materially false and misleading information

24  and failure to disclose material facts, as set forth above, the market price of ContextLogic securities

25  was artificially inflated.  In ignorance of the fact that market prices of ContextLogic's securities

26  were artificially inflated, and relying directly or indirectly on the false and misleading statements

27  made by these Defendants, or upon the integrity of the market in which the securities trade, and/or

28  in the absence of material adverse information that was known to, or recklessly disregarded by,

these Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class acquired ContextLogic securities at artificially high prices and were, or will be, damaged thereby.

87.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff, the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased, or otherwise acquired, their ContextLogic securities, or if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

88.     By virtue of the foregoing, these Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

89.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities.

90.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

### For Violations of §20(a) of the Exchange Act
### (Against the Individual Defendants

91.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.     The Individual Defendants acted as controlling persons of ContextLogic within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their high-level positions, agency, ownership, and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The

Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to have been misleading prior to, and/or shortly after, these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

93.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

94.     As set forth above, ContextLogic and the Individual Defendants each violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions, as alleged in this complaint.

95.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class have suffered damages in connection with their purchases of the Company's securities.

96.     This action is filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

### For Violations of §11 of the Securities Act
### (Against Defendant ContextLogic, the Director Defendants, and
### the Underwriter Defendants)

97.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

98.     This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Securities Act Defendants.  This is a non-fraud cause of action. Plaintiff does not assert that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

99.     The Offering Materials were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

100.    The Company is the registrant of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the materially inaccurate statements contained in the Offering Materials and the failure of the Offering Materials to be complete and accurate.  By virtue of the Offering Materials containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, ContextLogic is liable under §11 of the Securities Act to Plaintiff and the Class.

101.    The Director Defendants each signed the Offering Materials and caused its issuance.  As such, each is strictly liable for the materially inaccurate statements contained in the Offering Materials and the failure of the Offering Materials to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The Director Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials and ensure that they were true and accurate, there were no omissions of material facts that would make the Offering Materials misleading, and the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Director Defendants should have known of the material misstatements and omissions contained in the Offering Materials and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, the Director Defendants are liable to Plaintiff and the Class.

102.    The Underwriter Defendants each served as underwriters in connection with the IPO.  As such, each is strictly liable for the materially inaccurate statements contained in the Offering Materials and the failure of the Offering Materials to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The Underwriter Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials.  They had a duty to ensure that such statements were true and accurate, there were no omissions of material facts that would make the Offering Materials misleading, and the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Offering Materials and also

should have known of the omissions of material facts necessary to make the statements made therein not misleading.  Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

103.   Defendants acted negligently in preparing the Offering Materials.  None of the Defendants named in this Claim made a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Materials were true and without omission of any material facts and were not misleading.  In alleging the foregoing, Plaintiff specifically disclaims any allegation of fraud.

104.   By reasons of the conduct herein alleged, each Defendant named in this claim violated §11 of the Securities Act.

105.   None of the untrue statements or omissions of material fact in the Offering Materials alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Offering Materials did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

106.   Plaintiff acquired the Company's securities pursuant or traceable to the Offering Materials and without knowledge of the untruths and/or omissions alleged herein.  Plaintiff sustained damages, and the price of the Company's shares declined substantially due to material misstatements in the Offering Materials.

107.   This Claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

108.   By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

**For Violations of §12(a) of the Securities Act**
**(Against Defendant ContextLogic, the Director Defendants,**
**and the Underwriter Defendants)**

109.   Plaintiff repeats and re-alleges each and every allegation contained above, as if fully set forth herein.

110.    By means of the defective Prospectus, Defendants promoted, solicited, and sold ContextLogic shares to Plaintiff and other members of the Class.

111.    The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiff, and the other members of the Class who purchased ContextLogic shares pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated, in order to make the statements contained therein not misleading.   Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus, as set forth above.

112.    Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired ContextLogic shares.

