**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Counsel for Lead Plaintiffs and The Proposed
Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| YEN HOANG, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    v.<br><br>CONTEXTLOGIC, INC., PETER SZULCZEWSKI, RAJAT BAHRI, BRETT JUST, JULIE BRADLEY, ARI EMANUEL, JOE LONSDALE, TANZEEN SYED, STEPHANIE TILENIUS, HANS TUNG, JACQUELINE RESES, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., UBS SECURITIES LLC, RBC CAPITAL MARKETS, LLC, CREDIT SUISSE SECURITIES (USA) LLC, COWEN AND COMPANY, LLC, OPPENHEIMER & CO. INC., STIFEL, NICOLAUS & COMPANY, L.L.C., ACADEMY SECURITIES, INC., LOOP CAPITAL MARKETS LLC, and R. SEELAUS & CO., LLC,<br><br>        Defendants. | Case No. 3:21-cv-03930-BLF<br><br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Lead Plaintiffs Xiaoquan Yang and Alexander De Block  ("Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their amended complaint against Defendants ContextLogic, Inc., Peter Szulczewski, Rajat Bahri, Brett Just, Julie Bradley, Ari Emanuel, Joe Lonsdale, Tanzeen Syed, Stephanie Tilenius, Hans Tung, Jacqueline Reses, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, BofA Securities, Inc., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., UBS Securities LLC, RBC Capital Markets, LLC, Credit Suisse Securities (USA) LLC, Cowen And Company, LLC, Oppenheimer & Co. Inc., Stifel, Nicolaus & Company, L.L.C., Academy Securities, Inc., Loop Capital Markets LLC, And R. Seelaus & Co., LLC ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation it conducted by and through their attorneys, which included, among other things, a review and analysis of: (i) Defendants' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) public reports and news articles; (iii) transcripts of Defendants' conference calls; (iv) interviews with former employee[1] witnesses with relevant information; and (v) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      ContextLogic Inc. ("Company" or "ContextLogic"), an e-commerce platform company, knew in 2019 that its Monthly Active Users ("MAU") and active buyers were deteriorating materially. In early 2020, as the Covid pandemic hit, ContextLogic saw a short-term surge in MAU. Even as the MAU surge abated, returning to previously deteriorating levels, Defendants, in need of capital to fund its growth, determined to capitalize on the short-term surge to float 46,000,000 shares

---

[1] All former employees ("FEs") are referred to in the masculine to preserve their anonymity.

of ContextLogic common stock in an initial public offering ("IPO") raising over $1 billion. The Registration Statement for the IPO became effective on December 15, 2020.

2.      In the Registration Statement and Prospectus and in public statements during the Class Period, Defendants misled investors about its key financial and operational metrics, including MAUs, active buyers, revenues and the effectiveness of the Company's internal control over financial reporting. Former Employees of ContextLogic with close knowledge of the actual and forecasted metrics in question and Defendants' knowledge thereof, convey that by August 2021, four months before the IPO, Defendants knew that the short-term, Covid surge had abated and the Company's MAUs began deteriorating materially again as it had in 2019.

3.      By May of 2021, the Company acknowledged that its critical financial and operational metrics on which Defendants had based the IPO had deteriorated materially. When the truth gradually emerged, ContextLogic's common stock price fell significantly. At the time when this case was filed, the ContextLogic stock price had fallen by 64%, materially damaging investors.

4.      Plaintiffs bring this federal class action under §§11 and 15 of the Securities Act of 1933 ("Securities Act"), and rules promulgated thereunder[2], on behalf of all persons or entities that purchased or acquired ContextLogic common stock pursuant or traceable to the Company's Registration Statement on Form S-1, including amendments made thereto, (the "Securities Act Class"), which was filed initially with and declared effective by the SEC on November 20 and December 15, 2020, respectively (the "Registration Statement"). On December 17, 2020, the final Prospectus for the Company's Initial Public Offering ("IPO"), which forms part of the Registration Statement, was filed with the SEC (together, the "Registration Statement"). Plaintiff brings these Securities Act claims against Defendants, alleging negligence.

5.      Plaintiffs also bring this federal securities class action under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of a class consisting

---

[2] Plaintiffs specifically disclaim any allegation of fraud, recklessness or intentional misconduct concerning allegations under Securities Act.

of all persons and entities, other than Defendants and their affiliates, who purchased ContextLogic Inc. ("ContextLogic" or the "Company") securities between December 16, 2020 to May 12, 2021, inclusive (the "Class Period"), and who were damaged thereby (the "Exchange Act Class" and together, with the Securities Act Class, the "Class"). The Exchange Act claims are brought against Defendants ContextLogic and Individua Defendants (defined below).

6.      In its IPO and during the Class Period, Defendants touted the "massive growth" of ContextLogic's key financial and operation indicators, including the MAU or monthly users (explained in detail below), active buyers and revenue.

7.      Unbeknownst to the investing public, such massive growth in 2019 was a transient growth abnormality as a result of increased traffic to ContextLogic's platform during the Covid and was unsustainable and had discontinued in the third quarter and the fourth quarter of 2020 leading up to the IPO.

8.      In the Registration Statement and during the Class Period, Defendants failed to disclose that the key performance indicators in the third quarter of 2020 and the fourth quarter of 2020— in which ContextLogic completed its IPO 15 calendared days before the end of the fourth quarter—were declining, violating their affirmative duty to disclose under the SEC regulations and causing the Registration Statements and other public statements issued during the Class Period to be materially false and misleading.

9.      In the Registration Statement and during the Class Period, Defendants failed to disclose that they manipulated the financial statements and forecasts.

10.     Also, in the Registration Statement and during the Class Period, Defendants failed to disclose that ContextLogic had material weaknesses in its internal control over financial reporting, violating its duty to maintain the effectiveness of the internal control under law.

11.     ContextLogic's materially false and misleading information, when exposed, significantly damaged investors. Defendants should be held accountable to these innocent investors under the securities law.

**JURISDICTION AND VENUE**

3

12.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because the alleged misstatements entered and the subsequent damages took place in this judicial district.

15.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

16.     Lead Plaintiff Xiaoquan Yang purchased ContextLogic securities pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. Its PSLRA certification (Dkt. 28-2) has been previously filed with the Court and is incorporated by reference herein.

17.     Lead Plaintiff Alexander De Block purchased ContextLogic securities pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. Its PSLRA certification (Dkt. 28-2) has been previously filed with the Court and is incorporated by reference herein.

18.     Defendant ContextLogic Inc. is incorporated in Delaware with principal executive offices located at One Sansome Street 40th Floor, San Francisco, CA 94104. The Company's common stock trade in an efficient market on the NASDAQ under the ticker symbol "WISH."

19.     Defendant Piotr Szulczewski ("Szulczewski") has served as ContextLogic's Chief Executive Officer ("CEO") and Chairman of its Board of Directors at all relevant times. Mr. Szulczewski

founded Wish in 2010 and has served as CEO since July 2010. Prior to founding the Company, he held various positions at Google, Inc. Mr. Szulczewski holds a B.S. in mathematics and computer science from University of Waterloo. Szulczewski signed or authorized the signing of the Registration Statement filed with the SEC.

20.     Defendant Rajat Bahri ("Bahri") has served as ContextLogic's Chief Financial Officer ("CFO") since December 2016. Prior to joining the Company, Bahri served as CFO at various companies, including serving as the CFO at a public company for 8 years. Bahri holds a Bachelor in Commerce from the University of Delhi and an M.B.A. from the Fuqua School of Business at Duke University. Bahri signed or authorized the signing of the Registration Statement filed with the SEC.

21.     Defendant Brett Just ("Brett Just") has served as ContextLogic's Chief Accounting Officer ("CAO") since November 2020. Prior to taking on the role of CAO, he served as ContextLogic's Controller from August 2019 and as Assistant Controller from September 2017. Just was previously the Controller for the Internet of Things (IOT) Business Unit at Cisco Systems, Inc. from 2016 to 2017 and Assistant Controller for Jasper Wireless from 2013 to 2016, prior to its acquisition by Cisco in March 2016. Just began his career in public accounting at Deloitte and Just, Gurr & Associates. He holds a B.S. in Business Economics from the University of California, Los Angeles. Just signed or authorized the signing of the Registration Statement filed with the SEC.

22.     Defendant Julie Bradley ("Bradley") served as a director of ContextLogic at the time of the IPO. Bradley signed or authorized the signing of the Offering Documents filed with the SEC.

23.     Defendant Ari Emanuel ("Emanuel") served as a director of ContextLogic at the time of the IPO. Emanuel signed or authorized the signing of the Offering Documents filed with the SEC.

24.     Defendant Joe Lonsdale ("Lonsdale") served as a director of ContextLogic at the time of the IPO. Lonsdale signed or authorized the signing of the Offering Documents filed with the SEC.

25.     Defendant Tanzeen Syed ("Syed") served as a director of ContextLogic at the time of the IPO. Syed signed or authorized the signing of the Offering Documents filed with the SEC.

26.     Defendant Stephanie Tilenius ("Tilenius") served as a director of ContextLogic at the time of the IPO. Tilenius signed or authorized the signing of the Offering Documents filed with the SEC.

27.     Defendant Hans Tung ("Tung") served as a director of ContextLogic at the time of the IPO. Tung signed or authorized the signing of the Offering Documents filed with the SEC.

28.     Defendant Jacqueline Reses ("Reses") was identified as an incoming director of ContextLogic at the time of the IPO and was named a member of the Board of Directors on December 18, 2020.

29.     Defendants Szulczewski, Bahri, Just, Bradley, Emanuel, Lonsdale, Syed, Tilenius, Tung, and Reses are sometimes referred to herein collectively as the "Individual Defendants."

30.     Defendants ContextLogic and Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

31.     The Individual Defendants each reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

32.     The senior management of ContexLogic, including the Individual Defendants, as executive officers and authorized representatives of ContextLogic, participated in the solicitation and sale of ContextLogic securities to investors in the IPO, motivated in part to serve their own and the Company's financial interests.

