UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| YEN HOANG, et al., | Case No.  21-cv-03930-BLF |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** |
| CONTEXTLOGIC, INC., et al., | [Re:  ECF No. 83] |
| Defendants. | |

This is a putative class action for securities fraud against ContextLogic, Inc. ("Wish" or "Company")[1], certain of its officers and directors, and underwriters of its IPO.  Plaintiffs have filed a Consolidated Amended Class Action Complaint alleging violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  CAC, ECF No. 81.

Wish and its officers and directors ("Wish Defendants") filed a motion to dismiss.  MTD, ECF No. 83.  The underwriters of Wish's IPO ("Underwriter Defendants") joined Wish's motion. ECF No. 84.  Plaintiffs oppose the motion to dismiss.  Opp., ECF No. 88.  For the reasons discussed at the January 12, 2023, motion hearing and further explained below, the Court GRANTS Wish's motion to dismiss WITH LEAVE TO AMEND.

I.    **BACKGROUND**

Defendant Wish is an e-commerce company that operates the Wish platform. CAC ¶¶ 1, 61.  The Wish platform enables merchants to sell their products directly to global consumers.  *Id.* ¶ 61.

---

[1] Context Logic, Inc., stock trades on the NASDAQ stock exchange under the ticker symbol "WISH."  CAC ¶ 18, ECF No. 81.

Defendant Piotr Szulczewski was Wish's Chief Executive Officer ("CEO") and Chairman of Wish's Board of Directors at all relevant times. *Id.* ¶ 19. Defendant Rajat Bahri was Wish's Chief Financial Officer ("CFO") from 2016 through July 23, 2021. *Id.* ¶ 20. Defendant Brett Just has served as Wish's Chief Accounting Officer ("CAO") since November 2020. *Id.* ¶ 20. Defendants Julie Bradley, Ari Emanuel, Joe Lonsdale, Tanzeen Syed, Stephanie Tilenius, and Hans Tung served as directors on Wish's Board of Directors at the time of its initial public offering ("IPO"). *Id.* ¶¶ 22-27. Defendant Jaqueline Reses was identified as an incoming director of Wish at the time of the IPO and named a member of the Board of Directors on December 18, 2020. *Id.* ¶ 28. Collectively these officers and directors are referred to throughout this order as the "Individual Defendants."

The Underwriter Defendants are Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; BofA Securities, Inc.; Citigroup Global Markets Inc.; Deutsche Bank Securities Inc.; UBS Securities LLC; RBC Capital Markets, LLC; Credit Suisse Securities (USA) LLC; Cowen and Company, LLC; Oppenheimer & Co. Inc.; Stifel, Nicolaus & Company, Incorporated; William Blair & Company, L.L.C.; Academy Securities, Inc.; Loop Capital Markets LLC; and R. Seelaus & Company, LLC. *Id.* ¶¶ 36-50.

Lead Plaintiffs Xiaoquan Yang and Alexander De Block's Consolidated Class Action Complaint asserts four counts for violations of securities laws. *See* CAC. The first two counts allege violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), respectively. *Id.* ¶¶ 182-196. The remaining two counts allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), respectively. *Id.* ¶¶ 197-211. The complaint names as defendants Wish, 10 individuals, and 15 companies that underwrote Wish's initial public offering (IPO).

Plaintiffs bring their Securities Act claims on behalf of "all persons or entities that purchased or acquired [Wish] common stock pursuant or traceable to the Company's Registration Statement on Form S-1." *Id.* ¶ 4. They bring their Exchange Act claims on behalf of "all persons and entities, other than Defendants and their affiliates, who purchased [Wish] securities between December 16, 2020 to May 12, 2021, inclusive (the 'Class Period')." *Id.* ¶ 5.

### A.    Key Performance Metrics

Wish measures its performance using two key metrics.  *Id.* ¶ 67.  The first, Monthly Active Users (MAUs), is the number of users who visited the Wish platform during a given month.  *Id.* ¶ 68.  The second, Last-Twelve-Month (LTM) Active Buyers, is the number of users who made a purchase on the Wish platform during the preceding 12 months.  *Id.* ¶ 69.

### B.    Alleged Misrepresentations and Omissions

Plaintiffs' Section 10(b) claim is based on alleged misrepresentations and omissions in the following disclosures:

- Registration Statement, effective December 15, 2020

- Form 8-K, dated March 8, 2021 ("March 2021 8-K")

- Earnings Call held on March 8, 2021 ("March 2021 Earnings Call")

- Form 10-K for Fiscal Year Ended December 31, 2020 ("2020 10-K")

#### 1.    Registration Statement

On December 15, 2020—15 days before the close of the fourth quarter 2020—the Registration Statement for Wish's IPO became effective.  *Id.* ¶¶ 1, 112.  Plaintiffs allege that Wish's Registration Statement contained materially false and misleading statements and omissions concerning (1) MAUs; (2) advertising in certain markets; (3) internal controls.

#### a.    MAUs

According to Plaintiffs, Wish's Registration Statement did not disclose (1) that Wish had experienced a material decline in MAUs in the third and fourth quarters of 2020 and (2) "the significant increase of MAUs from the nine months ended September 30, 2019 and to the nine months ended September 30, 2020 was primarily caused by the irregular increase of visits to [Wish's] platform during the Covid and was not sustainable."  *Id.* ¶¶ 119, 123.  Plaintiffs contend that these omissions rendered the following statements in the Registration Statement false or misleading:

- Increases in MAUs from the nine months ended September 30, 2019, and to the nine months ended September 30, 2020, "have primarily been driven by the growing popularity and recognition of our brand and platform, the user preferences for our

United States District Court
Northern District of California

differentiated mobile shopping experience, wide selection of attractively priced products, and the success of our promotional and marketing campaigns." *Id.* ¶ 123.

- Fluctuations in quarterly and annual operating results could be caused by "[Wish's] user acquisition strategies"; "traffic on [Wish's] platform"; and "continued impact from COVID-19, including the effects of increased online activity and government stimulus programs." *Id.* ¶ 124.

- "If [Wish is] unable to increase engagement and revenue from existing buyers and attract new buyers to [Wish's] platform, [Wish's] revenue and results of operations will be negatively impacted." *Id.* ¶ 125.

- *"Positive trends in revenue from new buyers and existing buyers may not continue and may be negatively impacted by [Wish's] inability to continue to increase engagement from existing buyers and attract and engage new buyers." Id.*

### b. Advertising

Plaintiffs also allege that Wish's Registration Statement did not disclose that Wish materially reduced advertising in India, Brazil, the Philippines, and other emerging market countries outside of Europe and North America in the fourth quarter of 2020, despite Defendants' knowledge of a link between advertising and customer acquisition. *Id.* ¶¶ 112, 113, 120.

### c. Internal Controls

Plaintiffs allege that Registration Statement falsely stated that management will be required to evaluate the effectiveness of Wish's internal controls over financial reporting and acknowledged that failure to maintain effective internal controls may cause consumers to lose confidence in Wish's financial reports. *Id.* ¶ 127. According to Plaintiffs, these statements were false because "Defendants failed to disclose that at the time of the IPO, there were two material weaknesses in the company's internal controls over financial reporting: i) the company did not design and maintain effective controls over information technology general controls and ii) the company did not fully implement components of the [Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ('COSO Framework')]." *Id.* ¶ 128.

4

### 2. March 2021 8-K and Earnings Call

Plaintiffs allege that the March 2021 8-K and Earnings Call contained material misrepresentations about the MAU declines in the fourth quarter of 2020, revenue projections, and technological improvements.

The March 2021 8-K stated that "MAUs declined . . . primarily in some emerging markets outside of Europe and North America where Wish temporarily de-emphasized advertising and customer acquisition." *Id.* ¶ 130. Similarly, Defendant Bahri stated during the March 2021 Earnings Call that MAUs declined because "during the holiday season, [Wish] decided to de-emphasize customer acquisition in some emerging markets outside of Europe and North America." *Id.* ¶ 135; *see also id.* ¶ 140. Plaintiffs allege that these statements were false and misleading because MAUs declined not only in emerging markets but also in Europe and North America. *Id.* ¶¶ 131, 136, 141. Plaintiffs also allege that the MAU decline did not result from decreased advertising. *Id.* ¶ 132, 137.

The March 2021 8-K and Earnings Call also disclosed revenue expectations for the first quarter of 2021. *Id.* ¶¶ 133, 138. Plaintiffs allege that this outlook was materially false and misleading because it contained unattainable numbers. *Id.* ¶¶ 134, 139.

On the March 2021 Earnings Call, Defendant Szulczewski stated that "[Wish] continued to innovate and launch new products and features that further enhance the consumer experience on the Wish platform, including . . . improved time to door estimates." *Id.* ¶ 142. Plaintiffs allege that this statement was false because "'Time to Door' performance was poor but the Company was unable to improve it." *Id.* ¶ 143.

### 3. March 2021 10-K

Plaintiffs identify alleged misrepresentations in Wish's March 24, 2020, 10-K. These alleged misrepresentations are similar to those identified in the Registration Statement, March 2021 8-K, and March 2021 Earnings Call. *See id.* ¶¶ 144-154.

### C. Events After the IPO

On May 12, 2021, Wish announced its 1Q21 financial results for the interim period ended March 31, 2021. *Id.* ¶ 159. Wish's MAUs declined and its forward sales guidance also fell short,

United States District Court
Northern District of California

1   with its 2Q21 revenue guidance of $715 million to $730 million coming below the guidance of

2   $735 to $750 million provided for 1Q21. *Id.* Wish's stock fell more than 29% by close the next

3   day. *Id.*

4        On June 30, 2021, Wish announced that Bahri has notified the Board of Directors that he

5   planned to resign from his position effective July 23, 2021. *Id.* ¶ 162. And on November 10,

6   2021, Wish announced that Szulczewski would step down as the CEO when a new CEO was

7   appointed or no later than February 1, 2022. *Id.* ¶ 166.

8        On March 1, 2022, Wish disclosed that "[d]uring the preparation and the audit of the

9   company's consolidated financial statements for the year ended December 31, 2021, management

10  and the company's independent registered public accounting firm identified two material

11  weaknesses in the company's internal controls over financial reporting: i) the company did not

12  design and maintain effective controls over information technology general controls and ii) the

13  company did not fully implement components of the COSO framework." *Id.* ¶ 168.

      **D.**    **Former Employee Statements**

15       Plaintiffs offer statements by four former employees ("FEs"). CAC ¶¶ 82-111, 114-115,

16  117-118, 131-132, 134, 136, 139, 141, 162. Plaintiffs rely on the former employees to support a

17  range of allegations.

18       FE 1 was a Financial Manager who worked at Wish from October 2017 until June 2021.

19  CAC ¶ 82. FE 1 reported directly to Thomas Chuang, Vice President of Finance and later

20  Operations, who reported directly to Bahri. *Id.* Bahri often sought out FE 1 directly, including

21  request a list of headcount forecasts, to ask questions by email during the IPO, and when Bahri

22  needed to negotiate certain deals. *Id.* ¶¶ 84, 88.

23       FE 1 had full access to and reviewed all MAU data during his tenure at the company. *Id.* ¶

24  91. FE 1 states that "the IPO was really born out of numbers from a truly brief period of time that

25  conflicted with actual numbers and trends both before and after the Covid bump." *Id.* ¶ 85.

26  According to FE 1, senior company executives received MAU reports, Gross Merchandise Value

27  reports, and P&L statements daily by email. *Id.* ¶¶ 92, 94, 95. FE 1 also states that poor time-to-

28  door performance and other bad user experiences were causing MAU deterioration before and

after the COVID bump.  *Id.* ¶ 98.  FE 1 further states that Bahri "adjusted key drivers for the [Registration Statement's] forecast" and Szulczewski "led all efforts to boost MAU through advertising spend."  *Id.* ¶ 110.

Separate from statements about MAUs, FE 1 also offers statements about alleged internal control deficiencies at Wish.  FE 1 states, for example, that "material internal control deficiencies were serious" and that he repeatedly warned Jennifer Oliver, Head of Financial Planning and Analysis, and Brett Just about these deficiencies.  *Id.* ¶ 117.