113.    By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased ContextLogic securities, pursuant to the Prospectus, sustained substantial damages in connection with their purchases of the shares.  Accordingly, Plaintiff and the other members of the Class who hold ContextLogic securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their ContextLogic shares to Defendants sued herein.  Class members who have sold their ContextLogic securities seek damages to the extent permitted by law.

**For Violations of §15 of the Securities Act**
**(Against the Director Defendants)**

114.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.    This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against each of the Director Defendants.

116.    The Director Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, and had the power to influence, and exercised same over, the Company to cause it to engage in the conduct complained of herein.  Similarly, each of the other Director Defendants not only controlled those subject to liability as primary violators of §11 of the Securities Act, as alleged above, they directly participated in controlling ContextLogic by having signed, or authorized the signing of, the Registration Statement and authorizing the issuance of ContextLogic securities to Plaintiff and members of the Class.

117.    As control persons of ContextLogic, each of the Director Defendants are jointly and severally liable pursuant to §15 of the Securities Act with and to the same extent as ContextLogic for its violations of §11 of the Securities Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on Plaintiff's own behalf and on behalf of the Exchange Act and Securities Act Classes, prays for relief and judgement as follows:

A.    Declaring that this action is a proper class action, pursuant to Fed. R. Civ. P. 23, certifying Plaintiff as a representative of the Exchange Act and Securities Act Classes, and designating Plaintiff's counsel as Class Counsel for both the Exchange Act and Securities Act Classes;

B.    Awarding compensatory damages in favor of Plaintiff and the other members of the Exchange Act Class against all Exchange Act Defendants, jointly and severally, for all damages sustained, as a result of the Exchange Act Defendants' wrongdoing, in an amount to be proved at trial, including interest thereon;

C.    Awarding Plaintiff and the Exchange Act and Securities Act Classes their reasonable costs and expenses incurred in this action, including attorneys' and expert fees;

D.    Awarding rescission or a rescissionary measure of damages; and

E.    Such other and further relief as the Court deems appropriate.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**DEMAND FOR TRIAL BY JURY**</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands trial by jury of all issues that may be so tried.

DATED: May 25, 2021          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ John T. Jasnoch*
JOHN T. JASNOCH (CA 281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-0508
jjasnoch@scott-scott.com

THOMAS L. LAUGHLIN, IV
(*pro hac vice* forthcoming)
JONATHAN M. ZIMMERMAN
(*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 233-6444
Fax: (212) 233-6334
tlaughlin@scott-scott.com
jzimmerman@scott-scott.com

*Counsel for Plaintiff Yen Hoang and the Proposed Class*

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Yen Hoang, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I have reviewed the Complaint and authorize Scott+Scott Attorneys at Law LLP to file the Complaint and lead plaintiff papers on my behalf.

2.      I am willing to serve as a representative party on behalf of all purchasers of ContextLogic Inc. ("ContextLogic") securities during the Class Period, including providing testimony at deposition and trial, if necessary.

3.      During the Class Period, I purchased and/or sold the security that is the subject of the Complaint, as set forth in the attached **Schedule A**.

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the federal securities laws.

5.      I have not sought to serve as a representative party or lead plaintiff on behalf of a class any private actions arising under the federal securities laws and filed during the three-year period preceding the date on which this certification is signed.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at ____Hayward, California_____. (City, Country)


5/21/2021
_____                        _____
Date                                                    Yen Hoang

# Schedule A

**CONTEXTLOGIC INC - A**                              **Ticker:**  **WISH**        **Cusip:**  **21077C107**
Class Period: 12/16/2020 to 05/13/2021

**Yen Hoang**

|          |          | DATE       | SHARES | PRICE   |
|----------|----------|------------|--------|---------|
|          | Purchases: | 03/02/2021 | 100    | $18.59  |
|          |          | 03/16/2021 | 2,222  | $18.33  |
|          | Sales:   | 03/05/2021 | 100    | $17.47  |
|          |          | 04/20/2021 | 2,222  | $11.99  |