33.     The Individual Defendants, along with other ContextLogic senior executives, attended investor roadshow presentations and met with investment analysts and large investors in the weeks leading up to the IPO in an effort to persuade investors that ContextLogic was a worthy investment and solicit investors to purchase ContextLogic securities in the IPO, all to further the financial interests of ContextLogic.

34.     Each of the Individual Defendants:

    a.     directly participated in the management of the Company;

    b.     was directly involved in the day-to-day operations of the Company at the highest levels;

c.      was privy to confidential proprietary information concerning the Company and its business and operations;

d.      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.      approved or ratified these statements in violation of the federal securities laws.

35.     ContextLogic is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to ContextLogic under *respondeat superior* and agency principles.

36.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

37.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

38.     Defendant BofA Securities, Inc. ("BofA") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

39.     Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

40.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

41.     Defendant UBS Securities LLC ("UBS") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

42.     Defendant RBC Capital Markets, LLC ("RBC") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

43.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

44.     Defendant Cowen and Company, LLC ("Cowen") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

45.     Defendant Oppenheimer & Co., Inc. ("Oppenheimer") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

46.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

47.     Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

48.     Defendant Academy Securities, Inc. ("Academy Securities") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

49.     Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

50.     Defendant R. Seelaus & Co., LLC ("R. Seelaus") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

51.     Defendants listed in ¶¶36-50 are collectively referred to herein as the "Underwriter Defendants."

52.     Defendants Goldman Sachs, J.P. Morgan and BoA acted as the representatives of all the Underwriter Defendants. Each Underwriter Defendant named herein is an investment banking firm whose activities include, inter alia, the underwriting of public offerings of securities.

53.     The Underwriter Defendants participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. The Underwriter Defendants' participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests. As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees. All of the Underwriter Defendants conducts business in this District.

54.     As underwriters, the Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

55.     The Underwriter Defendants also assisted ContextLogic and the Individual Defendants in planning the IPO. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants

1   had continual access to confidential corporate information concerning the Company's business,

2   financial condition, products, plans, and prospects.

3   56.    In addition to having access to internal corporate documents, the Underwriter Defendants

4   and/or their agents, including their counsel, had access to ContextLogic's management, directors,

5   and lawyers to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO,

6   including the price at which ContextLogic's common stock would be sold; (iii) the language to be

7   used in the Offering Materials; (iv) what disclosures about ContextLogic would be made in the

8   Offering Materials; and (v) what responses would be made to the SEC in connection with its review

9   of the Offering Materials. As a result of those constant contacts and communications between the

10  Underwriter Defendants' representatives and ContextLogic's management, directors, and lawyers,

11  at a minimum, the Underwriter Defendants should have known of ContextLogic's undisclosed then-

12  existing problems and plans and the Offering Materials' materially inaccurate, misleading, and

13  incomplete statements and omissions, as detailed herein.

14  57.    The Underwriter Defendants also demanded and obtained an agreement from ContextLogic

15  under which ContextLogic agreed to indemnify and hold the Underwriter Defendants harmless from

16  any liability under the Securities Act.

17  58.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and

18  declared effective in connection with the IPO, so that they, and the Director Defendants, could offer

19  to sell, and sell, ContextLogic shares to Plaintiff and the members of the Securities Act Class

20  pursuant (or traceable) to the Offering Materials.

21  59.    In the Underwriting Agreement, attached to the Registration Statement, the non-lead

22  underwriters gave to the Lead Underwriters full legal authority to act on their behalf in connection

23  with their underwriting of the IPO. In communications with the SEC, the Lead Underwriters stated

24  that they are acting as representatives for all of the underwriters. Thus, the actions of the Lead

25  Underwriters bound the non-lead underwriters in connection with the IPO.

26

27

28

60.     The Underwriters' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement.

**DEFENDANTS' WRONGDOING**

**ContextLogic Touted Its "Massive Growth" at the time of the IPO.**

61.     ContextLogic operates the Wish platform, enabling merchants to sell their products directly to global consumers who favor affordability over brand-name products and convenience. According to ContextLogic, most of its merchants are based in China. The unbranded products can be discounted in excess of 85% compared to branded alternatives. Over 90% of ContextLogic user activity and purchases occur on ContextLogic's mobile app.

62.     On December 15, 2020, ContextLogic's Registration Statement became effective. Its stock started trading on December 16, 2020. In the IPO, ContextLogic issued and sold through the Underwriter Defendants 46 million shares of common stock at $24 per share, raising more than $1.1 billion in gross proceeds.

63.     According to the Registration Statement,[3] for the nine months ended September 30, 2020, 82% of ContextLogic's revenue was from marketplace services and 18% was from logistics services. As to the marketplace services revenue, 90% of it was from ContextLogic's core marketplace revenue, or commission fees collected in connection with user purchases of the merchants' products and the remaining 10% was from ProductBoost fees for displaying a merchant's selected products in preferential locations on ContextLogic's platform. ContextLogic's logistics revenue came from merchants' payment to ContextLogic for direct end-to-end single order shipment from a merchant's location to the user.

---

[3] The Registration Statement warned investors to review no information other than the information it contained, stating, "neither we nor any of the underwriters have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses prepared by us or on our behalf or to which we have referred you." It continued that "[n]either we nor any of the underwriters take any responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you."

64.     In terms of geographic diversification by users, for the nine months ended September 30, 2020, 43% of ContextLogic's core marketplace revenue came from Europe, 42% from North America, 5% from South America, and 10% from the rest of the world.

65.     In the Registration Statement, ContextLogic touted itself as one of the largest and fastest growing global ecommerce platforms, claiming to have achieved "massive growth and scale" since its founding in 2010. In particular, the Registration Statement claimed 32% revenue increase from $1.3 billion for the nine months ended September 30, 2019 to $1.7 billion for the nine months ended September 30, 2020, immediately before its IPO.

66.     ContextLogic attributed the massive growth and scale over the years to two key factors: the drastic increase of MAUs and monthly active buyers. It claimed that as of September 30, 2020, the Company had over 12 million monthly active buyers and over 100 million MAUs in over 100 countries.

67.     MAUs and active users are the two key metrics that ContextLogic use to measure its performance, identify trends affecting its business, and make strategic decisions.

68.     ContextLogic defines MAUs as the number of unique users that visited the Wish platform, either on its mobile app, mobile web, or on a desktop, during a month. MAUs for a given reporting period equal the average of the MAUs for that period. The Company claims to identify active users by a unique email-address. According to ContextLogic, the change in MAUs in a reporting period captures both the inflow of new users as well as the outflow of existing users who did not visit the platform in a given month.

69.     ContextLogic determines the last-twelve-month or LTM active buyers by counting the total number of individual users who have placed at least one order on the Wish platform, mobile app, mobile web, or desktop, during the preceding 12 months. The number of active buyers purportedly shows ContextLogic's ability to monetize visits to its platform, converting visits into purchases. The Registration Statement stated that the Company generated $2.3 billion of LTM revenue as of September 30, 2020, and grew over 30% in the first nine months of 2020.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-03930- BLF

70.     Specifically, in the Registration Statement, ContextLogic disclosed the historic data of MAUs and LTM active buyers as follows:

| | Year Ended December 31, | | | | | Nine Months Ended September 30, | |
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2019 | 2020 |
| | (in millions, except percentages) | | | | | | |
| MAU | 21 | 30 | 49 | 73 | 90 | 81 | 108 |
| LTM Active Buyers | 18 | 31 | 52 | 64 | 62 | 60 | 68 |

| | Three Months Ended | | | | | | |
| | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 | September 30, 2020 |
| | (in millions, except percentages) | | | | | | |
| MAUs | 75 | 76 | 93 | 115 | 109 | 116 | 100 |
| LTM Active Buyers | 61 | 59 | 60 | 62 | 63 | 70 | 68 |

71.     The Registration Statement disclosed that the MAUs and active buyers were growing steadily, and no materially adverse events relating to the MAUs and active buyers had occurred that undermined the Company's operations and financial performance in the near future.

**ContextLogic Is Required To Maintain An Effective Internal Control Over Financial Reporting.**

72.     As a public company, ContextLogic is required to maintain internal control over financial reporting and to report any material weaknesses in such internal control pursuant to Section 404 of the Sarbanes-Oxley Act. ContextLogic's auditor is required to deliver an attestation report on the effectiveness of the Company's disclosure controls and internal control over financial reporting starting with the annual report for the year ended December 31, 2021.

73.     The Sarbanes-Oxley Act of 2002 ("SOX") is a law created to improve the accuracy and reliability of corporate disclosures in public companies' financial statements and to protect investors from fraudulent accounting practices. SOX Section 404 requires that companies annually assess and

13

report on the effectiveness of their internal control structure.

74.     Under SOX Section 404 and Rules 13a-15(f) and 15d-15(f) under the Exchange Act, every public company, including ContextLogic, is required to include a management report on the company's internal control over financial reporting in its annual reports, which contains management's assessment of the effectiveness of the company's internal control over financial reporting. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements in accordance with U.S. GAAP and includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of a company's assets, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with the GAAP, and that a company's receipts and expenditures are being made only in accordance with authorizations of a company's management and directors, and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of a company's assets that could have a material effect on the consolidated financial statements.

75.     Specifically, a public company is required to include with their annual filing:

    a.     a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting;

    b.     statement identifying the framework used by management to evaluate the effectiveness of internal control; and

    c.     management's assessment of the effectiveness of internal control as of the end of the company's most recent fiscal year end.

64.     In making its assessment of internal control over financial reporting, public companies use the criteria established by Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO Framework"). The COSO Framework, borrowing from GAAP, defines fair presentation in financial statements as containing the following:

14

- the accounting principles selected and applied have general acceptance;

- the accounting principles are appropriate in the circumstances;

- the financial statements are informative of matters that may affect their use, understanding and interpretation; and

- the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.

**Defendants Had an Affirmative Obligation to Disclose Material Risks And Uncertainties Under SEC Regulations.**

*17 C.F.R. §229.105 – Item 105 (Risk Factors)*

76.    Registrants are obligated to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105. The presentation of risks that could apply generically to any registrant or any offering is discouraged. *Id*. Where a summary of risk factors is required, the issuer should provide "a series of concise, bulleted or numbered statements that is no more than two pages summarizing the principal factors that make an investment in the registrant or offering speculative or risky." *Id*.