FE 2 was a Senior Treasury and Payment Service Manager at Wish from November 2017 until November 2021.  *Id.* ¶ 99.  FE 2 reported directly to Walter Boileau, Vice President and Treasurer, who reported directly to Bahri.  *Id.*  In addition to other basic treasury functions, FE 2 oversaw the Company's bank accounts, managing incoming cash.  *Id.*  According to FE 2, the Finance function published MAU data in real time to Defendants and the Company's senior executives.  *Id.*  FE 2 reports that time-to-door was slow and was an issue confronting senior executives in the context of deteriorating MAUs.  *Id.* ¶ 100.

FE 3 worked at Wish as a Senior Data Analyst from November 2017 to May 2019, then as Senior Data Scientist from until January 2021, then as Data Science Manager until March 2022, and finally as a Senior Data Science Manager until May 2022.  *Id.* ¶ 102.  In his time at Wish, part of FE 3's role was to build fraud detection models to identify fraudulent transactions.  *Id.*  FE 3 had real-time access to MAU data and confirms that an "MAU bump" occurred during April or May of 2020 but disappeared quickly.  *Id.* ¶ 103.

FE 4 worked at Wish as Product Manager from December 2020 to September 2021.  *Id.* ¶ 106.  He reported to Alex Swan, Manager of Product Management.  *Id.*  FE 4 was responsible for customer support.  *Id.*  FE 4 "built tech statistics related to customer feedback."  *Id.*  FE 4 recalls that during his tenure, MAUs were declining and was a major concern of senior management.  *Id.* ¶ 107.  FE 4 also states that time-to-door was always an issue at Wish.  *Id.* ¶ 109.

## II.   LEGAL STANDARD

### A.   Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff.  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).  However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).  While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

In deciding whether to grant leave to amend, the Court must consider the factors set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2009).  A district court ordinarily must grant leave to amend unless one or more of the Foman factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. Eminence Capital, 316 F.3d at 1052.  "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight."  *Id.*  However, a strong showing with respect to one of the other factors may warrant denial of leave to amend.  *Id.*

## B.    Rule 9(b) and the Private Securities Litigation Reform Act of 1995

In addition to the pleading standards discussed above, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule

of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also In re VeriFone Holdings*, 704 F.3d at 701. That is, "the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud." *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1065 (N.D. Cal. 2010).

Similarly, under the PSLRA "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). "To satisfy the requisite state of mind element, a complaint must allege that the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701 (brackets and internal quotation marks omitted). The scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## III.    REQUEST FOR JUDICIAL NOTICE

While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, under Fed. R. Evid. 201(b), courts may take judicial notice of facts that are "not subject to reasonable dispute." Courts have taken judicial notice of documents on which complaints necessarily rely, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), and publicly available articles or other news releases of which the market was aware, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Defendants request that the Court take judicial notice of 10 exhibits in support of their

United States District Court
Northern District of California

motion to dismiss.  *See* RJN, ECF No. 83-2; *see also* Lutz Decl., ECF No. 83-1.  The exhibits are (1) excerpts of Wish's Amended Registration Statement on Form S-1, filed with the U.S. Securities and Exchange Commission ("SEC") on December 7, 2020 (Lutz Decl. Ex. 1 ("Registration Statement")); (2) Wish's Form 8-K, filed with the SEC on March 8, 2021 (Lutz Decl. Ex. 2 ("March 2021 8-K")); (3) a transcript of Wish's earnings call for the fourth quarter of 2020, dated March 8, 2021 (Lutz Decl. Ex. 3 ("March 2021 Earnings Call")); (4) excerpts of Wish's Annual Report on Form 10-K, filed with the SEC on March 24, 2021 (Lutz Decl. Ex. 4 ("March 2021 10-K")); (5) Wish's Quarterly Report on Form 10-Q, filed with the SEC on May 12, 2021 (Lutz Decl. Ex. 5 ("May 2021 10-Q")); (6) Piotr Szulczewski's Statement of Changes in Beneficial Ownership on Form 4/A, filed with the SEC on April 2, 2021 (Lutz Decl. Ex. 6); (7) Rajat Bahri's Statement of Changes in Beneficial Ownership on Form 4, filed with the SEC on March 12, 2021 (Lutz Decl. Ex. 7); (8) Rajat Bahri's Statement of Changes in Beneficial Ownership on Form 4/A, filed with the SEC on April 2, 2021 (Lutz Decl. Ex. 8); (9) Brett Just's Statement of Changes in Beneficial Ownership on Form 4, filed with the SEC on March 17, 2021 (Lutz Decl. Ex. 9); (10) Brett Just's Statement of Changes in Beneficial Ownership on Form 4/A, filed with the SEC on April 2, 2021 (Lutz Decl. Ex. 10).

These documents are attached to or referenced in the complaint or are matters of public record.  Plaintiffs do not object to Defendants' request for judicial notice.  Accordingly, the Court takes notice of Exhibits 1-10 to Lutz's Declaration at ECF 83-1.  The Court does not take notice of the truth of any of the facts asserted in these documents.

## IV.    DISCUSSION

Defendants move to dismiss each of Plaintiff's four claims. The Court addresses each claim in turn, and in combination where appropriate.

### A.    Section 11 Claim (Count I)

The parties dispute whether Plaintiffs' Section 11 claim is subject to Rule 8(a)'s or 9(b)'s pleading standard, though they both contend that they prevail under either standard.  The Court will first determine the applicable pleading standard and then analyze whether Plaintiffs' Section 11 claim survives dismissal under that standard.

### 1. Pleading Standard

"[T]he particularity requirements of Rule 9(b) apply to claims brought under Section 11 when . . . they are grounded in fraud." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996). To determine whether a complaint sounds in fraud, the Court "must normally determine, after a close examination of the language and structure of the complaint, whether the complaint 'alleges a unified course of fraudulent conduct' and 'relies entirely on that course of conduct as the basis of a claim.'" *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003)). "Where . . . a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud." *Id.*

Here, the Court can assume the Section 11 claim sounds in fraud because Plaintiffs' Section 11 and Section 10(b) claims rely on the same factual allegations. *See id.* Plaintiffs expressly incorporate their Section 11 allegations into their Section 10(b) allegations. *See* CAC ¶ 129, *see also* CAC ¶¶ 182, 191. This incorporation supports the conclusion that Plaintiffs' Section 11 claim sounds in fraud. *C.f. In re Daou Sys., Inc.*, 411 F.3d 1006, 1028 (9th Cir. 2005) (Section 11 claim sounded in fraud where "[t]he complaint fully incorporate[d] all allegations previously averred in the complaint for purposes of all their claims").

Further confirming that Plaintiffs' Section 11 claim sounds in fraud, the conduct forming the basis of Plaintiffs Section 11 claims, *see* CAC ¶¶ 1-128, 157-178, 182, is the same as the conduct Plaintiffs forming the basis of the Section 10(b) claims, *see* CAC ¶¶ 1-154, 157-178, 197. For example, to support both their Section 11 and 10(b) claims, Plaintiffs allege that Defendants "failed to disclose, pursuant to Items 105 and 303, that in [the relevant quarter] the Company had been experiencing a material decline of MAUs." *Compare* CAC ¶ 119 (discussing Registration Statement), *with* CAC ¶ 145 (discussing 2020 10-K). As another example, Plaintiffs allege that Defendants failed to disclose in in both their Registration Statement and 2020 10-K that they "manipulated the financial data of the financial statements in the Registration Statement." *Compare* CAC ¶ 121 (discussing Registration Statement), *with* CAC ¶ 146 (discussing 2020 10-

K).  The similarity in the alleged conduct underlying Plaintiffs' Section 11 and 10(b) claims

confirms that the Section 11 claim is grounded in fraud and therefore subject to Rule 9(b)'s

heightened pleading standard.  *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052,

1068 (N.D. Cal. 2010) (heightened pleading standard applies where "there is a remarkable

similarity between the conduct forming the basis for plaintiffs' section 11 claims, and the conduct

forming a basis for plaintiffs' section 10(b) claims").

        The language of Plaintiff's allegations also confirms that their Section 11 claim is

grounded in fraud.  For example, Plaintiffs allege that "Defendants knew in advance of the IPO

that [Wish] had not consistently achieved the performance that supported the IPO . . . . Therefore,

Defendants had to mislead to accomplish the IPO."  CAC ¶ 85.  Plaintiffs also allege that

"Defendants manipulated the financial data of the financial statements in the Registration

Statement."  *Id.* ¶ 121; *see also id* ¶ 9.  The CAC even includes a section entitled "[Wish]

Manipulated the Financial and Operation Data in the Registration Statement."  *Id.* p.23.  Plaintiffs

also allege that "Defendants knew of the material deterioration [of MAUs] but relied on the lag

time between the data that the Company was required to disclose at the time of the IPO and what

Defendants already knew internally but chose not to disclose in support of the IPO."  *Id.* ¶ 97; *see

also id.* ¶¶ 91, 96.  These allegations sound in fraud and therefore confirm that Plaintiffs' Section

11 claims should be subject to Rule 9(b)'s heightened pleading standards.  *See In re Daou Sys.,

Inc.*, 411 at 1028 (applying heightened pleading standard where complaint "allege[s] myriad

misrepresentations made by defendants, of which defendants had full knowledge, which induced

plaintiffs' reliance, and which caused plaintiffs damages.").

        The Court finds unconvincing Plaintiffs' bald assertions that they "disclaim any allegation

of fraud, recklessness or intentional misconduct" concerning their Securities Act allegations.  *See

CAC* ¶¶ 4 n.2, 182, 191, p.26 n.9; *see also* Opp. 9.  "[A] plaintiff's nominal efforts to disclaim

allegations of fraud with respect to its section 11 claims are unconvincing where the gravamen of

the complaint is fraud and no effort is made to show any other basis for the claims."  *In re Rigel

Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) (citing *Stac Elecs.*, 89 F.3d at 1405

n.2).  The Ninth Circuit has rejected efforts to disclaim fraud allegations where a plaintiff's

Section 11 claim relied on the same alleged misrepresentations as the plaintiff's Section 10(b) claim. *See id.* at 886. Here, as discussed above, Plaintiffs' Section 11 and 10(b) claims are based on the same alleged misrepresentations. The Court therefore rejects Plaintiffs' nominal attempt to disclaim fraud allegations regarding their Section 11 claim.

The cases upon which Plaintiffs rely do not support their assertion that their Section 11 claim need only meet Rule 8's pleading requirements. Plaintiffs argue, for example, that the court in *Flynn v. Sientra, Inc.*, No. 15-CV-07548 SJO (RAOx), 2016 WL 3360676 (C.D. Cal. June 9, 2016), applied Rule 8(a) to "substantially similar allegations." Opp. 4-5. But in *Flynn*, the court held that Rule 9(b)'s requirements did not apply because the plaintiffs had "stripped their Securities Act allegations of fraud and only levied fraud allegations against a select few defendants based upon specified unique, particularized facts as to those defendants." 2016 WL 3360676, at *17 (cleaned up). Here, Plaintiffs' Securities Act allegations rely on the same course of conduct as their Exchange Act allegations. Plaintiffs have therefore not "stripped their Securities Act allegations of fraud" as the plaintiffs did in *Flynn*. Nor have Plaintiffs here levied their fraud allegations against a select few defendants based upon particularized facts as to those defendants. Plaintiffs instead assert their Section 10(b) claim against all Wish Defendants based on general allegations of what "Defendants failed to disclose." *See* CAC ¶¶ 131, 134, 136, 139, 141, 143, 148, 151, 153.

Plaintiffs' reliance on *Brown v. China Integrated Energy, Inc.*, No. 11-CV-02559 MMM (PLAx), 2012 WL 1129909 (C.D. Cal. Apr. 2, 2012), is also misplaced. In *Brown*, accounting firm Sherb & Co. moved to dismiss plaintiffs' Section 11 claim against it under Rule 9(b). 2012 WL 1129909, at *1-2, 4. The court noted that although plaintiffs had alleged that some defendants engaged in fraudulent behavior, plaintiffs' allegations against Sherb were "allegations of negligence, not fraud." *Id.* at *3. The court therefore held that "while plaintiffs' allegations against other defendants may have to satisfy Rule 9(b), their allegations of negligence against Sherb need only comply with the more lenient standards of Rule 8." *Id.* at *4. Here, Plaintiffs have made no attempt distinguish which, if any, Defendants are accused of negligence and which are accused of fraud. Plaintiffs instead argue in general terms that "Rule 8(a)'s notice pleading

1    requirements apply [to their Section 11 claim] because the Complaint's Section 11 claim sounds in

2    negligence, not fraud."  Opp. 4.