*17 C.F.R. § 229.303 – Item 303 (Material Events or Uncertainties)*

77.    The Reg. S-K also requires a registrant to discusses in the "Management's Discussion and Analysis of financial condition and results of operations" material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources. 17 C.F.R. § 229.303. The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. *Id*. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations. *Id*. The discussion and analysis must be of the

financial statements and other statistical data that the registrant believes will enhance a reader's understanding of the registrant's financial condition, cash flows and other changes in financial condition and results of operations. *Id.* A discussion and analysis that meets the requirements of this paragraph is expected to better allow investors to view the registrant from management's perspective. *Id.*

78.     In a 1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

> *Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[4]

79.     Item 303 creates a duty to disclose a known trend, event or uncertainty unless management determines that a material effect on financial condition or results of operations is not likely to appear. The 1989 Interpretive Release provides the following test to determine if disclosure under Item 303(a) or Part I, Item 5 of Form 20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.
> 1989 Interpretive Release, 1989 WL 1092885, at *6

80.     Issuers must disclose regulatory actual or contemplated regulatory action, as shown by an example provided by the 1989 Interpretive Release:

---

[4] The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, *1 n.1 (same).

16

Facts: A registrant has been correctly designated a PRP by the EPA with respect to cleanup of hazardous waste at three sites. No statutory defenses are available. The registrant is in the process of preliminary investigations of the sites to determine the nature of its potential liability and the amount of remedial costs necessary to clean up the sites. Other PRPs also have been designated, but the ability to obtain contribution is unclear, as is the extent of insurance coverage, if any. Management is unable to determine that a material effect on future financial condition or results of operations is not reasonably likely to occur.

Based upon the facts of this hypothetical case, MD&A disclosure of the effects of the PRP status, quantified to the extent reasonably practicable, would be required. [Footnote omitted]. For MD&A purposes, aggregate potential cleanup costs must be considered in light of the joint and several liability to which a PRP is subject. Facts regarding whether insurance coverage may be contested, and whether and to what extent potential sources of contribution or indemnification constitute reliable sources of recovery may be factored into the determination of whether a material future effect is not reasonably likely to occur.

*Id.* at *6.

81.     Issuers must disclose both (a) known trends and uncertainties and (b) any potential material impact of known trends and uncertainties on their own operations even if the trends are a matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at *6.

**Defendants Failed to Disclose That ContextLogic's Key Financial and Operation Metrics Were Declining.**

82.     Former Employee 1 ("FE 1"), a Financial Manager, worked at ContextLogic from October 2017 until June 2021. FE 1 reported directly to Thomas Chuang, or Peiyen Chuang ("Chuang") who was Vice President of Finance from June 2014 to December 2019 and Vice President of Operations since December 2019. Chuang reported directly to Defendant Bahri, the Company's CFO.

83.     FE 1 worked on the operational side and had unfettered access to company financial data, all company spending and costs and Profit and Loss ("P&L"), all contracts negotiated and operations on a daily basis. In addition, he had access to financial data regarding sales and MAU growth. FE 1 also managed the cost side of the finances including head count forecasting. FE 1 states he had access to HR data bases and compiled accounts, worked with recruiters and built out contracts. FE 1's job responsibilities also included working with Department Heads to evaluate contracts under negotiation. Every month FE 1 consolidated and built financial forecast line items for the P&L related to costs. FE 1 worked out of the ContextLogic headquarters in San Francisco.

84.     FE 1 worked closely with Defendant Bahri, as often Bahri ignored FE 1's direct report, Chuang, seeking out FE 1 directly. For example, according to FE 1, Bahri came to him and asked for a list of headcount forecasts to determine whom to lay off to save on costs.

85.     According to FE 1, According to FE 1, the IPO was really born out of numbers from a truly brief period of time that conflicted with actual numbers and trends both before and after the Covid bump. Defendants knew in advance of the IPO that ContextLogic had not consistently achieved the performance that supported the IPO. ContextLogic had no operational plans supporting the numbers Defendants wanted to achieve and could not position for growth without resources. Therefore, Defendants had to mislead to accomplish the IPO. At the time of the IPO and beyond the IPO, ContextLogic was not functioning properly across all fronts and the key operational and financial data confirmed it. Defendants' goals for ContextLogic were unattainable.

86.     According to FE 1, in 2017 and part of 2018, the Company was performing well. In 2019, ContextLogic encountered issues relating to material increases in shipping costs that concerned senior management. Around the end of 2019, according to FE 1, revenue began to decline noticeably. Defendant Szulczekewski, the Company CEO, started targeting departments, pointing out mistakes that cost the Company money and firing personnel. FE 1 recalls discussions in 2019 about the need to go public to raise capital but there were challenges at that time with several companywide initiatives, including the deterioration in revenue, tracking sales and logistics in general.

87.     According to FE 1, ContextLogic hired Bahri to take the Company public and Bahri accomplished the IPO and then left the Company.

88.     FE 1 recalls that Bahri was a careful and focused manager who sought to be aware, in detail, of the Company's finances. It is this that caused Defendant Bahri to avoid interacting with FE 1's direct report, Chuang, and to seek out FE 1 directly. As an example, when Bahri needed to negotiate certain deals, he talked with FE 1 directly. As another example, Bahri directly emailed to FE 1 with questions, specifically during the IPO.

89.     According to FE 1, the arrival of the Covid startled Company personnel who were surprised when sales increased. Bahri saw an opportunity to leverage the Covid-inflated financial results to take the Company public. Rather than including normalized financial results in the Registration Statement, Defendant Bahri used these abnormal sales and growth numbers. He did this, according to FE 1, because sales swooned after the initial Covid bump, but Defendant Bahri used the short-lived anomaly to bolster materially and artificially the Registration Statement's financial figures. FE 1 recalls attending a Zoom meeting during which Bahri discussed his decision to leverage the short-lived Covid sales bump.

90.     FE 1 recalls that the IPO roadshow was in the second and third quarters of 2020. All of the senior executives, including Defendants Bahri and Szulczewski, Jennifer Oliver ("Oliver"), Head of Financial Planning and Analysis ("FP&A"), and Eric Owyang, FP&A Manager, attended. Brett Just, Chief Accounting Officer and Oliver, FE 1 recalls, collaborated with the underwriters on a daily basis in connection with the IPO.

91.     FE 1 had full access to and reviewed all historic MAU data and the MAU data for each month during his tenure at the Company. In 2017 and part of 2018, MAUs increased. At some time in 2018, according to FE 1, however, it stalled. 2019 was not a good year, according to FE 1, as MAUs began materially deteriorating. That ended in 2020 with the Covid bump. MAU hit the peak sometime in May 2020 and there may have still been some Covid bump in July 2020, FE 1 recalls. Thereafter, however, MAU decline materially from August to November 2020. MAU continued materially deteriorating in December 2020. FE 1 recalls the numbers were very poor and did not recover during his tenure at the Company, continuing to decline from January 2021 through May 2021. According to FE 1 ContextLogic's senior executives knew of the deteriorating MAU and conceived of and authorized the Company to increase marketing spend attempting to increase MAU.

92.     According to FE 1, the Company's finance function in which he served and where he saw the increase in marketing spend senior executives had implemented to stop the material decline, created all MAU reports. All such reports distributed daily, automatically by email, to the most senior Company executives, including Defendants. That is, daily, Defendants received MAU reports

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-03930- BLF

automatically, including those that showed material decline in 2020, the Covid bump, and the serious and material deterioration of MAU starting in August 2020.

93.    The MAU reports after August 2020, FE 1 recalls, showed that the old users abandoned the Company's platform materially more frequently than the Company acquired new users.

94.    In addition to MAUs, according to FE 1, ContextLogic tracked in real time Gross Merchandise Value or GMV [5]—which included information of commissions earned for each transaction and the amount transacted on the platform—on GmB ("Google my Business", now "Google Business Profile").[6] ContextLogic's GMV historic data and forecast were live on Google Sheets and available in real time to Defendants Szulczekewski and Bahri. This provided Defendants with access to a daily report which were forwarded by automated email from Finance to the several people including CEO Szulczekewski and CFO Bahri. According to FE 1, the GMV data was materially deteriorating before the IPO and during the Class Period showing the continuous mateirla deterioration of the Wish platform's attractiveness to users.

95.    According to FE 1, the Company also maintained in real time a daily P&L statement on Google Sheets and on the Company's computer system, allowing recipients to comment on the data they reviewed regarding daily transactions. In addition to real time email receipt of daily MAU and GMV reports, according to FE 1, Defendants received and had real time access to the daily P&L statement, with comments, in addition to Excel files containing the Company's monthly forecasts of relevant operational and financial metrics.

96.    Defendants Szulczekewski, Bahri and other senior Company executives, according to FE 1, knew about the material decline in active user growth since August 2021. Indeed, Defendant Szulczekewski, himself, led efforts to increase marketing spend attempting to reverse the materially deteriorating MAU of which he was aware. The MAU data's rapid variability forced Defendants Szulczekewski, Bahri, and Head of Financial Planning and Analysis Oliver to review and to track

---

[5] According to Investopedia, Gross merchandise value is the total value of merchandise sold over a given period of time through a customer-to-customer (C2C) exchange site. It is a measure of the growth of the business or use of the site to sell merchandise owned by others.
[6] According to Google, Google Business Profile is an easy-to-use tool for businesses and organizations to manage their online presence across Google.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-03930- BLF

MAU data and other data on the Google Sheets at least daily. All engaged in daily discussions, FE 1 recalls, about MAU and other data, in particular after Defendants determined to take the Company public when the Company's valuation depended on that data.

97.     In the months, weeks, and days leading up to the IPO, FE 1 recalls, the Finance department was alarmed with the materially deteriorating MAU data, leading many, including FE 1, to question whether the IPO was appropriate. Indeed, to hide the cracks in the Company's foundation in advance of the IPO, FE 1 recalls that Defendants knew of the material deterioration but relied on the lag time between the data that the Company was required to disclose at the time of the IPO and what Defendants already knew internally but chose not to disclose in support of the IPO. Defendants, FE 1 recalls, chose to disclose stale, inaccurate MAU data, knowing that they would have to disclose the material adverse MAU data only after the IPO.