3        Accordingly, the Court finds that Plaintiffs' Section 11 claim sounds in fraud and therefore

4    must be pled in accordance with Rule 9(b)'s heightened pleading standards.

5            **2.  Applicable Law**

6        Section 11 of the Securities Act contains a private right of action for purchasers of a

7    security if the issuer publishes a registration statement in connection with the security that

8    "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be

9    stated therein or necessary to make the statements not misleading."  15 U.S.C. § 77k(a).  "To

10   prevail in such an action, a plaintiff must prove (1) that the registration statement contained an

11   omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is,

12   it would have misled a reasonable investor about the nature of his or her investment."  *Rubke*, 551

13   F.3d at 1161 (internal quotation marks omitted).  "By definition, a plaintiff must show that a

14   purported misstatement in a registration statement was misleading at the time the registration

15   statement was issued."  *In re: Resonant Inc. Sec. Litig.*, No. 15-CV-01970 SJO (PJWx), 2016 WL

16   1737959, at *7 (C.D. Cal. Feb. 8, 2016).  For example, "[a] claim under section 11 based on the

17   omission of information must demonstrate that the omitted information existed at the time the

18   registration statement became effective."  *Rubke*, 551 F.3d at 1164.

19       Because the heightened pleading standard applies here, the Amended Complaint must

20   "state with particularity the circumstances constituting fraud"; that is, "the complaint must set

21   forth what is false or misleading about a statement, and why it is false."  *Id.* at 1161 (internal

22   quotation marks omitted).  Plaintiff can satisfy this requirement "by pointing to inconsistent

23   contemporaneous statements or information (such as internal reports) which were made by or

24   available to the defendants."  *Id.* (internal quotation marks omitted).

25           **3.  Discussion**

26       Defendants argue that Plaintiffs fail to state a claim for a Section 11 violation because

27   Plaintiffs have not pled facts showing that any statement or omission was false or misleading.

28   MTD 8-9.  Plaintiffs dispute Defendants' contention.  Opp. 6.  The parties organized their

United States District Court
Northern District of California

14

1    argument by category of subject matter of the alleged misleading statement or omission.  These

2    categories are: (1) MAUs and active buyers; (2) advertising; (3) internal controls; (4) financial

3    data and projections.  *Compare* MTD 9, *with* Opp. 6-13.  The Court analyzes the statements within

4    each category.

5                                    **a.  MAUs and Active Buyers**

6            Plaintiffs' allegations regarding MAUs and active buyers break down to two key alleged

7    omissions and several statements allegedly rendered misleading by these omissions.  The two key

8    alleged omissions are (1) Wish was "experiencing a material decline of MAUs" in the period

9    leading up to its IPO, CAC ¶¶ 119, 123-24, 126; and (2) increases in MAUs Wish had sustained

10   because of the COVID-19 pandemic were not sustainable and had subsided, CAC ¶¶ 123-34.

11           Defendants argue that Plaintiffs fail to allege facts showing a false or misleading statement

12   regarding MAUs because the Registration Statement disclosed accurate MAU data and it disclosed

13   the COVID-19 impacts that Plaintiffs allege it omitted.  MTD 10-12.  Defendants note that the

14   Registration Statement provided the quarterly data it was required to disclose, *id.* at 10, and

15   Defendants identify several specific disclosures regarding the COVID-19 pandemic, *id.* at 11.  As

16   for the alleged misrepresentations concerning active buyers, Defendants argue that Plaintiffs

17   conflate buyers with users and ignore that Defendants disclosed their buyer numbers and the

18   revenue generated from them.  *Id.* at 13.

19           Plaintiffs respond that Wish's MAU disclosures were incomplete because Wish should

20   have disclosed intra-quarter data or known trends and risks under Items 105 and 303.  Opp. 6-10.

21   Plaintiffs further respond that the Registration Statement's COVID-19 disclosures were

22   inadequate because, although the disclosures identified certain COVID-19 related risks, they did

23   not disclose that those risks had transpired.  Opp. 8-9.

24

25

26

27

28

### i.   MAU Data Disclosures

Wish's Registration Statement was made effective on December 16, 2020—15 days before the close of the fourth quarter of 2020.  The registration statement disclosed the following quarterly MAU data:

|  | Three Months Ended | | | | | | |
|---|---|---|---|---|---|---|---|
|  | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 | September 30, 2020 |
|  | (in millions, except percentages) | | | | | | |
| MAUs | 75 | 76 | 93 | 115 | 109 | 116 | 100 |
| LTM Active Buyers | 61 | 59 | 60 | 62 | 63 | 70 | 68 |

CAC ¶ 70.

Plaintiffs allege that the registration statement failed to disclose "that in the third quarter of 2020 and fourth quarter of 2020 . . . the Company had been experiencing a material decline in MAUs."  *See, e.g.*, CAC ¶ 119.  But the data disclosed in the Registration Statement shows that MAUs declined from 116 million in the second quarter of 2020 to 100 million in the third quarter of 2020.  Thus, the Registration Statement showed that in the third quarter of 2020—the last full quarter before Wish's IPO—Wish had experienced a 14% decline in MAUs.  This disclosure defeats Plaintiffs' claim that Wish failed to disclose it was "experiencing a material decline of MAUs" in "the third quarter of 2020," but it leaves open the question of what if anything Wish had to disclose regarding the fourth quarter data.

Plaintiffs argue that Wish was required to disclose intra-quarter data, known MAU trends, and risk factors related to the fourth quarter's data.  The Court addresses each in turn.

Intra-Quarter Data: In general, "[c]ompanies have no duty to disclose intraquarter results." *Steckman v. Hart Brewing, Inc.*, No. CIV. 96-1077-K, 1996 WL 881659, at *4 (S.D. Cal. Dec. 24, 1996) (citing *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1419 (9th Cir.1994)); *see also Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 546 (S.D.N.Y. 2017) ("A company . . . has no general obligation to disclose the results of a quarter in progress." (internal quotation marks and citations omitted)).  "However, intra-quarter updates may be required if intervening events trigger a duty to disclose." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d

487, 513 (S.D.N.Y. 2013) (cleaned up).

Here, Plaintiffs have identified no intervening events in the fourth quarter that triggered a duty to disclose intra-quarter data.  Plaintiffs repeatedly allege that Defendants failed to disclose that Wish's MAUs were declining in the third and fourth quarters of 2020.  CAC ¶¶ 119, 123-24, 126.  But the Registration Statement disclosed this exact decline when it showed that MAUs had decreased by 14% in the third quarter of 2020.  Plaintiffs identify no event in the fourth quarter that would trigger additional MAU disclosures.  Accordingly, the Court finds that Plaintiffs have failed to allege a misleading omission arising from Registration Statement's failure to disclose intra-quarter data.

Item 303:  Under SEC Regulation S-K Item 303, issuers must "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii).  Issuers must also "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."  17 C.F.R. § 229.303(b)(2)(i).  A claim under Item 303 must show that the trend, demand, commitment, event, or uncertainty "is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

Defendants argue that Plaintiffs have failed to demonstrate a trend that required disclosure under Item 303 because, as alleged in the CAC, MAUs decreased in the last full quarter before the IPO and then increased the next quarter.  *See* MTD 12.  Plaintiffs respond that "Defendants overlook that the trend or uncertainty includes any event, not merely one of extended duration, whether more or less than three months as Defendants suggest."  Opp. 9.

The Court agrees with Defendants that the CAC fails to identify a trend that management knew about and failed to disclose.  Plaintiffs allege that "[t]he Registration Statement failed to disclose, pursuant to Items 105 and 303, that in third quarter of 2020 and the fourth quarter of 2020 . . . the Company had been experiencing a material decline of MAUs."  CAC ¶ 119.  But as

17

alleged in the CAC, Wish's Registration Statement disclosed that MAUs decreased from 116 million in the second quarter of 2020 to 100 million in the third quarter of 2020.  CAC ¶ 70. Plaintiffs allege that MAUs then increased in the fourth quarter of 2020—the first quarter reported after the IPO—to 104 million.  *Id.* ¶ 130.  These numbers contradict Plaintiffs' blanket assertion that MAUs declined in the third and fourth quarters of 2020.  "Contradictory allegations such as these are inherently implausible, and fail to comply with Rule 8, *Twombly,* and *Iqbal*," much less Rule 9(b)'s heightened pleading standard.  *See Hernandez v. Select Portfolio, Inc.*, No. 15-CV-01896 MMM AJWx, 2015 WL 3914741, at *10 (C.D. Cal. June 25, 2015) (collecting cases); *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("We have held that a plaintiff can . . . plead himself out of a claim by including . . . details contrary to his claims." (citing *Steckman*, 143 F.3d at 1295–96)).  Accordingly, the Court finds that Plaintiffs have failed to identify a known trend that Defendants failed to disclose in the Registration Statement.

Item 105: The complaint also refers to Item 105 of Regulation S-K, alleging that "[t]he Registration Statement failed to disclose, pursuant to Items 105 and 303, that in third quarter of 2020 and the fourth quarter of 2020 . . . the Company had been experiencing a material decline of MAUs."  *See* CAC ¶ 119.  Item 105 requires disclosure of "the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105.  Defendants argue that the Registration Statement sufficiently disclosed the risk of losing users.  Mot. 12 (citing Registration Statement, at 21; March 2021 10-K, at 12).  Plaintiffs do not respond to this argument, and the Court cannot identify any allegations in the CAC regarding other risk factors that the Registration Statement failed to disclose.  Accordingly, the Court finds that Plaintiffs have failed to identify any material factors regarding MAUs that required disclosure under Item 105 that Defendants failed to disclose.

In sum, the Court finds that the CAC does not identify any false or misleading statements or omissions regarding MAU data in the Registration Statement.  Accordingly, to the extent that Plaintiffs' Section 11 claim is premised on an alleged misleading statement or omission concerning MAU data, it is hereby DISMISSED WITH LEAVE TO AMEND.

### ii.    COVID-19 Related Risks

Plaintiffs allege that Wish made material misrepresentations in the Registration Statement by failing to disclose the impact of the COVID-19 pandemic on MAUs.  The CAC identifies the following disclosures as false and misleading: (1) increases in MAUs from the nine months ended September 30, 2019, and to the nine months ended September 30, 2020, "have primarily been driven by the growing popularity and recognition of our brand and platform, the user preferences for our differentiated mobile shopping experience, wide selection of attractively priced products, and the success of our promotional and marketing campaigns," CAC ¶ 122; and (2) quarterly and annual results may fluctuate due to factors including "our user acquisition strategies," "traffic on our platform," and "continued impact from COVID-19, including the effects of increased online activity and government stimulus programs," CAC ¶ 124.  Plaintiffs allege that "[t]hese statements were materially false and misleading because Defendants failed to disclose that the significant increase of MAUs from the nine months ended September 30, 2019 and to the nine months ended September 30, 2020 was primarily caused by the irregular increase of visits to [Wish's] platform during the Covid and was not sustainable."  *Id.* ¶¶ 123-24.

The parties dispute whether Plaintiffs have alleged facts demonstrating that these statements were false and misleading.  Defendants argue that these allegations do not plead a false or misleading statement or omission because the Registration Statement disclosed the information Plaintiffs claim was omitted.  MTD 11.  Defendants note that the Registration Statement disclosed that Wish benefited from the pandemic due to "increasing consumer demand globally driven by greater mobile usage, online shopping, and less competition from physical retail as a result of shelter-in-place mandates."  *Id.* (citing Registration Statement, at 98).  Defendants further note that the Registration Statement identified that certain benefits Wish experienced during the pandemic had ended, expressly stating that "consumer demand for online shopping [] declined from the peak levels of the second quarter with fewer shelter-in-place mandates and more physical retail reopenings around the world."  *Id.* (citing Registration Statement, at 99).  Plaintiffs respond that the disclosures Defendants identify are insufficient because Defendants (1) "ignore that the increases in MAUs were not 'primarily' driven by the factors listed in ¶122, but by the

19

1   unsustainable Covid anomaly and data fabrication"; (2) the disclosures do not alert investors that

2   some of the disclosed risks may have already transpired.  Opp. 9.