98.     Among the issues, according to FE 1, causing MAU to deteriorate materially was "Time to Door" or how quickly users received products they ordered.  Defendants were aware, according to FE 1, that for a material number of users, time to door was poor and that it and other bad user experiences were causing the MAU deterioration both before and after the Covid-bump.

99.     Former Employee 2 ("FE 2") was a Senior Treasury and Payment Service Manager at ContextLogic from November 2017 until November 2021. FE 2 reported directly to Walter Boileau, VP and Treasurer. Boileau reported directly to Defendant Bahri. In addition to other basic treasury functions, FE 2 oversaw the Company's bank accounts, managing incoming cash. FE 2 confirms that while the Engineers and Data Team actively managed the MAU data, it forwarded that data in real time to the Finance. According to FE2, FE 1 was in the best position to know generally and specifically about MAU data as the Finance function published that data in real time to Defendants and the Company's senior executives.

100.    FE 2 also corroborates that "Time to Door" was slow and an issue confronting senior executives in the context of deteriorating MAU because it was out of ContextLogic's control.

101.    Former Employee 3 ("FE 3" worked at ContextLogic from November 2017 to May 2022.

102.     Former Employee 3 ("FE 3") worked at ContextLogic as a Senior Data Analyst from November 2017 to May 2019. In this role he built fraud detection models to identify fraudulent transactions prior to the product's shipment and reported to Tab Stang, Senior Data Science Manager. From May 2019 to January 2021, FE 3 worked as a Senior Data Scientist and studied anomalies to identify business functions behaving badly or irregularly. In this role he combed through data to identify suspicious atypical orders and provided suggestions to combat fraudulent activities. In this role FE 3 reported to Pai Lu, Chief Data Officer. From January 2021 to March 2022, FE 3 was a Data Science Manager. From March 2022 to May 2022, he was promoted to be a Senior Data Science Manager and worked closely with the analytics teams in support of the Product Team.  FE 3 has a PhD degree in Economics and has studied data science and mathematics. FE 3 is qualified to conduct MAU forecasting. FE 3 worked at the ContextLogic headquarters in San Francisco. During his entire tenure at ContextLogic, to perform his analytical work, FE 3 had real time access to the MAU data that he understood as well or better than any other Company employee.

103.     Corroborating FE 1, according to FE 3, the MAU bump occurred during April or May of 2020 but disappeared quickly, decreasing to about 60 million by August and September 2020. After the initial Covid bump, customer retention was also at its lowest.

104.     FE 3 states that in January, February and March 2021 the MAU numbers continued declining. The declining MAUs became so severe in April of 2021 that ContextLogic tried to figure out what caused the decline by scrutinizing the data from several angles.

105.     FE 3 confirms that the Company was aggressive on "Time to Door" estimates leading up to the IPO. According to FE 3, Defendants sought to entice customers by aggressively touting "Time to Door" estimates when longer horizon estimates showed "Time to Door" as one of several issues causing loss of platform users. According to FE 3, this fit Defendants' pattern of both sacrificing long-term customer loyalty for short term profit and, in turn, shortening windows to present more robust numbers to investors.

106.     Former Employee ("FE 4") is a former Product Manager at ContextLogic from December 2020 to September 2021. FE 4 reported directly to Alex Swan, Manager of Product Management.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-03930- BLF

Swan reported to Will Young, Director of Product Management. In his position FE 4 was responsible for customer support. FE 4 owned product strategy related to "Wish Assistant" and worked closely with Data Science and Engineering. Specifically, FE 4 built tech statistics related to customer feedback.

107.    According to FE 4, he had access to MAU data because he used MAU to build his Product Requirement Documents (PRD). FE 4 recalls that during his tenure, MAU was in a decline and was a major concern of senior management. The problem was acute as Facebook threatened to terminate ContextLogic's advertisement due to the decline in both MAU and new users. Facebook runs an aggregate with a bottom-line value and was concerned with ContextLogic's many disappointing metrics, such as shipping and delivery. According to FE 4, when the aggregate dips, it demonstrates low confidence in the platform.

108.    Corroborating FE 4, FE 3 recalls that Facebook sent a customer satisfaction survey every time someone bought a product off of ContextLogic via the ContextLogic ads on Facebook. These surveys showed user dissatisfaction. As a direct result, according to FE3 Facebook restricted ContextLogic's advertising.

109.    FE 4 corroborates FE 1, that "Time to Door" was always an issue at ContextLogic. The Company tested its customers' expectations by telling them their products would come in (x) number of days to see what their reactions would be.

**ContextLogic Manipulated the Financial and Operation Data in the Registration Statement.**

110.    In addition to manipulating user data like MAU, according to FE 1, in advance of and just after the IPO, Defendant Bahri tailored financial data to inflate artificially and materially the Company's outlook. FE 1, for example, gathered cost inputs and then produced a forecast based on the latest trends. When the historical data trended down, conflicting with the positive message Defendants sought to project publicly, Defendant Bahri overrode the numbers. The Company's forecasts, FE 1 recalls were not based on actual trends as Defendants adjusted them to fit their narrative of "massive growth." Indeed, according to FE 1, Defendant Bahri adjusted key drivers for the forecast to improve ContextLogic's financial outlook in advance of and just after the IPO. In

addition, FE 1 recalls, Defendant Bahri enlisted Oliver, Head of Financial Planning and Analysis, to manipulate metrics to assist him in artificially and materially inflating the Company's outlook. This was common knowledge to employees in the Company's finance function.

111.    According to FE 1, after the IPO, Defendants spent material sums on expenses that hardly related to the Company's operations. For example, Defendant Bahri authorized spending $200,000 monthly on a party house rental in Los Angeles, CA that employees and other called the WISH Party House at which the Company threw several parties.

**Defendants Failed to Disclose the Advertising Decrease and Its Attendant Material Uncertainty.**

112.    At the time of the IPO, only 15 calendar days remained before the close of the fourth quarter, 2021. In that quarter, Defendants caused the Company materially to reduce advertising in India, Brazil, the Philippines and other emerging market countries outside of Europe and North America. Later, the Company attributed a 10% YoY MAU decline during the fourth quarter to their reducing advertising in those locations.

113.    Despite Defendants' knowledge of the link between the decease of advertising and customer acquisition, however, in the Registration Statement, Defendants failed to disclose that the Company pulled back advertising in those regions and the attendant material uncertainty caused by such decrease on ContextLogic's operations.

114.    According to FE 1, advertising spend is a daily conversation for Szulczekewski; Szulczekewski managed those communications over Slack,[7] and he was aware of any and all issues. Defendant Szulczekewski, FE 1 recalls, led all efforts to boost MAU through advertising spend. Defendant Bahri worked closely with Defendant Szulczekewski on advertising spend.  According to FE 1, Defendant Szulczekewski knew what customer acquisition cost ("CAC") calculations they used and any spikes in CAC caught his immediate attention.

115.    Corroborating FE 1, FE 3 confirms that Szulczekewski was very hands on with the Advertising Team and had knowledge of the positive correlation between the ads spend and the MAU numbers. FE 3 confirms that in the first half of 2019, to increase the margins, the Company

---

[7] Slack is a messaging program designed specifically for the office.

1  materially reduced advertising and showed profits, whereas in second half of 2019, ContextLogic

2  aggressively put advertisement back up, leading to the MAU increase.

3  **ContextLogic Failed to Maintain Effective Internal Controls**.

4  116.    As stated above, as a public company, ContextLogic is required to maintain the effectiveness

5  of its internal control. In March 2022, however, the Company disclosed for the first time that during

6  the preparation and the audit of the Company's consolidated financial statements for the year ended

7  December 31, 2021, the management and the company's independent registered public accounting

8  firm identified two material weaknesses in the company's internal controls over financial reporting:

9  i) the company did not design and maintain effective controls over information technology general

10  controls and ii) the company did not fully implement components of the COSO framework. As

11  explained below, the Company later disclosed more details of these material weaknesses.

12  117.    According to FE 1, material internal control deficiencies were serious, something about

13  which he repeatedly warned Oliver and Brent Just. For example, when the Company determined to

14  fulfill customer orders itself through its "Fulfillment by Wish" program,[8] it required the Company

15  to carry inventory. According to FE 1, however, ContextLogic maintained no entry management

16  system, forcing it to count inventory items by hand. Indeed, FE 1 recalls, the Finance function did

17  not have an assigned Data Manager. This disabled the Company from reconciling inventory data.

18  At the time, the Data Analyst for the Finance department, Wanmeng ("Emma") Ren, left

19  ContextLogic in September 2019, leaving the Finance with no support and forcing Finance to share

20  a Data Analyst with Accounting. FE 1 alerted the Finance management team, but they failed to hire

21  their own analyst.

22  118.    FE 3 recalls the chaotic budget control of the Finance department and the lack of oversight

23  over the Advertising Team's spending. When the Finance function established the budget for the

24  Advertising Team, Finance only "accounted for new user costs," ignorant that 40-50 percent of the

25

26  _____

[8] Before the IPO, ContextLogic altered its asset-light business model of holding no inventory of its
27  own to establishing its own inventory at its warehouse partners via several shipping logistics
programs such as Fulfillment by Wish and Fulfillment by Store programs with an attempt to
28  facilitate shipping of merchandise.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-03930- BLF

advertisement budget was to re-engage a previous user. FE 3 corroborates that the Advertising Team was spending its allotted budget with no questions asked and this was the major miscommunication, which ultimately was Bahri' and Szulczekewski's responsibility.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE REGISTRATION STATEMENT[9]

119.    The Registration Statement failed to disclose, pursuant to Items 105 and 303, that in third quarter of 2020 and the fourth quarter of 2020 in which ContextLogic conducted its IPO when there were only 15 calendar days left before the close of the quarter, the Company had been experiencing a material decline of MAUs, which was reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition and also had rendered investment in the ContextLogic shares risky.