3       The Court finds that Plaintiffs have not pled a false or misleading statement and addresses

4   each of Plaintiffs' arguments in turn.  Plaintiffs' first argument appears to be that Wish

5   misleadingly credited its brand and platform as the primary reasons for increased MAUs, when the

6   real reason was "the unsustainable Covid anomaly."  *See id.*  But Plaintiffs have alleged no facts

7   that show that the increases were not "primarily" caused by brand quality.  Plaintiffs' assertions to

8   the contrary are conclusory only.

9       Plaintiffs' second argument appears to be that Defendants' "[f]ailure to explain the

10  dissipated Covid anomaly" rendered statements about risks that "may" occur misleading because

11  those risks had already occurred.  *Id.*  But reading the Registration Statement as a whole, as the

12  Court must, *see, e.g.*, *In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 209 (S.D.N.Y. 2000), the

13  Court finds that Wish disclosed that it had benefitted from the pandemic and that those benefits

14  were dissipating.  In a section entitled "The Impact of the COVID-19 Pandemic," the Registration

15  Statement disclosed that in "[t]he second quarter of 2020 . . . [Wish] benefitted from increasing

16  consumer demand globally driven by greater mobile usage, online shopping, and less competition

17  from physical retail as a result of shelter-in-place mandates in various countries."  Registration

18  Statement 98.  It further noted that Wish "experienced increased buyer spending due to U.S.

19  government stimulus programs that were implemented as a result of the COVID-19 pandemic."

20  *Id.*  As for the third quarter of 2020, Wish disclosed that "consumer demand for online

21  shopping . . . declined from the peak levels of the second quarter with fewer shelter-in-place

22  mandates and more physical retail openings around the world."  *Id.* at 99.  The Registration

23  Statement thus disclosed what Plaintiffs appear to contend it is missing—that benefits to Wish

24  from the "Covid anomaly" were dissipating.

25      To the extent Plaintiffs are arguing that the risks Defendants failed to disclose were that

26  MAUs were plummeting in the fourth quarter of 2020, this argument fails for the reasons

27  discussed above regarding Defendants' disclosure obligations under Item 303.  As alleged in the

28  CAC, Defendants disclosed their MAUs for the third quarter of 2020, and MAUs increased the

United States District Court
Northern District of California

20

1    next quarter.  CAC ¶¶ 70, 130.  Plaintiffs have thus not alleged any trend in the fourth quarter that

2    Defendants misleadingly failed to disclose.

3         Accordingly, the Court finds that the CAC does not allege any false or misleading

4    statements or omissions regarding benefits or risks related to COVID-19 in the Registration

5    Statement.  To the extent that Plaintiffs' Section 11 claim is premised on such statements or

6    omissions, it is hereby DISMISSED WITH LEAVE TO AMEND.

7                            **iii.    Active Buyers**

8         Plaintiffs allege that the Registration Statement falsely and misleadingly stated that (1) "if

9    [Wish was] unable to increase engagement and revenue from existing buyers and attract new

10   buyers to [Wish's] platform, [Wish's] revenue and results of operations [would] be negatively

11   impacted," and (2) certain "positive trends in revenue from new buyers and existing buyers may

12   not continue and may be negatively impacted by [Wish's] inability to continue to increase

13   engagement from existing buyers and attract and engage new buyers."  CAC ¶ 125.  According to

14   Plaintiffs, these statements were false and misleading because defendants failed to disclose that

15   Wish had lost users in the third and fourth quarter of 2020 and the risk that Wish may not be able

16   to increase engagement from existing buyers and attract new buyers had transpired.  *Id.* ¶ 126.

17        The Court finds that Plaintiffs have failed to allege a false or misleading statement or

18   omission about active buyers.  As an initial matter, Plaintiffs appear to conflate buyers and users.

19   As the CAC acknowledges, users and buyers are two different metrics used in the Registration

20   Statement.  *See id.* ¶¶ 68-69 (describing MAUs and last-twelve month (LTM) active buyers).  Yet

21   Plaintiffs allege that the Registration Statement's disclosures about buyers were false and

22   misleading based on alleged omissions about users.  Even if the Registration Statement

23   misleadingly omitted information about users, as Plaintiffs contend, Plaintiffs have not provided

24   sufficient factual allegations to enable the Court to reasonably infer that separate statements about

25   buyers were misleading.

26        Moreover, as the Court explained above when discussing Wish's MAU data disclosures,

27   Plaintiffs have not identified a misleading statement or omission about users. The Registration

28   Statement disclosed actual quarterly MAU data from before the IPO, including data for the third

quarter of 2020.  *See* CAC ¶ 70.  Plaintiffs ignore this, and they do not dispute the accuracy or veracity of these numbers.  Nor do Plaintiffs identify an intervening event in the fourth quarter of 2020—the quarter during which Wish filed its Registration Statement—that would require Wish to disclose intra-quarter MAU data.  *Compare Nguyen*, 234 F. Supp. 3d at 546 ("A company . . . has no general obligation to disclose the results of a quarter in progress." (internal quotation marks and citations omitted)), *with In re Facebook*, 986 F. Supp. 2d at 513 ("[I]ntra-quarter updates may be required if intervening events trigger a duty to disclose." (cleaned up)).  Plaintiffs' assertion that the Registration Statement contains misleading statements about buyers based on alleged omissions about users thus fails for the independent reason that Plaintiffs have not identified an actionable omission.

Accordingly, to the extent that Plaintiffs' Section 11 claim is premised on statements or omissions about active buyers, it is hereby DISMISSED WITH LEAVE TO AMEND.

### b.  Advertising

Plaintiffs allege that the Registration Statement misleadingly "failed to disclose, pursuant to Items 105 and 303, that in the fourth quarter of 2020 . . . [Wish] had pulled back advertising in India, Brazil, the Philippines and other emerging market countries outside of Europe and North America."  CAC ¶ 120.

Defendants argue that Plaintiffs have not alleged a false or misleading statement or omission regarding advertising because (1) even if Wish was required to disclose the reduction in advertising, it was not required to do so before the end of the quarter, and (2) the CAC contains no facts demonstrating that the alleged temporary decrease in advertising was a "known trend" required to be disclosed under Item 303.  MTD 15.  Plaintiffs respond that Defendants were required to disclose the decrease in advertising because it created a risk of, and ultimately correlated with, a decrease in MAUs.  Opp. 11.  Plaintiffs also respond the CAC alleges that "the declines in MAUs did not result from decreased ads and customer acquisition in countries outside Europe and North America, but rather because materially fewer customers returned to the platform."  *Id.*

To state a claim under Item 105, a plaintiff must allege that an issuer knew, at the time of

United States District Court
Northern District of California

the IPO, but did not disclose, a material factor that made an investment in the registrant or offering speculative or risky. *See Wandel v. Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022); 17 C.F.R. § 229.105. To state a claim under Item 303 a plaintiff must allege that a defendant failed to disclose a trend, demand, commitment, event, or uncertainty was both (1) known to management at the time of IPO and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation. *Steckman*, 143 F.3d at 1296; *see also Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); 17 C.F.R. §§ 229.303(b)(1)(i), (2)(ii).

The Court disagrees with Defendants that Wish had no obligation to disclose the advertising reduction on the basis that "there is no disclosure obligation before the close of a fiscal quarter." MTD 15. "Disclosures under Item 303 [are] required to be accurate and complete as of the time a Registration Statement bec[omes] effective." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d at 513. The same is true of disclosures under Item 105. Thus, to the extent that Wish was aware of a risk factor or trend, demand, commitment, event or uncertainty that would trigger Items 105 or 303, Wish was required to disclose it—even if it arose intra-quarter. *See id.*

However, the Court agrees with Defendants that Plaintiffs have not pled facts demonstrating that Defendants failed to comply with any disclosure obligation here. The CAC asserts that the reduction in advertising required disclosure under Items 105 and 303. CAC ¶ 120. Plaintiffs support this assertion with a single conclusory allegation that the advertising reduction "was reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition and also had rendered investment in the [Wish's] shares risky." *Id.* The CAC provides no facts to suggest that Defendants knew at the time of IPO that the reduction in advertising made investment in Wish risky or would have a material effect on Wish's financial position or even that the reduction was likely to last to become a "trend," such that the Registration Statement needed to disclose it under Items 105 or 303.

Accordingly, to the extent that Plaintiffs' Section 11 claim is premised on alleged omissions concerning Wish's reduction in advertising in certain emerging markets, it is hereby DISMISSED WITH LEAVE TO AMEND.

23

### c.  Internal Controls

Plaintiffs allege that certain disclosures in Wish's Registration Statement were false and misleading because Wish failed to disclose that, at the time of IPO, there were two material weaknesses in Wish's internal controls over its financial reporting.  CAC ¶ 128.  The alleged weaknesses were (1) the company did not design and maintain effective controls over information technology general controls and (2) the company did not fully implement components of the COSO framework.  *Id.*

Defendants argue that these allegations do not plead a false or misleading statement regarding internal controls because Plaintiffs do not allege any facts that the purported weaknesses in Wish's internal controls existed at the time Wish filed the Registration Statement.  MTD 15-16.  Plaintiffs respond that the CAC contains reports of former employees who "reported about internal control issues during their tenures."  Opp. 12.  Plaintiffs also argue that the Court must infer that the alleged weaknesses existed at the time of the IPO because Defendants admitted material weaknesses existed as of December 31, 2021, and prior filings stated that no changes were made to the Company's internal controls.  *Id.*

The Court finds that Plaintiffs have failed to allege facts to suggest that the Registration Statement contained a false or misleading statement or omission regarding Wish's internal controls over financial reporting.  Plaintiffs allege that Wish's management discovered the two alleged weaknesses in its internal controls in March 2022, during the preparation and audit of the company's consolidated financial statements for the year ended December 31, 2021.  CAC ¶¶ 168-70.  But Wish's discovery of weaknesses in internal controls over a year after its IPO does not, by itself, plausibly suggest that such weaknesses existed at the time of the IPO.  *See Hunt v. Bloom Energy Corp.*, No. 19-CV-02935-HSG, 2021 WL 4461171, at *13 (N.D. Cal. Sept. 29, 2021) (declining to infer that material weaknesses in financial controls recognized in a 2019 10-K implicated representations about financial controls in 2017).

Nor do statements in Wish's filings between the Registration Statement and the March 2022 discovery bridge the gap.  These filings stated that "[t]here were no changes in [Wish's] internal control over financial reporting identified . . . that have materially affected, or are

1    reasonably likely to materially affect, [Wish's] internal control over financial reporting."  May

2    2021 10-Q, at 27 (cleaned up).  The Court finds that it is not reasonable to infer based on this

3    statement that the material weaknesses Wish identified in March 2022 existed at the time of the

4    IPO in December 2020.

5           The reports by former employees (FEs) described in the CAC also do not plausibly suggest

6    that the control weaknesses identified in March 2022 existed when Wish filed its Registration

7    Statement.  The CAC includes allegations concerning internal controls based on the statements of

8    FE1 and FE3, two former employees who were at Wish before the IPO.  *See* CAC ¶¶ 117, 118.

9    According to Plaintiffs, FE1 stated that "[Wish] maintained no entry management system, (forcing

10   inventory counts by hand), and the finance function did not have an assigned Data Manager."

11   Opp. 12 (citing ¶ 117).   Plaintiffs also identify allegations that "FE3 recounted . . . the chaotic

12   budget control of the Finance department and the lack of oversight over the Advertising Team's

13   spending."  Opp. 12 (citing ¶ 118).  But the CAC does not appear to allege that these issues

14   existed at the time of the IPO.  CAC ¶¶ 117-18.  Nor is it clear that these issues are related to the

15   internal control weaknesses identified in March 2022 concerning "controls over information

16   technology general controls" and "components of the COSO framework."  *See* CAC ¶ 116.  The

17   Court therefore cannot reasonably infer that the weaknesses in Wish's internal controls identified

18   in March 2022 existed at the time of IPO based on former employees' statements about apparently

19   unrelated control issues.  *See In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 843 (N.D. Cal.