120.    The Registration Statement also failed to disclose, pursuant to Items 105 and 303, that in the fourth quarter of 2020 in which ContextLogic conducted its IPO when there were only 15 calendar days left before the close of the quarter, the Company had pulled back advertising in India, Brazil, the Philippines and other emerging market countries outside of Europe and North America, which was reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition and also had rendered investment in the ContextLogic shares risky.

121.    The Registration Statement also failed to disclose that Defendants manipulated the financial data of the financial statements in the Registration Statement, rendering the financial data materially false and misleading and should not be relied on by the investing public.

122.    Additionally, the Registration Statement states, in the relevant part, that

> The following are key elements of our financial model that drive our growth:
> **Increase the scale and growth of our user and buyer base.**   Attracting and engaging users have been our key areas of focus since our founding. We measure our effectiveness in attracting and engaging users through metrics such as our MAUs, which increased over 33% from the nine months ended September 30, 2019

---

[9] Plaintiffs specifically disclaim any allegation of fraud, recklessness or intentional misconduct concerning allegations under Securities Act.

and to the nine months ended September 30, 2020, as well as the average minutes spent per visit by user. ***These increases have primarily been driven by the growing popularity and recognition of our brand and platform, the user preferences for our differentiated mobile shopping experience, wide selection of attractively priced products, and the success of our promotional and marketing campaigns.*** This growth has contributed to making Wish the most downloaded global shopping app for each of the last three years according to a report from Sensor Tower.[17] As a result, we have experienced significant revenue growth in recent periods. We will need to continue to invest in our marketing efforts to attract additional users and buyers and to enhance our brand and drive user engagement, and over time we will need to do this cost-effectively in order to achieve profitability.

123.    These statements were materially false and misleading because Defendants failed to disclose that the significant increase of MAUs from the nine months ended September 30, 2019 and to the nine months ended September 30, 2020 was primarily caused by the irregular increase of visits to ContextLogic's platform during the Covid and was not sustainable; in third quarter of 2020 and the fourth quarter of 2020 leading up to the IPO, the Company had been experiencing a material decline of MAUs with the transitory Covid phenomenon wearing off. Defendants failed to disclose that as a result, the revenue for the third and fourth quarters of 2020 was also declining.

124.    The Registration Statement states, in the relevant part, that "***Our quarterly and annual operating results may fluctuate, which could cause our stock price to decline.***" The Registration Statement listed, among other things, the following factors that could cause the Company's ***quarterly and annual operating results may fluctuate: "our user acquisition strategies"; "traffic on our platform" and "continued impact from COVID-19, including the effects of increased online activity and government stimulus programs"***. These statements were materially false and misleading because Defendants failed to disclose that the significant increase of MAUs in nine months ended September 30, 2020 was primarily caused by the irregular increase of visits to ContextLogic's platform during the Covid and was not sustainable; in third quarter of 2020 and the fourth quarter of 2020 leading up to the IPO, the effects of increased online activities as a result of the Covid had discontinued. Defendants failed to disclose that as a result, in third quarter of 2020 and the fourth quarter of 2020, the Company had been experiencing a material decline of MAUs and revenue.

125.    The Registration Statement states, in the relevant part, that

Revenue from New Buyers and Existing Buyers

> Our success also depends on our ability to increase engagement from existing buyers while simultaneously attracting and engaging new buyers. Therefore, we focus on increasing revenue from both new and existing buyers. ***If we are unable to increase engagement and revenue from existing buyers and attract new buyers to our platform, our revenue and results of operations will be negatively impacted.***
>
> We have been able to consistently grow revenue from both new and existing buyers. While we continue to acquire new buyers, the share of revenue from existing buyers has also increased over time, indicating our ability to improve engagement and monetization of existing buyers. Existing buyers generated 69% of revenue in the last twelve months ("LTM") ended September 30, 2020, up from 57% in the last twelve months ended March 31, 2017. The figures below represent our revenue from new and existing buyers for the last twelve months ended March 31, 2017, March 31, 2018, March 31, 2019, and September 30, 2020. However, ***these positive trends in revenue from new buyers and existing buyers may not continue and may be negatively impacted by our inability to continue to increase engagement from existing buyers and attract and engage new buyers.***

126.    These statements were materially false and misleading because Defendants failed to disclose that in the third and fourth quarter of 2020 leading up to the IPO, the existing users abandoned the Company's platform materially faster than the Company acquired new users, causing the total number of the buyers on ContextLogic's platform to have declined; the risk of inability to increase engagement and revenue from existing buyers and attract new buyers to the Wish platform had occurred and the Company's revenue and results of operations had been negatively impacted.

127.    The Registration Statement states, in the relevant part, that

> ***Our management will be required to evaluate the effectiveness of our internal control over financial reporting. If we are unable to maintain effective internal control over financial reporting, investors may lose confidence in the accuracy of our financial reports.***
> As a public company, we will be required to maintain internal control over financial reporting and to report any material weaknesses in such internal control. Section 404 of the Sarbanes-Oxley Act requires that we evaluate and determine the effectiveness of our internal control over financial reporting. Additionally, our auditor will be required to deliver an attestation report on the effectiveness of our disclosure controls and internal control over financial reporting starting with the second annual report that we file with the SEC after the completion of this offering.

28

128.     These statements were materially false and misleading because Defendants failed to disclose that at the time of the IPO, there were two material weaknesses in the company's internal controls over financial reporting: i) the company did not design and maintain effective controls over information technology general controls and ii) the company did not fully implement components of the COSO framework. **First**, the Company did not design and maintain effective controls over information technology general controls ("ITGCs") for information systems and applications that are relevant to the preparation of the consolidated financial statements. Specifically, the Company did not design and maintain: (i) sufficient user access controls to ensure appropriate segregation of duties and adequately restrict user and privileged access to financial applications, programs and data to appropriate Company personnel; (ii) program change management controls to ensure that information technology program and data changes affecting financial information technology applications and underlying accounting records are identified, tested, authorized and implemented appropriately; and (iii) computer operations controls to ensure that critical batch and interface jobs are monitored, privileges are appropriately granted, and data backups are authorized and monitored. Business process controls (automated and manual) that are dependent on the ineffective ITGCs, or that rely on data produced from systems impacted by the ineffective ITGCs, are also deemed ineffective.  **Second**, the Company did not fully implement components of the COSO framework, including elements of the control environment, information and communication, control activities and monitoring activities components, relating to: (i) providing sufficient management oversight and ownership over the internal control evaluation process; (ii) hiring and training sufficient competent personnel to support the Company's internal control objectives; (iii) performing timely monitoring to ascertain whether the components of internal control are present and functioning effectively; (iv) communicating deficiencies in a timely manner to those parties responsible for taking corrective action; and (v) retaining sufficient documentation of control activities and evidence supporting the operating effectiveness of the controls. As such, management concluded that it did not have an adequate process in place to complete its assessment of the design and

operating effectiveness of internal control over financial reporting in a timely manner. The details of the material weakness are explained below.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

**Registration Statement**

129.    Plaintiffs repeat and reallege each and every allegation set forth in ¶¶ 118-127 regarding the materially misleading statements and omission concerning the Registration Statement as if fully set forth herein.

**4Q20 And FY20 Financial Results on Form 8-K**

130.    On March 8, 2021, ContextLogic reported its 4Q20 and FY20 financial results for the period ended December 31, 2020, disclosing that, in the fourth quarter of 2020, its "MAUs declined 10% YoY during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America where Wish temporarily de-emphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year."

131.    These statements were materially false and misleading because Defendants failed to disclose that the MAUs in the fourth quarter of 2020 declined not only in some emerging markets outside of Europe and North America but also, according to FE 1, in the US and Europe.

132.    According to FE 1 the MAU decline in 4Q2020 did not result from decreased ads and customer acquisition in countries outside Europe and North America.  Rather than decreased ads attracting fewer new consumers, MAU declined because materially fewer customers returned to the platform. In turn, the flight of existing users from the platform, according to FE 1, caused the Company to reduce advertising. ContextLogic's losing existing users faster than it gained new users, FE 1 recalls, rendered advertising to acquire new users irrelevant.

133.    The Form 8-K also disclosed the Company's outlook for the first quarter of 2021 as follows:

|  | Three Months Ending March 31, 2021 |
|---|---|
| Revenue | $735    to    $750 |

| | | | |
|---|---|---|---|
| % Growth YoY | 67% | to | 70% |
| Adjusted EBITDA* | ($85) | to | ($80) |
| % of Revenue | (12)% | to | (11)% |

134.     These statements were materially false and misleading because Defendants failed to disclose that these numbers were unattainable. Rather, the Company manipulated these key drivers for the forecast to make the data look better and to show how the Company was going to get where they needed to be. According to FE 1, based on the real time data Defendants automatically received and on which they focused, they knew that these numbers were unattainable.

**Earnings Call for 4Q20 And FY20 Financial Results**

135.     At the Earnings Call for 4Q20 And FY20 Financial Results held on March 8, 2021, Bahri stated that "During the holiday season, we decided to de-emphasize customer acquisition in some emerging markets outside of Europe and North America where we faced logistical challenges due to the pandemic that resulted in unfavorable unit economics and a customer experience that did not meet our standards. This decision led to an MAU decline of 10% year over year in Q4."

136.     These statements were materially false and misleading because Defendants failed to disclose that the MAUs in the fourth quarter of 2020 declined not only in some emerging markets outside of Europe and North America but also, according to FE 1, in the US and Europe.

137.     According to FE 1 the MAU decline in 4Q2020 did not result from decreased ads and customer acquisition in countries outside Europe and North America.  Rather than decreased ads attracting fewer new consumers, MAU declined because materially fewer customers returned to the platform. In turn, the flight of existing users from the platform, according to FE 1, caused the Company to reduce advertising. ContextLogic's losing existing users faster than it gained new users, FE 1 recalls, rendered advertising to acquire new users irrelevant.

138.     At the Earnings Call, Bahri also stated that "For the first quarter of 2021, we expect revenue in the range of $735 million to $750 million, or a 67% to 70% year over year increase."