20   2019) (alleged unauthorized use of data by app developers did not render statement about

21   preventing data theft by malicious actors who use methods like phishing false because the issues

22   were not sufficiently related).

23          Accordingly, to the extent that Plaintiffs' Section 11 claim is premised on alleged

24   omissions concerning statements about Wish's internal controls, it is hereby DISMISSED WITH

25   LEAVE TO AMEND.

26                        **d.  Financial Data Projections**

27          Plaintiffs allege in that "the Registration Statement . . . failed to disclose that Defendants

28   manipulated the financial data of the financial statements in the Registration Statement."  CAC ¶

United States District Court
Northern District of California

1    121.  Defendants argue that this allegation does not support a Plaintiffs' claims because it is

2    unsupported by factual allegations.  MTD 16.  Plaintiffs respond by identifying allegations that a

3    former employee has stated that Defendant Bahri "tailored financial data to inflate artificially and

4    materially the Company's outlook"; "overrode . . . numbers"; "adjusted key drivers for the

5    forecast to improve [Wish's] financial outlook in advance of and just after the IPO"; and enlisted

6    an employee to "manipulate metrics."  Opp. 12.

7          The Court agrees with Defendants that Plaintiffs fail to allege sufficient facts to state a

8    claim.  Under Rule 9(b), "[a] complaint must allege specific facts regarding the fraudulent activity,

9    such as the time, date, place, and content of the alleged fraudulent representation, how or why the

10   representation was false or misleading, and in some cases, the identity of the person engaged in the

11   fraud."  *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d at 1065.  Here, the CAC alleges

12   that Defendants manipulated data, but it fails to allege basic facts about that data.  The CAC does

13   not identify, for example, what data was manipulated and what specific disclosures reflect this

14   manipulated data.  Plaintiffs therefore fail to state a claim because they fail to "specify each

15   statement alleged to have been misleading [and] the reason or reasons why the statement is

16   misleading."  *Metzler*, 540 F.3d at 1061.

17         Accordingly, to the extent that Plaintiffs' Section 11 claim is premised on Defendants'

18   alleged manipulation of data, it is hereby DISMISSED WITH LEAVE TO AMEND, as Plaintiffs

19   have failed to allege sufficient facts to support this allegation.

20                    **e.  Conclusion**

21         For the foregoing reasons, the Court finds that Plaintiffs have not alleged facts to support

22   their contention that Wish's Registration Statement contained a material omission or

23   misrepresentation.  Defendants' motion to dismiss Plaintiffs' Section 11 claim is therefore

24   GRANTED WITH LEAVE TO AMEND.

25         **B.    Section 10(b) Claim (Count III)**

26                **1.  Applicable Law**

27         Section 10(b) makes it unlawful "for any person . . . [t]o use or employ, in connection with

28   the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the Commission may prescribe[.]"  Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), in turn makes it unlawful for any person,

> To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a securities fraud claim, a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017).

### 2.   Discussion

Defendants argue that Claim 3 in the CAC should be dismissed because it lacks factual allegations to plausibly allege that Wish Defendants (1) made material misrepresentations or omissions or (2) that they did so with the requisite scienter.  The Court addresses each issue in turn.

### a.   Material Misrepresentations

Plaintiffs' Section 10(b) claim is based on alleged misrepresentations and omissions in the following disclosures:

- Registration Statement, effective December 15, 2020
- Form 8-K, dated March 8, 2021 ("March 2021 8-K")
- Earnings Call held on March 8, 2021 ("March 2021 Earnings Call")
- Form 10-K for Fiscal Year Ended December 31, 2020 ("2020 10-K")

As the Court explained in its analysis of Plaintiffs' Section 11 claim, the CAC does not allege facts to support Plaintiffs' contention that Wish's Registration Statement contained a material omission or misrepresentation.  Accordingly, to the extent Plaintiffs base their Section

United States District Court
Northern District of California

10(b) claim on alleged omissions or misrepresentations in the Registration Statement, Plaintiffs have failed to state a claim.

The Court also notes that the alleged misrepresentations and omissions of the 2020 10-K are substantially the same as the alleged misrepresentations or omissions of the Registration Statement. Specifically, as Plaintiffs note in their opposition, the alleged misrepresentations and omissions in the 2020 10-K were that it "failed to disclose that the potential declines in MAUs had occurred," attributed growth of user and buyer base to "growing popularity and recognition of the platform," "failed to disclose internal control problems," and "failed to disclose that Defendants manipulated the financial data of financial statements in the Registration Statement." Opp. 15. Plaintiffs assert that "[t]hese statements [in the 2020 10-K] were false and misleading because Defendants failed to disclose that the significant increase of MAUs was primarily caused by the irregular increase of visits to [Wish's] platform during Covid that was not sustainable." *Id.* These are the same allegations that the Court found to be insufficient to state a claim under Section 11 because of their failure to plausibly allege a false or misleading statement. The Court thus finds that these allegations are insufficient to state a claim under Section 10(b) for the same reason: Plaintiffs have not alleged the requisite facts to establish that any of the statements was materially false or that there was a material omission.

Plaintiffs' allegations regarding the March 2021 8-K and March 2021 Earnings Call include alleged misrepresentations and omissions that the Court has not yet addressed. These alleged misrepresentations fall into three categories (1) the location of MAU declines; (2) revenue projections; and (3) delivery times. The Court addresses each in turn.

### i. Location of MAU Declines

Plaintiffs challenge disclosures in Wish's March 2021 8-K and March 2021 Earnings Call that state that (1) MAUs had declined year over year "primarily in some emerging markets outside of Europe and North America where Wish temporarily de-emphasized advertising and customer acquisition" and (2) Wish "expect[ed] again to engage with these markets to get those MAUs back." CAC ¶¶ 130, 141; *see also* ¶¶ 135, 140. Plaintiffs allege that the first statement was false and misleading for two reasons: first, MAUs declined not only in the emerging markets but also in

28

Europe and North America, *id.* ¶¶ 131, 136, 141; and second, MAUs declined not because decreased advertisements attracted fewer customers but because materially fewer customers returned to the platform, *id.* ¶¶ 132, 137.  Plaintiffs allege that the second statement was false and misleading because "Defendants failed to disclose that the MAUs in the emerging markets would not improve."  *Id.* ¶ 141.

Defendants argue that the challenged statements were not false or misleading.  As to MAU declines in Europe and North America, Defendants argue that the statements were not false because they stated that the MAU decline occurred "primarily" in the emerging markets, not solely in the emerging markets.  MTD 13.  As to the impact of deemphasized advertising, Defendants argue that there is nothing inconsistent between lower MAUs from decreased advertising and lower MAUs from fewer customers returning to the platform.  *Id.*  As to the statements about getting MAUs back, Defendants argue that Plaintiffs fail to plead that Mr. Bahri, the defendant who made the challenged statement, did not hold the belief he professed or that the belief was objectively untrue.  *Id.* at 13-14.  Defendants further argue that Mr. Bahri's statements are protected under the PSLRA because they were forward looking.

Plaintiffs dispute Defendants' points.  As to MAU declines in Europe and North America, Plaintiffs repeat their allegations.  Opp. 13.  As to the impact of deemphasized advertising, Plaintiffs state that the CAC alleges that there was a "positive correlation between the ad spends and MAU numbers."  *Id.*  And as to Mr. Bahri's statement, Plaintiffs assert that the statement is actionable even if sincerely held because it omitted information necessary to make the statement not misleading.  *Id.*  Plaintiffs finally argue that Mr. Bahri's statements are not protected under the PSLRA's safe harbor because they were not forward looking.  *Id.*

Regarding the location of the MAU declines, the Court agrees with Defendants that Plaintiffs have failed to plead falsity of the challenged statement.  A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  The challenged statement disclosed that Wish lost MAUs "primarily in some emerging markets."

29

Plaintiffs allege that this statement is false or misleading because Wish failed to disclose that MAUs declined "not only in some emerging markets outside of Europe and North America but also . . . in the US and Europe." *See, e.g.*, CAC ¶ 131.  But Defendants' disclosure did not state that the losses occurred "only" in some emerging markets.  It stated that MAU losses occurred "primarily" in some emerging markets.  Plaintiffs do not allege facts showing greater losses elsewhere to support the claim of falsity in describing the emerging markets losses as "primary."  Further, Defendants' disclosure that MAU losses occurred primarily in one location does not, standing alone, establish that a reasonable investor would have the misimpression that there were no losses in another location or that such a misimpression is material.  While there may be facts that render Defendants' disclosure false or misleading, Plaintiffs have not pled them.

Regarding the impact of decreased advertising, however, the Court finds that Plaintiffs have adequately pled falsity.  The challenged statement disclosed that MAUs declined in certain emerging markets "where Wish temporarily de-emphasized advertising and customer acquisition."  CAC ¶ 130.  Plaintiffs allege this was false or misleading because Defendants attributed MAU declines to "decreased ads attracting fewer new customers" rather than "materially fewer customers return[ing] to the platform."  *See* CAC ¶¶ 132, 137.  Plaintiffs adequately allege falsity here because the challenged statement would have given a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed.  *See Berson*, 527 F.3d at 985.  An investor reviewing the challenged statement would have reasonably believed that the MAU decline in certain emerging markets was caused by the deemphasis in advertising and customer acquisition, as this was the only factor disclosed in the statement.  *See* CAC ¶ 130.  This perception would have been incorrect, according to the allegations in the CAC, because the MAU decline was not due to customer acquisition but rather due to customer retention.  CAC ¶ 132 (alleging that real reason for the MAU decline was "materially fewer customers return[ing] to the platform").

Finally, regarding Defendant Bahri's statement that Wish expected again to engage with the emerging markets "to get those MAUs back," the Court finds that Plaintiffs have not adequately pled falsity.  "[W]hen a plaintiff relies on a theory of material misrepresentation, the

plaintiff must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)).  The CAC includes no factual allegations that would enable the Court to reasonably infer that Mr. Bahri did not hold the belief that Wish expected to reengage with the emerging markets to get MAUs back.  Nor does it include allegations that would enable the Court to infer that this belief was objectively untrue.  Accordingly, Plaintiffs have not pled that Mr. Bahri's statement was a material misrepresentation.

In sum, the Court finds that Plaintiffs have adequately pled the falsity of Defendants' statement that MAUs had declined "primarily in some emerging markets . . . where Wish temporarily de-emphasized advertising and customer acquisition" on the basis that the statement omits that the decline was also due to "materially fewer customers return[ing] to the platform." Plaintiffs have not, however, adequately pled falsity of the disclosures concerning the location of MAU declines on any other basis.

### ii.    Revenue Projections

Plaintiffs challenge financial projections in the March 2021 8-K and March 2021 Earnings Call that disclosed the Company's outlook for the first quarter of 2021.  The outlook projected that revenue would be in the range of $735 to $750 million, which would reflect a 67% to 70% year-over-year increase.  CAC ¶¶ 133, 138.  Plaintiffs alleged that this projection was false or misleading because "Defendants failed to disclose that these numbers were unattainable" and that "[Wish] manipulated these key drivers for the forecast to make the data look better." *Id.* ¶¶ 134, 139.

Defendants argue that the projections were not false or misleading because Wish beat the "unattainable" projections.  MTD 16-17; *compare* March 2021 8-K, at 7 (projecting revenue of $735-$750 million), *with* May 2021 10-Q, at 8 (reporting revenue of $772 million).  Defendants further argue that even if Wish had not hit the projections, the PSLRA safe harbor protects the statements because Plaintiffs have not shown that Defendants made the statements with actual knowledge that they were false, and that the statements were not accompanied by meaningful

1  cautionary statements.  *Id.* 17-18.