139.     These statements were materially false and misleading because Defendants failed to disclose that these numbers were unattainable. Rather, the Company manipulated these key drivers for the

forecast to make the data look better and to show how the Company was going to get where they needed to be. According to FE 1, based on the real time data Defendants automatically received and on which they focused, they knew that these numbers were unattainable.

140. At the earnings call, Bahri was asked to provide more details for "the pullback that you did on advertising and customer acquisition in some of those emerging markets and how we should think about the timing as you bring that back on". In response, Bahri stated that

> the countries like – these emerging markets, the days to delivery was significantly large and we just felt it's not right to invest in these businesses if the consumers churn, what's the point of investing. So maybe much all of the decline was driven by countries like India, Philippines, Colombia, some Brazil all those countries wherever be it. Now, what we're seeing is that Wish Local works very well in these markets like in Mexico, 25% of the orders are Wish Local. And also the logistics are now running fairly normal. In those countries they're back to historical low level. So we would expect that in the next three to six months, we expect to again engage with these markets and get those MAUs back.

141. These statements were materially false and misleading because Defendants failed to disclose that the MAUs in 4Q2020 declined not only in some emerging markets outside of Europe and North America but also, according to FE 1, in the US and Europe. These statements were materially false and misleading also because Defendants failed to disclose that the MAUs in the emerging markets would not improve because ContextLogic cannot retain customers and older users abandoned the platform faster than the Company acquired new users. These statements were materially false and misleading also because at the time the earnings call was held, the majority of the first quarter of 2021 had passed and Defendant knew the MAUs for the first quarter had not improved based on the data available to them in real time.

142. At the earnings call, Szulczewski stated that

> We continued to innovate and launch new products and features that further enhance the consumer experience on the Wish platform, including a daily sweepstakes to reward and engage loyal customers, translation of product information to more than 40 languages, improved time to door estimates, and live chat support.

143. This statement was materially false and misleading because Defendants failed to disclose that the Company's "Time to Door" performance was very poor but the Company was unable to

1    improve it. The time to door problem, combined with other problems, had caused the platform users

2    to have abandoned the platform and the MAUs and active buyers to have materially declined.

3    **The 2020 Annual Report on Form 10-K**

4    144.   On March 24, 2020, ContextLogic filed its 2020 Annual Report for the fiscal year ended

5    December 31, 2020 on Form 10-K ("2020 10-K"). The 2020 10-K was signed by the Individual

6    Defendants. Attached to the 2020 10-K were certifications pursuant to pursuant to Rule 13a-

7    14(a) under the Securities Exchange act as adopted pursuant to SOX Section 302 and pursuant to

8    SOX Section 906 signed by Defendants Szulczewski and Bahri attesting to the accuracy of financial

9    reporting, the disclosure of any material changes to the Company's internal control over financial

10   reporting, and the disclosure of all fraud.

11   145.   The 2020 10-K failed to disclose, pursuant to Items 105 and 303, that in the first quarter of

12   2021 in which ContextLogic issued the 2020 10-K when there were only 15 calendar days left before

13   the close of the quarter, the Company had been experiencing a material decline of MAUs, which

14   was reasonably likely to cause reported financial information not to be necessarily indicative of

15   future operating results or of future financial condition and also had rendered investment in the

16   ContextLogic shares risky.

17   146.   The 2020 10-K also failed to disclose that Defendants manipulated the financial data of the

18   financial statements in the Registration Statement, rendering the financial data materially false and

19   misleading and should not be relied on by the investing public.

20   147.   Additionally, the 2020 10-K states, in the relevant part, that

21   **Increase the scale and growth of our user and buyer base.** Attracting and
     engaging users have been our key areas of focus since our founding. We measure
22   our effectiveness in attracting and engaging users through metrics such as our
     MAUs, which increased over 19% from the year ended December 31, 2019 to the
23   year ended December 31, 2020. **This increase has primarily been driven by the
     growing popularity and recognition of our brand and platform, the user
24   preferences for our differentiated mobile shopping experience, wide selection
     of attractively priced products, and the success of our promotional and
25   marketing campaigns.** As a result, we have experienced significant revenue
     growth in recent periods. We will need to continue to invest in our marketing efforts
26   to attract additional users and buyers and to enhance our brand and drive user

27

28                                              33

engagement, and over time we will need to do this cost-effectively in order to achieve profitability.

148. These statements were materially false and misleading because Defendants failed to disclose that the significant increase of MAUs in 2020 was primarily caused by the irregular increase of visits to ContextLogic's platform during the Covid and was not sustainable; in the third and fourth quarters of 2020 and the first quarter of 2021, the Company had been experiencing a material decline of MAUs with the Covid phenomenon wearing off. These statements were materially false and misleading also because Defendants failed to disclose that as a result, the revenue was also declining.

149. The 2020 10-K states, in the relevant part, that "*Our quarterly and annual operating results may fluctuate, which could cause our stock price to decline.*" The 2020 10-K listed, among other things, the following factors that could cause the Company's *results may fluctuate: "our user acquisition strategies"; "traffic on our platform" and "continued impact from COVID-19, including the effects of increased online activity and government stimulus programs"*. These statements were materially false and misleading because Defendants failed to disclose that the significant increase of MAUs in 2020 was primarily caused by the irregular increase of visits to ContextLogic's platform during the Covid and was not sustainable; in the third and fourth quarters of 2020 and the first quarter of 2021, the effects of increased online activities as a result of the Covid had discontinued. . Defendants failed to disclose that as a result, , in the first quarter of 2021, the Company had been experiencing a material decline of MAUs and the revenue was declining.

150. The 2020 10-K also states that

We benefited from greater mobile usage and less competition from physical retail as a result of shelter-in-place mandates. We also benefited from increased user spending due to U.S. government stimulus programs. While an additional stimulus program has been approved, such additional stimulus programs may not increase user spending on our platform and we cannot be certain additional stimulus programs will be offered, which may adversely affect user spending. Further, we cannot assure you that increased levels of mobile commerce will continue when COVID-19 has subsided or otherwise, or that the U.S. government will offer additional stimulus programs.

151.    These statements were materially false and misleading because Defendants failed to disclose that the irregular increase of visits and spending on ContextLogic's platform as a result of the Covid had discontinued and the Company's revenue and results of operations had been negatively impacted as a result.

152.    The 2020 10-K states, in the relevant part, that

> **Revenue from New Buyers and Existing Buyers**
> Our success also depends on our ability to increase engagement from existing buyers while simultaneously attracting and engaging new buyers. Therefore, we focus on increasing revenue from both new and existing buyers. **If we are unable to increase engagement and revenue from existing buyers and attract new buyers to our platform, our revenue and results of operations will be negatively impacted.**
> We have been able to consistently grow revenue from both new and existing buyers. While we continue to acquire new buyers, the share of revenue from existing buyers has also increased over time, indicating our ability to improve engagement and monetization of existing buyers. **However, these positive trends in revenue from new buyers and existing buyers may not continue and may be negatively impacted by our inability to continue to increase engagement from existing buyers and attract and engage new buyers.**

153.    These statements were materially false and misleading because Defendants failed to disclose that at the time the 2020 10-K was filed, the existing users abandoned the Company's platform materially faster than the Company acquired new users, causing the total number of the buyers on ContextLogic's platform to have declined; the risk of inability to increase engagement and revenue from existing buyers and attract new buyers to our platform had occurred and the Company's revenue and results of operations had been negatively impacted.

154.    The 2020 10-K was materially false and misleading also because Defendants failed to disclose that there were two material weaknesses in the Company's internal controls over financial reporting: i) the company did not design and maintain effective controls over information technology general controls and ii) the company did not fully implement components of the COSO framework. **First**, the Company did not design and maintain effective controls over information technology general controls ("ITGCs") for information systems and applications that are relevant to the preparation of the consolidated financial statements. Specifically, the Company did not design and maintain: (i) sufficient user access controls to ensure appropriate segregation of duties and

adequately restrict user and privileged access to financial applications, programs and data to appropriate Company personnel; (ii) program change management controls to ensure that information technology program and data changes affecting financial information technology applications and underlying accounting records are identified, tested, authorized and implemented appropriately; and (iii) computer operations controls to ensure that critical batch and interface jobs are monitored, privileges are appropriately granted, and data backups are authorized and monitored. Business process controls (automated and manual) that are dependent on the ineffective ITGCs, or that rely on data produced from systems impacted by the ineffective ITGCs, are also deemed ineffective. **Second**, the Company did not fully implement components of the COSO framework, including elements of the control environment, information and communication, control activities and monitoring activities components, relating to: (i) providing sufficient management oversight and ownership over the internal control evaluation process; (ii) hiring and training sufficient competent personnel to support the Company's internal control objectives; (iii) performing timely monitoring to ascertain whether the components of internal control are present and functioning effectively; (iv) communicating deficiencies in a timely manner to those parties responsible for taking corrective action; and (v) retaining sufficient documentation of control activities and evidence supporting the operating effectiveness of the controls. As such, management concluded that it did not have an adequate process in place to complete its assessment of the design and operating effectiveness of internal control over financial reporting in a timely manner. The details of the material weakness are explained below.

## INSIDER TRADES

155.   Based on Form 4s "Statement of Changes in Beneficial Ownership" that the ContextLogic insiders have filed with the SEC , the ContextLogic insiders, including Szulczekewski and Bahri, sold off massive amounts of their ContextLogic holdings during the Class Period, raking in nearly $150 million for themselves. A summary of these trades is as follows:

| Name | Position | Shares Sold during the Class Period | Dollar Amount Pocketed | Total Number of Sales During the Class Period |
|---|---|---|---|---|
| Piotr Szulczewski | Founder, CEO, and Director | 5,373,615 | $105,597,641.71 | 7 |
| Rajat Bahri | CFO | 1,743,637 | $33,931,549.70 | 10 |
| Peiyen Chuang | Vice President of Operations | 80,784 | $1,580,431.97 | 7 |
| Brett Just | Chief Accounting Officer | 46,901 | $921,406.67 | 8 |
| Pai Liu | Vice President of Data Science | 17,626 | $346,371.34 | 7 |
| Devang Shah | Secretary and General Counsel | 364,949 | $6,889,247.68 | 9 |

156.    Additionally, based on a Form 144 that Plaintiffs have obtained from Bloomberg Terminal, Peiyen Chuang sold additional 46,000 ContextLogic shares for $803,232.01 on March 11, 2021 but did not disclose this transaction in a Form 4. [10]

### THE TRUTH BEGAN TO EMERGE

157.    On March 8, 2021, ContextLogic reported its 4Q20 and FY20 financial results for the period ended December 31, 2020, disclosing that, in the fourth quarter of 2020, its "MAUs declined 10% YoY during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America where Wish temporarily de-emphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year."