2       Plaintiffs argue that Defendants' claim that Wish beat projections is irrelevant because the

3  CAC alleges that Defendants "manipulated key drivers to meet expectations."  Opp. 14.  Plaintiffs

4  also argue that Defendants cannot invoke the PSLRA safe harbor because "Plaintiffs alleged that

5  Defendants were aware of the falsity of their misrepresentations" and Defendants' cautionary

6  statements were too generalized.  *Id.* 13-14.

7       The Court finds that Plaintiffs have failed to allege an actionable statement regarding

8  Wish's revenue projections in either the March 2021 8-K or Earnings Call.  The Court agrees with

9  Defendants that the allegation that "Defendants failed to disclose that [projections] were

10  unattainable" is implausible where, as here, Defendants beat those projections.  Plaintiffs'

11  allegation that Defendants "manipulated . . . key drivers" related to the projections does not

12  undermine this conclusion, as Plaintiffs have not pled any facts to support this conclusory

13  allegation.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055 (court need not accept as true

14  "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

15  inferences.").  Nor have Plaintiffs even identified what "key drivers" the Defendants purportedly

16  manipulated.  Plaintiffs' failure to allege what key drivers were manipulated and how Defendants

17  manipulated them is fatal to their claim.  *C.f. Metzler*, 540 F.3d at 1061 (plaintiff must "specify

18  each statement alleged to have been misleading [and] the reason or reasons why the statement is

19  misleading.").

20       The projections are also not actionable because they are protected under the PSLRA's safe

21  harbor provision.  Earnings projections are generally considered forward-looking statements.  *See*

22  *In re Cutera*, 610 F.3d at 1111.  "A defendant will not be liable for a false or misleading statement

23  if it is forward-looking and *either* is accompanied by cautionary language *or* is made without

24  actual knowledge that it is false or misleading."  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th

25  Cir. 2021) (emphasis in original and citation omitted); *see also In re Cutera*, 610 F.3d at 1111–12;

26  15 U.S.C. § 78u-5(c)(1).

27       As an initial matter, the Court finds that the projections in the March 2021 8-K and

28  Earnings Call are not actionable as currently alleged because Plaintiffs identify no facts that would

United States District Court
Northern District of California

1    enable the Court to reasonably infer that the projections were made with actual knowledge that

2    they were materially false or misleading.  *See* Opp. 14.

3         The Court further finds that the projections in the March 2021 8-K are protected under the

4    PSLRA's safe harbor for the independent reason that they were accompanied by meaningful

5    cautionary language.  As Defendants note, the March 2021 8-K listed in detail the risks that could

6    affect the forward-looking guidance, including "efforts to improve . . . logistics programs to enable

7    faster and more reliable delivery," "efforts to build out and grow [the] Wish Local program in a

8    cost-effective manner," and "the COVID-19 pandemic."  *See* Lutz Decl. March 2021 10-K, at 9.

9    This identification of specific "important factors" that could impact results constitutes

10   "meaningful cautionary language."  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).

11        The Court finds that Defendants have not identified meaningful cautionary statements in

12   the March 2021 Earnings Call, however.  Defendants rely on the following statement:

13            During the call, we will make forward-looking statements about our
              future plans and financial performance. Although we believe the
14            expectations reflected in the forward-looking statements are
              reasonable, we cannot guarantee these results. These statements are
15            subject to risks, uncertainties, and assumptions.

16   Lutz Decl. Ex. 3, at 1-2; *see also* MTD 17.  Defendants contend that this statement is similar to the

17   statements held to be meaningful in *Police Retirement System of St. Louis v. Intuitive Surgical,*

18   *Inc.*, 759 F.3d 1051 (9th Cir. 2014) [hereinafter "*Intuitive*"].  *See* Reply 8.  The Court disagrees.

19   In *Intuitive*, the cautionary language expressly incorporated the "risks and uncertainties . . .

20   described in the company's [SEC] filings."  759 F.3d at 1059.  Here, the statements in the

21   Earnings Call contained no such incorporation of the risks and uncertainties disclosed in Wish's

22   SEC filings.  Rather, the statements on the March 2021 Earnings Call consisted of only boilerplate

23   warnings.  These do not constitute "meaningful cautionary statements."  *See Zaghian v. Farrell*,

24   675 F. App'x 718, 720 (9th Cir. 2017).  Accordingly, the Defendants have not established that the

25   projections in the March 2021 Earnings Call are protected under the PSLRA safe harbor on the

26   basis of "meaningful cautionary language."  Nevertheless, as noted above, these projections are

27   protected on the separate basis that Plaintiffs have not alleged facts to show that Defendants had

28   actual knowledge that they were false or misleading.

United States District Court
Northern District of California

33

1    Accordingly, to the extent Plaintiffs' Section 10(b) claim is premised on an alleged

2    misrepresentation about revenue projections, it is hereby DISMISSED WITH LEAVE TO

3    AMEND.

4                    iii.    **Delivery Times**

5    Finally, Plaintiffs allege that Mr. Szulczewski's statement during the March 2021 Earnings

6    Call that Wish experienced "improved time to door estimates" was misleading because "the

7    Company's 'Time to Door' performance was very poor but the Company was unable to improve

8    it."  CAC ¶¶ 142-43.

9    Defendants argue that this statement is not actionable under Section 10(b) because

10   Plaintiffs have failed to allege that it was false.  MTD 18.  Plaintiffs respond that "Defendants

11   failed to disclose information regarding poor 'Time to Door' performance."  Opp. 15.

12   Plaintiffs have failed to plead facts to plausibly allege that Mr. Szulczewski's statement

13   was a material misrepresentation.  The only basis Plaintiffs offer for their assertion that the

14   statement was false is the allegation that "Defendants failed to disclose that the Company's 'Time

15   to Door' performance was very poor but the Company was unable to improve it."  CAC ¶ 143.

16   But the allegation that time-to-door performance was poor does not enable the Court to reasonably

17   infer that Mr. Szulczewski's statement was false because it is not inconsistent that Wish's time-to-

18   door performance was poor but that Wish had nevertheless experienced improved time-to-door

19   estimates.  Plaintiffs' separate assertion Wish was unable to improve time-to-door performance is

20   insufficient to establish the falsity of Mr. Szulczewski's statement because it is unsupported by

21   any factual allegations.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055 (court need not accept as

22   true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

23   inferences.").  Plaintiffs have thus failed to plead sufficient facts to support their claim that Mr.

24   Szulczewski's statement was a material misrepresentation.

25   Accordingly, to the extent Plaintiffs' Section 10(b) claim is premised on an alleged

26   misrepresentation about delivery times, it is hereby DISMISSED WITH LEAVE TO AMEND.

27                        *        *        *

28   In sum, the Court finds that Plaintiffs have adequately pled the falsity of Defendants'

United States District Court
Northern District of California

34

1    statement that MAUs had declined "primarily in some emerging markets . . . where Wish

2    temporarily de-emphasized advertising and customer acquisition" on the basis that the statement

3    omits that the decline was also due to "materially fewer customers return[ing] to the platform."

4    Plaintiffs have not, however, adequately pled falsity of any other challenged statement.

5                                        **b.  Scienter**

6             Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst &*

7    *Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  To plead scienter, the complaint must "state

8    with particularity facts giving rise to a strong inference that the defendant acted with the required

9    state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  Scienter is adequately pled when "all of the facts

10   alleged, taken collectively give rise to a strong inference of scienter." *Tellabs*, 551 U.S. 323.  This

11   means that "[a] complaint will survive . . . only if a reasonable person would deem the inference of

12   scienter cogent and at least as compelling as any opposing inference one could draw from the facts

13   alleged." *Id.* at 324.

14            The Court finds that Plaintiffs' allegations regarding the independent directors are

15   insufficient to state a claim.  "Where, as here, the Plaintiffs seek to hold individuals and a

16   company liable on a securities fraud theory, we require that the Plaintiffs allege scienter with

17   respect to each of the individual defendants." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,

18   774 F.3d 598 (9th Cir. 2014).  Plaintiffs offer no specific allegations as to any of the independent

19   directors. *See* CAC ¶ 201.  Accordingly, Plaintiffs' claim under Section 10(b) is DISMISSED as

20   to independent directors Julie Bradley, Ari Emmanuel, Joe Lonsdale, Tanzeen Syed, Stephanie

21   Tilenius, Hans Tung, and Jaqueline Reses WITH LEAVE TO AMEND.

22            As to the other Wish Defendants—Piotr Szulczewski, Rajat Bahri, Brett Just, and Wish—

23   Plaintiffs endeavor to establish scienter through (i) former employee statements and related

24   allegations concerning officers' awareness of facts contradicting public statements; (ii) a core

25   operations theory, (iii) insider trades; and (iv) officer resignations and other personnel changes.

26   The Court analyzes each of grounds below.

27                                **i.    Former Employee Statements and Related Allegations**

28            "[A] complaint relying on statements from confidential witnesses must pass two hurdles to

---

United States District Court
Northern District of California

35

satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995 (citations omitted).

Plaintiffs attempt to establish scienter through the allegations based on the statements of four former employees (FEs). The parties divide their dispute over the sufficiency of the FE allegations into two parts. The parties first dispute whether the Court should consider the FE statements at all. The parties then dispute whether the FE statements and related allegations establish scienter as to certain topics of misrepresentations. The Court will address each argument in turn.

Defendants argue that the Court cannot credit the allegations of FEs 2, 3, and 4 because these FEs are not alleged to have had any interaction with the Wish Defendants. MTD 20. Defendants further argue that because FE 1 is alleged to only have directly interacted with Bahri, his allegations as to Szulczewski and Just are necessarily insufficient. *Id.*

Plaintiffs respond that the FEs' lack of direct interaction with Defendants does not indicate unreliability. Opp. 16-17. Plaintiffs further argue that the former employees' job roles establish their knowledge of data contradicting Defendants' public statements. *Id.* at 16-17. Finally, Plaintiffs that the consistency of the FEs' statements supports their reliability. *Id.* at 17.

The Court agrees with Plaintiffs that an FE's lack of direct contact with any Defendant does not preclude the Court from considering the FE's statements. The relevant question is whether a given former employee was "in a position to be personally knowledgeable of the information alleged." *Zucco Partners*, 552 F.3d 581. The answer to that question turns on the information alleged. A confidential witness who is not alleged to have had direct contact with a given Defendant likely cannot offer reliable statements about that Defendant's state of mind, but that does not mean the confidential witness's statements about any subject must be disregarded. *Cf. Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1146 (N.D. Cal. 2017) ("Even if the CWs statements are unreliable as to the individual Defendants' state of mind, they reliably bolster the

36

conclusion that DAU was Twitter's primary user engagement metric.").  The Court therefore declines Defendants' invitation to adopt a broad rule that would disregard any allegation based on the statement of an FE that has not had direct contact with Defendants.

Separate from this general argument about the adequacy of the FEs contacts with the individual Defendants, the parties dispute whether the CAC sufficiently alleges scienter, including based on FE statements, as to Defendants' disclosures or omissions regarding certain topics.  The topics are data disclosures, data manipulation, internal controls, and advertising decreases.  The Court analyzes the allegations concerning each topic below.

Data Disclosures:  The Court starts with Plaintiffs' allegations regarding Wish's data disclosures.  Plaintiffs allege that, according to FE 1, Defendants had access to MAU reports, Gross Merchandise Value ("GMV") historical data, and P&L reports demonstrates.  *See* CAC ¶¶ 92, 94, 95.  Plaintiffs further allege, supported by FE statements, that the data showed deteriorating performance in 2019, the Covid bump at the beginning of 2020, and the deterioration of MAUs and active buyers starting from August 2020.  *Id.* ¶¶ 99, 103-04, 107-08.  Finally, Plaintiffs allege, supported by FE statements, that poor time-to-door performance was causing MAUs to materially deteriorate, *see id.* ¶¶ 98, 100, 105, 109, and that this was an issue confronting senior executives, *see id.* ¶ 100.

Defendants contend that these allegations are insufficient to raise an inference of scienter as to any Defendant because Plaintiffs allege no facts demonstrating that the FEs have firsthand knowledge about what any Defendant knew or did not know.  Reply 10.  Defendants contend that Plaintiffs' assertions that Defendants had access to data are not enough to plausibly allege any Defendant acted with scienter.  *Id.*  As to time-to-door performance, Defendants argue that Plaintiffs' allegations that the information was widely known in the company does not support an inference that any Defendant acted with scienter.  *Id.* at 11.