---

[10] According to Sections 16(a) and 23(a) of the Securities Exchange Act, an insider must file a Form 4 whenever there is a material change in the holdings of company insiders. Insiders consist of directors and officers of the company, as well as any shareholders, owning 10% or more of the company's outstanding stock. It must be filed within two business days starting from the end of the day the material transaction occurred. Peiyen Chuang's failure to promptly disclose this trade has violated the Securities Exchange Act and materially misinformed investors of the true nature and the magnitude of the insider trades.

37

158.    The media was quick to analyze the Company's announcement. In "Wish Revenue Beats Estimates, Worries Linger About Growth," published on *Bloomberg on March 8, 2021,* the author observed that "Discount online retailer Wish gave a revenue forecast for the current quarter that beat analyst estimates" and "The shares jumped as much as 10% in extended trading after the results were released, but gave most of those gains back as investors focused on the decline in the website's users."

159.    On May 12, 2021, ContextLogic announced its 1Q21 financial results for the interim period ended March 31, 2021 and filed a Form 10-Q for the quarterly period ended March 31, 2021. Again, ContextLogic's MAUs declined, this time by an additional 7% to just 101 million. The Company's forward sales guidance also fell short, with its 2Q21 revenue guidance of just $715 million to $730 million coming in significantly below the guidance of $735 to $750 million provided for 1Q21.

160.    On this news, ContextLogic's stock cratered more than 29%, falling from $11.47per share on May 12, 2021 to close at $8.11 per share on May 13, 2021.

**EVENTS AFTER THE IPO**

161.    At the time when this case was filed, the ContextLogic stock price had fell by 64%, significantly damaging investors.

162.    On June 30, 2021, ContextLogic announced that Bahri has notified the Board of Directors that he plans to resign from his position effective July 23, 2021. Chief Accounting Officer Brett Just and Director of FP&A Jennifer Oliver will serve as interim co-CFOs while the Company was searching for Bahri's successor. FE2 states that Bahri left ContextLogic abruptly and it was surprising to see him leave so close to the time of the IPO. FE 2 explains that "most CFOs will stay on after going public, but Bahri was gone." FE 2 states that there was no transition in place for his departure.

163.    On July 12, 2021, ContextLogic announced the appointment of Farhang Kassaei, former Senior Director at Google, to the newly created position of Chief Technology Officer.

164.    On August 02, 2021, ContextLogic announced the appointment of Tarun Jain, former product leader from Google, to the newly created position of Chief Product Officer.

165.   On October 28, 2021, ContextLogic announced the appointment of Vivian Li, former Shutterfly CFO, as the Company's CFO effective November 10, 2021.

166.   On November 10, 2021, ContextLogic Inc. announced that Szulczewski would step down as the CEO when a new CEO was appointed or no later than February 1, 2022.

167.   On January 31, 2022, ContextLogic announced the appointment of Vijay Talwar, former CEO of Foot Locker's Europe, Middle East & Africa, as the CEO and a member of the Company's Board of Directors, effective February 1, 2022.

168.   On March 1, 2022, in its announcement of the financial results for the quarter and fiscal year ended December 31, 2021, ContextLogic disclosed for the first time that

> During the preparation and the audit of the company's consolidated financial statements for the year ended December 31, 2021, management and the company's independent registered public accounting firm identified two material weaknesses in the company's internal controls over financial reporting: i) the company did not design and maintain effective controls over information technology general controls and ii) the company did not fully implement components of the COSO framework. The management team is developing a remediation plan. We will further address and explain these two material weaknesses in our 10-K filing.

169.   On the same day, ContextLogic also disclosed that it was unable to file its Annual Report for the year ended December 31, 2021 by the March 1, 2022 filing deadline because "The Company has identified material weaknesses and is still in the process of compiling required information to complete the Form 10-K and to allow time for its independent registered public accounting firm to complete its audits of the financial statements and internal control over financial reporting, and expects to file the Form 10-K within the grace period prescribed by Rule 12b-25."

170.   On March 14, 2022, the Company filed its Annual Report for the year ended December 31, 2021 on Form 10-K, disclosing more details of the identified material weaknesses. In the relevant part, Form 10-K states:

**Evaluation of Disclosure Controls and Procedures**

> Our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) under the Exchange Act are designed to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and to ensure that information required to be disclosed is

accumulated and communicated to management, including our principal executive and financial officers, to allow timely decisions regarding disclosure. Our Chief Executive Officer and Chief Financial Officer, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of December 31, 2021, and, based on their evaluation, have concluded that the disclosure controls and procedures were not effective as of such date due to material weaknesses in internal control over financial reporting, described below.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining an adequate system of internal control over financial reporting and for the assessment of the effectiveness of internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP and includes those policies and procedures that: (1) pertain to the maintenance of records that accurately and fairly reflect our transactions and the dispositions of our assets; (2) provide reasonable assurance that our transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP and that our receipts and expenditures are being made only in accordance with appropriate authorizations; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Our management, under the supervision of and with the participation of the Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of our internal control over financial reporting as of December 31, 2021. In making this assessment, management used the criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) ("the COSO criteria").

Based on our assessment under the COSO criteria, management concluded that our system of internal control over financial reporting was not effective due to the material weaknesses described below. However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures we performed to ensure that our consolidated financial statements included in this Annual Report on Form 10-K were prepared in accordance with U.S. generally accepted accounting principles ("GAAP"), our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with GAAP.

**A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that**

**a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified:**

- The Company did not design and maintain effective controls over information technology general controls ("ITGCs") for information systems and applications that are relevant to the preparation of the consolidated financial statements. Specifically, the Company did not design and maintain: (i) sufficient user access controls to ensure appropriate segregation of duties and adequately restrict user and privileged access to financial applications, programs and data to appropriate Company personnel; (ii) program change management controls to ensure that information technology ("IT") program and data changes affecting financial information technology applications and underlying accounting records are identified, tested, authorized and implemented appropriately; and (iii) computer operations controls to ensure that critical batch and interface jobs are monitored, privileges are appropriately granted, and data backups are authorized and monitored. Business process controls (automated and manual) that are dependent on the ineffective ITGCs, or that rely on data produced from systems impacted by the ineffective ITGCs, are also deemed ineffective.

- The Company did not fully implement components of the COSO framework, including elements of the control environment, information and communication, control activities and monitoring activities components, relating to: (i) providing sufficient management oversight and ownership over the internal control evaluation process; (ii) hiring and training sufficient competent personnel to support the Company's internal control objectives; (iii) performing timely monitoring to ascertain whether the components of internal control are present and functioning effectively; (iv) communicating deficiencies in a timely manner to those parties responsible for taking corrective action; and (v) retaining sufficient documentation of control activities and evidence supporting the operating effectiveness of the controls. As such, management concluded that it did not have an adequate process in place to complete its assessment of the design and operating effectiveness of internal control over financial reporting in a timely manner.

The Company's independent registered public accounting firm, Ernst & Young LLP, has audited the effectiveness of the Company's internal control over financial reporting as of December 31, 2021, and has expressed an adverse opinion, which appears in Part II, Item 8 of this Annual Report on Form 10-K.

**Management's Plan to Remediate the Material Weaknesses**

Our remediation efforts are ongoing and we will continue our initiatives to implement measures designed to ensure that control deficiencies contributing to the material weaknesses are remediated, such that these controls are designed, implemented, and operating effectively. Management is committed to making the necessary changes and improvements to its system of controls to address the material weaknesses in internal control over financial reporting described above.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-03930- BLF

**In 2021, the Company has added to its executive leadership team with individuals who have extensive backgrounds leading and operating in SOX-compliant companies: (i) Chief Financial Officer, who is also a CPA and experienced in U.S. GAAP financial reporting, (ii) Chief Technology Officer, with experience in SOX compliance within Fortune 100 companies, (iii) Chief Product Officer, with experience in SOX compliance within Fortune 100 companies, and (iv) six finance and accounting personnel ranging from staff accountants to a Senior Director who are all CPAs. Additionally, in 2022, the Company appointed a new Chief Executive Officer**, an experienced retail, ecommerce and consumer brand executive who has led significant digital and operational transformations within both established and rapidly growing public, multinational enterprises.  We believe that this leadership team has the experience and commitment necessary to oversee and lead the necessary steps needed to remediate the material weaknesses noted above.

We are committed to continuing to implement a strong system of controls and believe that our ongoing remediation efforts will result in significant improvements to our system of controls and that we believe will remediate the material weaknesses. However, material weaknesses are not considered remediated until the new controls have been operational for a period of time, are tested, and management concludes that these controls are operating effectively. This remediation process will require resources and time to implement. We will continue to monitor the effectiveness of these remediation measures, and we will make any changes to the design of this plan and take such other actions that we deem appropriate given the circumstances.

*** 

*We have identified material weaknesses in our internal control over financial reporting and may identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, which may result in material misstatements of our consolidated financial statements or cause us to fail to meet our periodic reporting obligations.*

During the preparation and the audit of our consolidated financial statements for the year ended December 31, 2021, we and our independent registered public accounting firm identified material weaknesses in our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. In addition, given our reliance on information technology ("IT") systems to synthesize both financial and nonfinancial information, any material weaknesses in our IT controls may result in errors in not only our consolidated financial statements but our nonfinancial metrics as well.

The material weaknesses that we identified occurred because (i) the processes and controls over our IT systems relevant to the preparation of our consolidated

financial statements were inadequate and (ii) the current processes in place were insufficient to allow us to complete the testing and assessment of the design and operating effectiveness of internal controls over financial reporting in a timely manner.