Plaintiffs argue that their allegations are sufficient because the FEs describe the content of the data that Defendants had access to.  Opp. 18.  Plaintiffs further argue that the consistency of FE statements that the company was experiencing poor time-to-door performance and the fact that Szulczewski mentioned improving time-to-door performance shows that the problem was widely

United States District Court
Northern District of California

1    known in the company, including to Defendants.  *Id.*

2         The FE statements about Defendants' access to data do not support an inference of

3    scienter.  General allegations of access to data are insufficient to support an inference of scienter.

4    *See, e.g., Lipton v. PathoGenesis Corp.*, 284 F.3d at 1036; *see also Police Ret. Sys. of St. Louis v.*

5    *Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) ("Mere access to reports containing

6    undisclosed sales data is insufficient to establish a strong inference of scienter.").  To raise an

7    inference of scienter based on access to internal reports, Plaintiffs must include "corroborating

8    details" about the reports.  *See In re Vantive*, 283 F.3d at 1088.  These corroborating details should

9    include, for example, identification of dates and contents of the reports.  *Id.*  Here, Plaintiffs allege

10   based on FE statements that Defendants had access to MAU reports, GMV reports, and P&L

11   statements, *see* CAC ¶¶ 92, 94, 95, and they state that MAUs were declining before and after the

12   "Covid bump," *see* CAC ¶¶ 99, 103-04, 107-08   But the Ninth Circuit has repeatedly held that

13   allegations of "mere access" to data are insufficient to plead scienter, *see, e.g.*, *Intuitive*, 759 F.3d

14   at 1063, and none of the FEs allege that any Defendant reviewed this data.  Moreover, the FEs do

15   not state how any of the reports to which Defendants had access contradicted any Defendant's

16   public statements.  The FE statements that Defendants had access to the data are, therefore,

17   deficient because they are not themselves "indicative of scienter."  *See Zucco Partners*, 552 F.3d

18   at 995.

19        Plaintiff's allegation that the issue of poor time-to-door performance was widely known,

20   also does not plausibly allege that any Defendant acted with scienter.  *See Knollenberg v.*

21   *Harmonic, Inc.*, 152 F. App'x 674, 681–82 (9th Cir. 2005) ("The allegation that [a fact] was

22   'common knowledge' . . . does not comport with the PSLRA's requirement that plaintiffs allege

23   the required state of mind as to each Defendant who made an allegedly misleading statement and

24   is therefore insufficient.").  The CAC does not identify any specific information that was either

25   received or communicated by any Defendant about time-to-door performance that would

26   contradict any public statement at the time it was made.  Thus, Plaintiffs fail to allege when and

27   how any of the Defendants became aware of any facts giving rise to inference of scienter.

28        <u>Data Manipulation</u>:  Plaintiffs' allegations regarding Defendants' alleged manipulation of

38

data also fail to give rise to a strong inference of any Defendant's scienter.  Plaintiffs allege that, according to FE 1, "Defendant Bahri tailored financial data to inflate artificially and materially the company's outlook," "overrode" numbers related to "historical data," and "adjusted key drivers for the forecast."  CAC ¶ 110; *see also* Opp. 19-20.  These allegations fail because FE 1's statements are not "described with sufficient particularity to establish their reliability and personal knowledge."  *See Zucco Partners*, 552 F.3d at 995.  Plaintiffs do not plead facts that would enable the Court to infer that FE 1 actually knew that data was manipulated, including facts about what specific data was manipulated, how it was manipulated, or how FE 1 was aware that the data was manipulated.  Without these facts, it is unclear whether FE 1 was "positioned to know the information alleged," and it is therefore unclear whether FE 1's statements are reliable.  *Id.* at 996.

The Court notes that Plaintiffs argue in their opposition that the 3Q20 MAUs were falsely inflated because the July 2020 MAUs were impossibly higher than the MAUs in April and May 2020 peak.  Opp. 19.  Although Plaintiffs cite to paragraphs in the CAC to support this allegation, it is unclear that Plaintiffs pled this allegation.  The argument therefore cannot save Plaintiffs' claims on a motion to dismiss.  *See Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.").

Internal Controls:  Plaintiffs' allegations regarding Defendants' purported knowledge of internal control issues also fail to give rise to a strong inference of any Defendant's scienter.  Plaintiffs allege that "[a]ccording to FE 1, material internal control deficiencies were serious, something about which he repeatedly warned . . . Brent Just."  CAC ¶ 117.  Plaintiffs contend that this allegation supports the conclusion that Defendants knowingly, or with deliberate recklessness, failed to disclose that control weaknesses Defendants disclosed in March 2022 existed at the time of the IPO and throughout the class period.  Opp. 20.  The Court disagrees.  The allegation includes no specific facts about what "internal control deficiencies" FE 1 disclosed to Defendant Just.  This allegation is therefore not "indicative of scienter" because it is unclear whether the purported deficiencies FE 1 disclosed to Just were the control weaknesses Defendants disclosed in

1    March 2022.  *See Zucco Partners*, 552 F.3d at 995.

2        <u>Advertising</u>:  Finally, the Court finds that Plaintiffs' allegations regarding discontinued

3    advertising in certain emerging markets fail to give rise to a strong inference of any Defendant's

4    scienter.  Plaintiffs allege that Szulczewski knew that there was a correlation between advertising

5    spend and MAUs and that "advertising spend [was] a daily conversation for him," CAC ¶¶ 114-

6    15, and that Bahri "worked closely with Szulczewski on advertising spend," *id.*  Plaintiffs contend

7    that this knowledge combined with either Defendants' failure to disclose that Wish decreased its

8    advertising spend in certain markets creates a strong inference of scienter.  *See* Opp. 20-21; *see*

9    *also* CAC ¶¶ 112-13.

10        To allege that Defendants omitted information with scienter, Plaintiffs must plead that

11    Defendants intended the omission to be misleading or that the omission was "highly

12    unreasonable."  *Zucco Partners*, 552 F.3d at 991.  For an omission to be "highly unreasonable" it

13    must be "an extreme departure from the standards of ordinary care . . . which presents a danger of

14    misleading buyers or sellers that is either known to the defendant or is so obvious that the actor

15    must have been aware of it."  *Id.*  Here, Plaintiffs have not alleged any facts to suggest that

16    Defendants intended to mislead investors.  Nor have they alleged facts that would suggest that the

17    omission presented a danger of misleading investors that was known to Defendants or otherwise

18    obvious.  Accordingly, the Court finds that Plaintiffs' allegations regarding discontinued

19    advertising in certain emerging markets fail to create a strong inference of any Defendants'

20    scienter.

21        Related to disclosures concerning advertising, the Court notes that it found above that

22    Plaintiffs adequately alleged falsity of the following challenged statement: "MAUs declined . . .

23    primarily in some emerging markets . . . where Wish temporarily de-emphasized advertising and

24    customer acquisition."  CAC ¶ 130.  As stated above, taking Plaintiffs' allegations as true, this

25    statement was false because an investor would have reasonably believed that the MAU decline in

26    certain emerging markets was caused by the deemphasis in advertising and customer acquisition,

27    not the loss of existing customers.  *See id.*  The parties do not discuss, and the Court cannot find

28    any factual allegation in the CAC that any Defendant knew that the MAU decline in these

emerging markets was due to the loss of customers and not decreased advertising.  Accordingly, the Court finds that this allegedly false statement does not state a claim against any Defendant because Plaintiffs have not alleged that a Defendant made the statement with scienter.

In sum, the Court finds that the former employee statements and related allegations do not support an inference of scienter.

### ii.    Core Operations Theory

The "core operations" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers.  *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018).  "Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."  *Metzler Inv. GMBH*, 540 F.3d at 1068.  On the other hand, "specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements . . . is sufficient under the PSLRA."  *S. Ferry*, 542 F.3d at 785.

"Allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances.  [1] the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations. . . . [2] such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information. . . . [3] such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."  *Id.* at 785–86.

Plaintiffs raise the core operations doctrine in their opposition.  Opp. 21.  Plaintiffs argue that "Defendants knew of issues concerning MAUs, buyers, and other disputed data" because MAUs and active buyers were key metrics for Wish, Defendants Szulczewski and Bahri had

1    discussed these metrics, and the executive officers are responsible for the day-to-day management

2    of material risks.  *Id.*  Defendants respond that Plaintiffs' invocation of the core operations

3    doctrine is beside the point because the Plaintiffs have not alleged that Defendants had access to

4    any information that contradicts their statements to investors.  Reply at 13.

5          The core operations doctrine allows a court to infer a key officers' knowledge of certain

6    facts critical to a business's "core operations."  *See Webb*, 884 F.3d at 854.  Here, Plaintiffs seek

7    to use the doctrine to establish that Defendants were aware of MAU numbers and related data

8    based on their alleged access to data.  But alleging access to data is not sufficient to establish

9    scienter under the core operations doctrine.  *Id.* at 857 ("generalized access to reports" does not

10   plead scienter).  "A plaintiff must produce either specific admissions by one or more corporate

11   executives of detailed involvement in the minutia of a company's operations, such as data

12   monitoring, or witness accounts demonstrating that executives had actual involvement in creating

13   false reports."  *See Intuitive Surgical*, 759 F.3d at 1062 (citation omitted).  Here, Plaintiffs have

14   alleged no admissions by any Defendant of detailed involvement in monitoring MAU data.

15   Instead, Plaintiffs rely on allegations that certain reports were distributed to Defendants.  *See* CAC

16   ¶¶ 92, 94, 95.  This is insufficient to plead scienter.  *See Zucco Partners*, 552 F.3d at 1000 (finding

17   "allegations that senior management . . . closely reviewed the accounting numbers generated . . .

18   each quarter . . . and that top executives had several meetings in which they discussed quarterly

19   inventory numbers" insufficient to establish scienter).

20         The cases Plaintiffs rely on do not undermine this conclusion, as none relied on the mere

21   access to data.  *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 696, 705-706 (9th Cir. 2021)

22   (imputing knowledge of "largest data-security vulnerability in the history of [Alphabet and

23   Google]" to Alphabet CEO where data vulnerability was documented in a memo that Google CEO

24   was alleged to have read, Google CEO reported directly to Alphabet CEO, and the two CEOs

25   approved plan to shut down Google+ because of security concerns revealed in the memo);

26   *Shenwick*, 282 F. Supp. 3d at 1147 (finding scienter where defendant "referenc[ed] the data

27   directly" and made "detailed factual statements" about it); *Brendon v. Allegiant Travel Co.*, 412 F.

28   Supp. 3d 1244, 1254, 1261 (imputing knowledge of airline's maintenance issues to CEO and COO

United States District Court
Northern District of California

1    where CEO and COO responded to questions regarding maintenance issues after the issues were

2    widely reported and 10-Ks stated that management closely supervises all maintenance functions);

3            Accordingly, the Court finds that Plaintiffs' allegations do not support an inference of

4    scienter under the core operations theory.

5                            **iii.    Insider Trades**

6            For stock sales to be suspicious, and thus indicative of scienter, Plaintiff "must allege

7    sufficient context of insider trading" for the Court to determine whether the trading is

8    "dramatically out of line with prior trading practices at times calculated to maximize the personal

9    benefit from undisclosed inside information."  *See Ronconi v. Larkin*, 253 F.3d 423, 436-37 (9th

10   Cir. 2001) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).

11   Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the

12   timing of the sales; and (3) whether the sales were consistent with the insider's trading history.

13   *Metzler*, 540 F.3d at 1067.  The Court considers these factors below and finds that the allegations

14   concerning the Individual Defendants' stock sales do not support a strong inference of scienter.

15           The allegations regarding amount and percentage of shares sold does not support an

16   inference of scienter.  Plaintiffs allege the number of shares sold and "dollar amount pocketed" for

17   each Individual Defendant.  *See* CAC ¶ 155.  But they do not allege what percentage of each

18   Individual Defendant's holdings were sold.[2]  Plaintiffs have therefore failed to allege critical

19   information for determining whether the Individual Defendants' stock sales were suspicious.