We cannot guarantee that our efforts will remediate these deficiencies in internal control over financial reporting or that additional material weaknesses in our internal control over financial reporting will not be identified in the future. Our failure to implement and maintain effective internal control over financial reporting could result in errors in our consolidated financial statements that could result in a restatement of our financial statements and could cause us to fail to meet our reporting obligations, any of which could diminish investor confidence and cause a decline in the price of our Class A common stock. See Item 9A. "Controls and Procedures" for further discussions of the identified material weaknesses.

171.     On April 14, 2022, the Company announced that on April 8, 2022, the Company dismissed Ernst & Young LLP ("EY") as the Company's independent registered public accounting firm, effective following the filing of the Company's 2022 Q1 Form 10-Q, and selected PwC as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022.

172.     Consistent with FE 1 and FE3's statements, since the departure of Bahri and Szulczekewski and appointments of new top executives, the financial results for the reporting periods after the IPO significantly declined. A summary of the MAUs and revenue is as follows:

|  | 1Q2021 | 2Q2021 | 3Q2021 | 4Q2021 | 1Q2022 |
|---|---|---|---|---|---|
| **MAU** | 101 | 90 | 60 | 45 | 27 |
| **Revenue** | $772 | $656 | $368 | $289 | $189 |

(In millions)

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

173.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the Class. Excluded from the Class are Defendants, the officers and directors of ContextLogic, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have

1    or had a controlling interest.

2    174.    The Class members are so numerous that joinder of all members is impracticable. While the

3    exact number of the Class members is unknown to Plaintiffs at this time and can only be ascertained

4    through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed

5    Class. Record owners and other members of the Class may be identified from records maintained

6    by ContextLogic or its transfer agent and may be notified of the pendency of this action by mail,

7    using the form of notice similar to that customarily used in securities class actions.

8    175.    Plaintiffs' claims are typical of the claims of the Class members as all Class members are

9    similarly affected by Defendants' wrongful conduct in violation of federal law that is complained

10   of herein.

11   176.    Plaintiffs will fairly and adequately protect the interests of the Class members and have

12   retained counsel competent and experienced in class and securities litigation.

13   177.    Common questions of law and fact exist as to all Class members and predominate over any

14   questions solely affecting individual Class members. Among the questions of law and fact common

15   to the Class are:

16              a.   whether Defendants violated the federal securities laws;

17              b.   whether the Registration Statement misrepresented material facts;

18              c.   whether the Registration Statement omitted material facts necessary to make

19                   the statements made, in light of the circumstances under which they were made,

20                   not misleading;

21              d.   whether the Class members have sustained damages and, if so, what is the

22                   proper measure of damages.

23   178.    A class action is superior to all other available methods for the fair and efficient adjudication

24   of this controversy since joinder of all members is impracticable. Furthermore, as the damages

25   suffered by individual Class members may be relatively small, the expense and burden of individual

26   litigation make it impossible for the Class members to individually redress the wrongs done to them.

27   There will be no difficulty in the management of this action as a class action.

28

1                **APPLICATION OF PRESUMPTION OF RELIANCE**

2   **Fraud on the Market**

3   179.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-

4   market doctrine in that:

5          a.   ContextLogic common shares met the requirements for listing, and were listed and

6            actively traded on the NASDAQ, efficient markets;

7          b.   As a public issuer, ContextLogic filed periodic public reports;

8          c.   ContextLogic regularly communicated with public investors via established market

9            communication mechanisms, including through the regular dissemination of press

10            releases via major newswire services and through other wide-ranging public disclosures,

11            such as communications with the financial press and other similar reporting services;

12          d.   ContextLogic's common shares were liquid and traded with moderate to heavy

13            volume during the Class Period; and

14          e.   ContextLogic was followed by a number of securities analysts employed by major

15            brokerage firms who wrote reports that were widely distributed and publicly available.

16   180.    Based on the foregoing, the market for ContextLogic common shares promptly digested

17   current information regarding ContextLogic from all publicly available sources and reflected such

18   information in the prices of the securities, and Plaintiffs and the Exchange Act Class members are

19   entitled to a presumption of reliance upon the integrity of the market.

20   ***Affiliated Ute***

21   181.    Alternatively, Plaintiffs and the Exchange Act Class members are entitled to the presumption

22   of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United*

23   *States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period

24   statements in violation of a duty to disclose such information as detailed above.

25

26

27

28                         45

**SECURITIES ACT CLAIMS**

**COUNT I**
**Violations of Section 11 of the Securities Act**
**Against All Defendants Concerning**
**the Registration Statement**

182.    Plaintiffs repeat and re-allege the allegations set forth in ¶¶ 1-128,157-178 as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct.

183.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

184.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

185.    The Defendants named in this Count signed the Registration Statement and/or was a director at the time of the filing of the Registration Statement.

186.    Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

187.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

188.    Plaintiffs acquired ContextLogic common shares pursuant to the Registration Statement.

189.    At the time of their purchases of ContextLogic common shares, Plaintiffs and members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

190.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**COUNT II**
**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

191.    Plaintiffs repeat and re-allege the allegations set forth in ¶¶ 1-128,157-178, 182-190, as if fully set forth herein.  Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct.

192.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants, each of whom was a control person of ContextLogic during the relevant period.

193.     The Individual Defendants were in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statement.

194.    None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

195.    Plaintiffs and the Class have sustained damages. The value of ContextLogic common shares has declined substantially due to the Securities Act violations alleged herein.

196.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**EXCHANGE ACT CLAIMS**

**COUNT III**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated**
**Thereunder Against All Exchange Act Defendants**

197.    Plaintiffs repeat and reallege each and every allegation set forth in ¶¶1-181 as if fully set forth herein.

198.    This Count is asserted against c Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

199.    During the Class Period, Exchange Act Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

200.    Exchange Act Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a.   employed devices, schemes and artifices to defraud;

b.   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.   engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of ContextLogic securities during the Class Period.

201.    Exchange Act Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of ContextLogic were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of ContextLogic, their control over, and/or receipt and/or modification of ContextLogic's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning ContextLogic, participated in the fraudulent scheme alleged herein.

202.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth

48

above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other ContextLogic personnel to members of the investing public, including Plaintiffs and the Class.

203.    As a result of the foregoing, the market price of ContextLogic common shares was artificially inflated during the Class Period. In ignorance of the falsity of Exchange Act Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of ContextLogic common shares during the Class Period in purchasing ContextLogic common shares at prices that were artificially inflated as a result of Exchange Act Defendants' false and misleading statements.

204.    Had Plaintiffs and the other members of the Class been aware that the market price of ContextLogic common shares had been artificially and falsely inflated by Exchange Act Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased ContextLogic common shares at the artificially inflated prices that they did, or at all.

205.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

206.    By reason of the foregoing, Exchange Act Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of ContextLogic common shares during the Class Period.

## COUNT IV
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

207.    Plaintiffs repeat and reallege each and every allegation as set forth in ¶¶1-181, 197-206 as if fully set forth herein.

208.    During the Class Period, the Individual Defendants participated in the operation and management of ContextLogic, and conducted and participated, directly and indirectly, in the

1   conduct of ContextLogic's business affairs. Because of their senior positions, they knew the adverse

2   non-public information about ContextLogic's misstatement of revenue and profit and false financial

3   statements.

4   209.    As officers and/or directors of a publicly owned company, the Individual Defendants had a

5   duty to disseminate accurate and truthful information with respect to ContextLogic's financial

6   condition and results of operations, and to correct promptly any public statements issued by

7   ContextLogic which had become materially false or misleading.

8   210.    Because of their positions of control and authority as senior officers, the Individual

9   Defendants were able to, and did, control the contents of the various reports, press releases and

10   public filings which ContextLogic disseminated in the marketplace during the Class Period

11   concerning ContextLogic's results of operations. Throughout the Class Period, the Individual

12   Defendants exercised their power and authority to cause ContextLogic to engage in the wrongful

13   acts complained of herein. The Individual Defendants therefore, were "controlling persons" of

14   ContextLogic within the meaning of Section 20(a) of the Exchange Act. In this capacity, they

15   participated in the unlawful conduct alleged which artificially inflated the market price of

16   ContextLogic common shares.

17   211.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section

18   20(a) of the Exchange Act for the violations committed by ContextLogic.

19                                      **PRAYER FOR RELIEF**

20   **WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as

21   follows:

22           a.   declaring this action to be a proper class action, designating Xiaoquan Yang and

23                Alexander De Block as Lead Plaintiffs and certifying them as class representatives under

24                Rule 23 of the Federal Rules of Civil Procedure and designating Lead Plaintiffs' co-

25                counsel as Co-Class Counsel;

26           b.   awarding damages in favor of Plaintiffs and the other Class members against all

27                defendants, jointly and severally, together with interest thereon;

28                                                    50

c.   awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.   awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-03930- BLF

DATED:  July 15, 2022

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By:  */s/ Jocab Goldberg*

Laurence M. Rosen
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jacob Alexander Goldberg
The Rosen Law Firm, P.A.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
215-600-2817
Fax: 212-202-3827
Email: jgoldberg@rosenlegal.com

Jing Chen
The Rosen Law Firm, P.A.
275 Madison Avenue, 40th Floor
New York, NY 10016
212-686-1060
Fax: 212-202-3827

**GLANCY PRONGAY & MURRAY LLP**

Ex Kano S. Sams, II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  esams@glancylaw.com

*Co-Counsel for Lead Plaintiffs and The Proposed Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

1

## <u>**PROOF OF SERVICE BY ELECTRONIC POSTING**</u>

2

I, the undersigned, say:

3

I am not a party to the above case and am over eighteen years old. On July 15, 2022, I served

4

true and correct copies of the foregoing document, by posting the document electronically to the

5

ECF website of the United States District Court for the Northern District of California, for receipt

6

electronically by the parties listed on the Court's Service List.

7

I affirm under the penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct. Executed on July 15, 2022, at Los Angeles, California.

9

*/s/ Jacob Goldberg*
Jacob Goldberg

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28