20   *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 12332 (9th Cir. 2004)

21   (noting that the Ninth Circuit has given "great weight" to the percentage of stock sold).

22           Plaintiffs contend that the total dollar amount of the stocks sold supports an inference of

23   scienter, regardless of what percentages of each Individual Defendant's holdings the sales

24   represent.  Opp. 22.  Plaintiffs rely on *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, in

25   which the Ninth Circuit held that a CEO's sales of $900 million in shares supported an inference

26

27   _____

28   [2] Plaintiffs include this information for two of the three Individual Defendants in their opposition
     brief.  The Court however cannot consider these numbers, as they are not pled.  *See Schneider*,
     151 F.3d at 1197 n.1.

United States District Court
Northern District of California

43

of scienter, even though the shares amounted to only 2.1% of his holdings.  380 F.3d 1226, 1232 (9th Cir. 2004).  The *Oracle* court explained that "where . . . stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings."  *Id.*

Here, Defendants Szulczewski, Bahri, and Just's sales amounted to $106 million, $34 million, and less than $1 million, respectively.  But as Defendants note, all of Mr. Szulczewski's sales, 83% of Bahri's sales, and 79% of Just's sales were non-discretionary sales "to cover tax withholding obligations in connection with the vesting and settlement of RSUs."  MTD 23.  "Such sales for tax reasons are not indicative of fraud."  *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, No. 13 CIV. 1307 KBF, 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014).  Removing these sales from the calculation leaves figures that are not so astronomical that they support an inference of scienter irrespective of the percentage of each Individual Defendant's holdings the sales reflect. *See In Re Alteryx, Inc. Secs. Litig.*, No. 8:20-CV-01540-DOC JDEx, 2021 WL 4551201, at *4 (C.D. Cal. June 17, 2021) (individual defendants' sales amounting to $71,201,799 and $49,104,089 were not "astronomical numbers").

The Court next turns to the timing of the sales.  Sales after corrective disclosures do not support an inference of scienter.  *See City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 227 (E.D.N.Y. 2019).  Here, Plaintiffs note that all the discretionary sales occurred after the earnings report that Plaintiffs allege revealed the year-over-year MAU decline during Q4.  *Compare* Lutz Decl. Exs. 7, 9, *with* CAC ¶ 157.  Plaintiffs never directly respond to this argument.  Nor do they identify any other allegations in the CAC that suggest that the timing of any Individual Defendant's stock sales was suspicious.  The Court therefore finds that Plaintiffs have not alleged facts regarding the timing of the sales that supports an inference of scienter.

Finally, the Court considers whether the sales were consistent with the Individual Defendant's trading history.  This factor also does not support an inference of scienter, as Plaintiffs have alleged nothing about the Individual Defendants' trading history.  *See Curry v. Yelp Inc.*, No. 14-CV-03547-JST, 2015 WL 1849037, at *13 (N.D. Cal. Apr. 21, 2015).

In sum, none of the factors relevant to assessing whether the Individual Defendants' stock

sales were suspicious supports an inference of scienter.

### iv.   Officer Departures and Personnel Changes

Plaintiffs allege that Individual Defendants Bahri and Szulczewski resigned after the Class Period.  Defendants argue that these allegations do not support an inference of scienter Plaintiffs do not plead any facts suggesting the resignations were suspicious.  MTD 23.  Defendants further argue that the timing of the resignations is not suspicious because they happened months after Plaintiffs allege "the truth began to emerge" in March 2021.  *Id.*  Plaintiffs respond that Bahri's resignation was suspicious because it occurred the month after Wish "disclosed the negative news."  Opp. 23.  Plaintiffs do not specify that what "negative news" they mean, but it appears that they are referring to the May 12, 2021, 10-Q announcing 1Q21 financial results.  *See* CAC ¶ 159.  Plaintiffs also argue that the company's firing of its auditor supports an inference of scienter. Opp. 23.

"[A]n employee's resignation supports an inference of scienter only when 'the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances.'"  *City of Dearborn Heights*, 856 F.3d at 622 (quoting *Zucco Partners*, 552 F.3d at 1002).  Here, Plaintiffs plead no facts about Bahri's or Szulczewski's resignations that would support an inference of scienter.  Plaintiffs argue that Bahri's resignation was suspicious because it occurred in the month following Wish's disclosure of negative news.  But Plaintiffs make no effort to explain why that "negative news" renders Bahri's departure suspicious.  And they make no argument at all about why Szulczewski's departure was uncharacteristic or accompanied by suspicious circumstances.  The Court therefore finds that Plaintiffs have failed to allege facts that would support an inference of scienter based on the departures of Bahri and Szulczewski.

The Court reaches the same conclusion regarding Wish's firing of its auditor, E&Y. Again, the Court finds Plaintiffs have not identified any allegations that suggest that the firing was uncharacteristic or otherwise suspicious.

Accordingly, the Court finds that Plaintiffs have not alleged facts regarding the departures of Bahri and Szulczewski or the termination of E&Y that would support an inference of scienter.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### v.   Holistic Review

After having determined that none of Plaintiffs' allegations, standing alone, is sufficient to create a strong inference of scienter, the Court now considers the allegations holistically.  *See In re VeriFone*, 704 F.3d at 702–03; *Zucco Partners*, 552 F.3d at 992.  The Court finds that taken together, the facts do not evince such fraudulent intent or deliberate recklessness as to make the inference of scienter cogent.  *Tellabs*, 551 U.S. at 323.

\*       \*       \*

In conclusion, the Court finds that the CAC fails to plead facts creating a strong inference of scienter that is cogent and at least as compelling as any opposing inference of nonfraudulent intent.  Accordingly, Defendants' motion to dismiss Plaintiffs' Section 10(b) claim is GRANTED WITH LEAVE TO AMEND.

### c.   Loss Causation

Loss causation, "i.e. a causal connection between the material misrepresentation and the loss" experienced by the plaintiff, is a necessary element of pleading a securities fraud claim under section 10(b) of the Exchange Act.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which caused the company's stock price to drop and investors to lose money."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (internal quotation marks omitted).  To be corrective, the disclosure must "relate back to the misrepresentation and not to some other negative information about the company."  *In re Nuveen Funds/City of Alameda Sec. Litig.*, No. 08-cv-4575-SI, 2011 WL 1842819, at \*10 (N.D. Cal. May 16, 2011) (internal quotation marks omitted).  Federal Rule of Civil Procedure 9(b) requires a plaintiff to state with particularity the elements of a securities fraud claim, including loss causation.  *Apollo*, 774 F.3d at 605.

The parties appear to agree that Wish issued what Plaintiffs allege to be corrective disclosures on May 12, 2021.  These disclosures were that MAUs declined by 7% to 101 million in the quarter ended March 31, 2021, and that the Wish's projected revenues for 2Q21 would be lower than 1Q21.  CAC ¶ 159.  Plaintiffs allege that, on the news of this disclosure, Wish's stock

dropped more than 29%.  *Id.* ¶ 160.

Defendants argue that Plaintiffs fail to plead loss causation based on this corrective disclosure.  MTD 24.  Defendants argue that because this disclosure says nothing about the subject matter of any challenged statement with the exception of statements about MAUs, it cannot serve as a corrective disclosure for any of the allegedly false non-MAU statements.  *Id.*  Defendants argue that the disclosure cannot serve as a corrective disclosure for statements about MAUs because the market knew MAUs were declining before this disclosure.  *Id.* at 24-25.

Plaintiffs respond that the corrective disclosure revealed to the market that certain of Wish's warnings of future risks were false and misleading because the risks had already occurred when wish issued the warnings.  Opp. 23-24.  Plaintiffs identify the warnings in Wish's 2020 10-K that Wish may experience declines in traffic on its platform and may be unable to engage existing buyers and attract new buyers as the warnings the corrective disclosures showed to be misleading. *Id.*  Plaintiffs also argue that corrective disclosure "revealed, for the first time, the transpired risk for the first quarter of 2021."  *Id.* at 25.  Plaintiffs do not address Defendants' argument regarding non-MAU statements.

The Court finds that the purported corrective disclosure does not establish loss causation for any non-MAU statement.  "[T]o prove loss causation by relying on one or more corrective disclosures, a plaintiff must show that: (1) a corrective disclosure revealed, in whole or in part, the truth concealed by defendant's misstatements; and (2) disclosure of the truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020).  Plaintiffs allege misleading statements that did not concern MAUs.  For example, Plaintiffs allege that Defendants failed to disclose certain internal control weaknesses, CAC ¶ 154, and that Defendants disclosed guidance numbers that they knew to be unattainable, CAC ¶ 134.  Yet no alleged corrective disclosure refers to any of these non-MAU statements.  The only alleged disclosure not concerning MAUs was "[t]hat the Company's forward sales guidance also fell short, with its 2Q21 revenue guidance of just $715 million to $730 million coming in significantly below the guidance of $735 to $750 million provided for 1Q21."  *Id.* ¶ 159.  But Plaintiffs have alleged no false statement concerning

United States District Court
Northern District of California

1  the 2Q21 projections.  This is not a corrective disclosure as alleged because it is unclear what

2  statement this projection could possibly correct.  As Plaintiffs have alleged no other corrective

3  disclosures regarding non-MAU statements, Plaintiffs have not alleged facts to establish loss

4  causation as to any non-MAU statement.

5       The Court further finds that the purported corrective disclosures do not establish loss

6  causation for any alleged misleading statement concerning MAUs.  "[C]orrective disclosures must

7  present facts to the market that are new, that is, publicly revealed for the first time."  *Rok v.*

8  *Identiv, Inc.*, No. 15-CV-5775-CRB, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017) (quoting

9  *Meyer v. Greene*, 710 F.3d 1189, 1197–98 (11th Cir. 2013)), *aff'd sub nom. Cunningham v.*

10  *Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018).  Here, Plaintiffs have not identified what new facts,

11  if any, were disclosed in the May 2021 disclosure.  As alleged in the CAC, by the time of the May

12  2021 disclosure, Defendants had disclosed in their Registration Statement and again in March

13  2021 that MAUs were declining.  CAC ¶ 70 (figure from Registration Statement showing decline

14  in 3Q20); CAC ¶ 157 (stating that on March 8, 2021, Wish disclosed that MAUs declined in

15  4Q20).  It is therefore unclear what new corrective information Wish provided in May 2021.

16  Accordingly, Plaintiffs have not alleged facts to establish loss causation as to the alleged

17  misleading statements regarding MAUs.

18       Finally, the Court addresses Plaintiffs' assertion that "the May disclosure revealed, for the

19  first time the transpired risk for the first quarter of 2021."  To the extent Plaintiffs are attempting

20  to argue that the purported corrective disclosure establishes loss causation as to a misleading

21  statement regarding the first quarter of 2021, Plaintiffs fail because they have not specified which

22  statement the disclosure corrected.  *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774

23  F.3d 598, 608 (9th Cir. 2014) (loss causation not adequately alleged where plaintiff fails to

24  identify which of defendant's statements were made untrue by corrective disclosure).

25       Accordingly, the Court finds that Plaintiffs have not adequately alleged loss causation.

26  Defendants' motion to dismiss Plaintiffs' Section 10(b) claim is therefore GRANTED WITH

27  LEAVE TO AMEND on this independent basis.

28

**C.     Section 15 and Section 20(a) Claims**

Section 20(a) and section 15 both require underlying primary violations of the securities laws.  *Rigel*, 697 F.3d at 886; *see also* 15 U.S.C. §§ 77*o*, 78t(a).  Because Plaintiffs here have failed to adequately plead a violation of the federal securities laws, it follows that Plaintiffs also have failed to adequately plead violations of section 20(a) and section 15.

**V.     ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss the is GRANTED, with leave to amend. Any amended complaint shall be filed within 30 days of the entry of this order.

The amended complaint shall include a chart listing numerically each alleged false or misleading statement, the speaker, date, reason for claim of falsity and scienter.  The chart shall also cite the paragraphs in the amended complaint where the allegations are made.  Plaintiffs shall also provide the Court a redlined version of the amended complaint.

Dated:  March 10, 2023

_____
BETH LABSON FREEMAN
United States District Judge