**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Counsel for Lead Plaintiffs and The Proposed Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

YEN HOANG, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

CONTEXTLOGIC, INC., PETER SZULCZEWSKI, RAJAT BAHRI, BRETT JUST, JULIE BRADLEY, ARI EMANUEL, JOE LONSDALE, TANZEEN SYED, STEPHANIE TILENIUS, HANS TUNG, JACQUELINE RESES, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., UBS SECURITIES LLC, RBC CAPITAL MARKETS, LLC, CREDIT SUISSE SECURITIES (USA) LLC, COWEN AND COMPANY, LLC, OPPENHEIMER & CO. INC., STIFEL, NICOLAUS & COMPANY, L.L.C., ACADEMY SECURITIES, INC., LOOP CAPITAL MARKETS LLC, and R. SEELAUS & CO., LLC,

Defendants.

Case No. 3:21-cv-03930-BLF

**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Lead Plaintiffs Xiaoquan Yang and Alexander De Block ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their second amended complaint against Defendants ContextLogic, Inc. ("Company" or "Wish"), Peter Szulczewski ("Szulczewski"), Rajat Bahri ("Bahri"), Brett Just, Julie Bradley, Ari Emanuel, Joe Lonsdale, Tanzeen Syed, Stephanie Tilenius, Hans Tung, Jacqueline Reses, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, BofA Securities, Inc., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., UBS Securities LLC, RBC Capital Markets, LLC, Credit Suisse Securities (USA) LLC, Cowen and Company, LLC, Oppenheimer & Co. Inc., Stifel, Nicolaus & Company, L.L.C., Academy Securities, Inc., Loop Capital Markets LLC, And R. Seelaus & Co., LLC ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' allegations are based on the investigation conducted by their attorneys, which included, among other things, a review and analysis of: (i) Defendants' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) public reports and news articles; (iii) transcripts of Defendants' conference calls; (iv) interviews with former employee witnesses[1] with relevant information; and (v) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. Wish, an e-commerce platform, sought to attract "underserved," "value-conscious" low-earning consumers around the world, particularly in the emerging markets, to its platform by "bring[ing] an affordable and entertaining mobile shopping experience to billions of consumers around the world, . . . . providing merchants access to hundreds of millions of consumers globally."

2. In its Registration Statement, Wish repeatedly attributed the success of the user growth on its platform primarily to advertising. That is, the more Wish spent on advertising sales

[1] All former employees ("FEs") are referred to in the masculine to preserve their anonymity.

and marketing, the more active users it attracted. The Registration Statement disclosed that Wish materially increased its advertising spend for the first nine months of 2020 compared to the first nine months of 2019. Wish also repeatedly stressed the importance of "attracting and engaging users" to the Company's operation and finance and represented that the Company would continue to acquire new users particularly in, according to Wish, "key growth markets", or emerging markets, where the populations, price/value conscious, were inclined to buy un-branded items at deeply discounted prices.

3. The Registration Statement gave the investing public an impression that at the time of its initial public offering ("IPO"), to advance its primary goal to grow users worldwide, particularly in the emerging market countries, Wish was still continuing with the same adverting and marketing efforts as the Company had been making for the first nine months of 2020.

4. Unbeknownst to the investing public, starting from the beginning of the fourth quarter of 2020, two and a half months before IPO, however, Wish materially reduced advertising expenses and the efforts to acquire customers in in India, Brazil, Columbia, the Philippines and other emerging market countries outside of Europe and North America.

5. Yet, the Registration Statement omitted to disclose, completely and accurately, the reduced advertising and marketing efforts in emerging markets in the fourth quarter of 2020 and was silent on the attendant risks that Wish's performance, particularly its user growth and MAUs, could reasonably likely suffer materially as a result. These omissions rendered the Registration Statement materially false and misleading.

6. Furthermore, the SEC Regulation S-K Item 105 (17 C.F.R. §229.105) requires registrants, such as Wish, to discuss the material factors that make an investment in the registrant or offering speculative or risky. Wish failed to disclose that its reduced advertising and efforts to acquire users in emerging markets in the fourth quarter of 2020 could reasonably like cause a material adverse impact on MAUs and Wish performance for the fourth quarter of 2020 and subsequent quarters, rendering an investment in Wish "speculative or risky." Such omission thus violated the affirmative duty to disclose under Item 105.

7. On March 8, 2021, two and a half months later, Wish disclosed for the first time the truth and its material adverse impact on the fourth quarter of 2022. Tying its materially reduced ad spend directly to its MAU decline, the Company stated that "MAUs declined 10% YoY during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America where Wish temporarily de-emphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year."

8. But the adverse effect did not just stop at the end of the fourth quarter of 2020. This "de-emphasizing" strategy continued materially impacting the Company's performance, financial condition and results of operation for the next two quarters. On May 12, 2021, Wish announced that its MAUs declined, again, this time by an additional 7% to just 101 million. The Company also had to reduce its forward revenue guidance for the second quarter of 2021 to just $715 million to $730 million, significantly below the guidance of $735 to $750 million provided for the first quarter of 2021. On this news, Wish's stock plummeted more than 29% in one day.

9. Wish's materially false and misleading information, when exposed, damaged investors. At the time when this case was first filed, Wish's stock price had fallen by 64% from the offering price.

10. Plaintiffs bring this federal class action under §§11 and 15 of the Securities Act of 1933 ("Securities Act"), and rules promulgated thereunder, on behalf of all persons or entities that purchased or acquired Wish common stock pursuant or traceable to the Company's Registration Statement on Form S-1, as amended, that became effective on December 15, 2020 ("Registration Statement"). On December 17, 2020, the final Prospectus for the Company's IPO, which forms part of the Registration Statement, was filed with the SEC (together, the "Registration Statement"). Plaintiffs bring these Securities Act claims against Defendants, alleging strict liability and/or negligence. Plaintiffs specifically disclaim any allegation of fraud, recklessness or intentional misconduct concerning allegations under the Securities Act.

**JURISDICTION AND VENUE**

11. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act. 15 U.S.C. §§ 77k and 77o.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act. 15 U.S.C. § 77v.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act. 15 U.S.C. § 77v because the events in question occurred in whole or in material part in this judicial district.

14. In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

**PARTIES**

15. Lead Plaintiff Xiaoquan Yang purchased Wish securities pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. Lead Plaintiff Yang's certification (Dkt. 28-2) has been previously filed with the Court and is incorporated by reference herein.

16. Lead Plaintiff Alexander De Block purchased Wish securities pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. Lead Plaintiff De Block's certification (Dkt. 28-2) has been previously filed with the Court and is incorporated by reference herein.

17. Defendant Wish Inc. is incorporated in Delaware with principal executive offices located at One Sansome Street 40th Floor, San Francisco, CA 94104. The Company's common stock trade in an efficient market on the NASDAQ under the ticker symbol "WISH."

18. Defendant Piotr Szulczewski ("Szulczewski") has served as Wish's Chief Executive Officer ("CEO") and Chairman of its Board of Directors at all relevant times. Mr. Szulczewski founded Wish in 2010 and has served as CEO since July 2010. Prior to founding the Company, he held various positions at Google, Inc. Mr. Szulczewski holds a B.S. in mathematics and computer science from University of Waterloo. Szulczewski signed or authorized the signing of the Registration Statement filed with the SEC.

19. Defendant Rajat Bahri ("Bahri") has served as Wish's Chief Financial Officer ("CFO") since December 2016. Prior to joining the Company, Defendant Bahri served as CFO at various companies, including serving as the CFO at a public company for 8 years. Defendant Bahri holds a bachelor's degree in commerce from the University of Delhi and an M.B.A. from the Fuqua School of Business at Duke University. Defendant Bahri signed or authorized the signing of the Registration Statement filed with the SEC.

20. Defendant Brett Just ("Brett Just") has served as Wish's Chief Accounting Officer ("CAO") since November 2020. Prior to taking on the role of CAO, he served as Wish's Controller from August 2019 and as Assistant Controller from September 2017. Brett Just was previously the Controller for the Internet of Things (IOT) Business Unit at Cisco Systems, Inc. from 2016 to 2017 and Assistant Controller for Jasper Wireless from 2013 to 2016, prior to its acquisition by Cisco in March 2016. Brett Just began his career in public accounting at Deloitte and Just, Gurr & Associates. He holds a B.S. in Business Economics from the University of California, Los Angeles. Brett Just signed or authorized the signing of the Registration Statement filed with the SEC.

21. Defendant Julie Bradley ("Bradley") served as a director of Wish at the time of the IPO. Bradley signed or authorized the signing of the Offering Documents filed with the SEC.

22. Defendant Ari Emanuel ("Emanuel") served as a director of Wish at the time of the IPO. Emanuel signed or authorized the signing of the Offering Documents filed with the SEC.

23. Defendant Joe Lonsdale ("Lonsdale") served as a director of Wish at the time of the IPO. Lonsdale signed or authorized the signing of the Offering Documents filed with the SEC.

24. Defendant Tanzeen Syed ("Syed") served as a director of Wish at the time of the IPO. Syed signed or authorized the signing of the Offering Documents filed with the SEC.

25. Defendant Stephanie Tilenius ("Tilenius") served as a director of Wish at the time of the IPO. Tilenius signed or authorized the signing of the Offering Documents filed with the SEC.

26. Defendant Hans Tung ("Tung") served as a director of Wish at the time of the IPO. Tung signed or authorized the signing of the Offering Documents filed with the SEC.

27. Defendant Jacqueline Reses ("Reses") was identified as an incoming director of Wish at the time of the IPO and was named a member of the Board of Directors on December 18, 2020.

28. Defendants Szulczewski, Bahri, Just, Bradley, Emanuel, Lonsdale, Syed, Tilenius, Tung, and Reses are sometimes referred to herein collectively as the "Individual Defendants."

29. The Individual Defendants each reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

30. The senior management of Wish, including the Individual Defendants, as executive officers and authorized representatives of Wish, participated in the solicitation and sale of Wish securities to investors in the IPO, motivated in part to serve their own and the Company's financial interests.

31. The Individual Defendants, along with other Wish senior executives, attended investor roadshow presentations and met with investment analysts and large investors in the weeks leading up to the IPO in an effort to persuade investors that Wish was a worthy investment and solicit investors to purchase Wish securities in the IPO, all to further the financial interests of Wish.

32. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the Securities Act.

33. Wish is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

34. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

35. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

36. Defendant BofA Securities, Inc. ("BofA") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

37. Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

38. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

39. Defendant UBS Securities LLC ("UBS") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

40. Defendant RBC Capital Markets, LLC ("RBC") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

41. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

42. Defendant Cowen and Company, LLC ("Cowen") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

43. Defendant Oppenheimer & Co., Inc. ("Oppenheimer") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

44. Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

45. Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

46. Defendant Academy Securities, Inc. ("Academy Securities") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

47. Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

48. Defendant R. Seelaus & Co., LLC ("R. Seelaus") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

49. Defendants listed in ¶¶34-48 are collectively referred to herein as the "Underwriter Defendants."

50. Defendants Goldman Sachs, J.P. Morgan and BoA acted as the representatives of all the Underwriter Defendants. Each Underwriter Defendant named herein is an investment banking firm whose activities include, inter alia, the underwriting of public offerings of securities.

51. The Underwriter Defendants participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. The Underwriter Defendants' participation in, and its solicitation of, offers in connection with the IPO was motivated by its financial interests. As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees. All the Underwriter Defendants conduct business in this District.

52. The Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

53. The Underwriter Defendants also assisted Wish and the Individual Defendants in planning the IPO. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

54. In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to Wish's management,

directors, and lawyers to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Wish's common stock would be sold; (iii) the language to be used in the Offering Materials; (iv) what disclosures about Wish would be made in the Offering Materials; and (v) what responses would be made to the SEC in connection with its review of the Offering Materials. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Wish's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of Wish's undisclosed then-existing information and plans and the Offering Materials' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

55. The Underwriter Defendants also demanded and obtained an agreement from Wish under which Wish agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

56. The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the IPO, so that they, and the Director Defendants, could offer to sell, and sell, Wish shares to Plaintiffs and the members of the Class pursuant (or traceable) to the Offering Materials.

57. In the Underwriting Agreement, attached to the Registration Statement, the non-lead underwriters provided the Lead Underwriters the full legal authority to act on their behalf in connection with their underwriting of the IPO. In communications with the SEC, the Lead Underwriters stated that they are acting as representatives for all the Underwriter Defendants. Thus, the actions of the Lead Underwriters bound the non-lead Underwriter Defendants in connection with the IPO.

58. The Underwriters' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement.

## FACTUAL ALLEGATIONS UNDER THE SECURITIES ACT

**Acquiring Users in Emerging Markets Was Wish's Growth Strategy; MAU was A Key Metric for Measuring Success in User Growth in Emerging Markets**

59. On December 15, 2020, Wish's Registration Statement became effective. Wish issued 46 million shares of common stock at $24 per share, selling them through the Underwriter Defendants and raising more than $1.1 billion in gross proceeds. On December 16, 2020, the SEC accepted for filing Defendants' Prospectus on Form 424(b)(4), soliciting purchases of Wish shares that the Underwriter Defendants had purchased from Wish.

60. Wish operates the Wish platform, enabling merchants to sell their products directly to global consumers, primarily those in emerging markets who are low earning and price-conscious. According to Wish, "[w]e built Wish to serve these consumers who favor affordability over brand and convenience, and are being underserved by traditional ecommerce platforms." Under the heading, "Billions of Value-Conscious Consumers Are Underserved," the Registration Statement continued,

> Value-conscious consumers represent a large and growing portion of the global consumer population, and they have been historically underserved by traditional ecommerce. For this segment of the global population, price is often the single most important determinant when making a purchase. Forty-four percent of U.S. consumers and 85% of European consumers have a household income of less than $75,000, and we estimate that there are over 1 billion households with income of less than $75,000 around the world, excluding China and India. Additionally, in the emerging economies of Africa, the Middle East, Latin America, and Eastern Europe, where the average household income is approximately $18,000, affordability will be the key element for users shopping online for the first time. We believe that the next billion ecommerce customers will be these value-conscious consumers.

61. According to Wish, most of its merchants are based in China. The unbranded products can be discounted in excess of 85% compared to branded alternatives. Growing users in emerging markets where income generally is lower than in North America and Europe, therefore, was among Wish's most important means of growth and critical to its key performance indicators or KPIs. In the Registration Statement, Wish touted itself as one of the largest and fastest growing global ecommerce platforms, claiming to have achieved "massive growth and scale" since its founding in 2010. The Company presented the "Key Milestones" for the massive growth in its user

platform expansion primarily in the form of MAUs or monthly active buyers. It claimed that as of September 30, 2020, the Company had over 100 million MAUs in over 100 countries.

62. Wish defined MAUs as the number of unique users that visited the Wish platform, either on its mobile app, mobile web, or on a desktop, during a month. MAUs for a given reporting period equaled the average of the MAUs for that period. The Company claimed to identify active users by a unique email address. According to Wish, the change in MAUs in a reporting period captured both the inflow of new users as well as the outflow of existing users who did not visit the platform in a given month.

63. Wish measured its "effectiveness in attracting and engaging users through metrics such as [its] MAUs." The Company listed MAUs as part of the financial information and data in the Registration Statement and classified MAUs as one of the key metrics to "measure [its] performance, identify trends affecting [its] business, and make strategic decisions."

64. In the Registration Statement, Defendants repeatedly stressed the importance of acquiring users, as reflected by MAUs, to Wish's operation and finance, and highlighted their plan to expand the Company's user base, numerically and geographically, particularly in emerging markets, as the primary operational goal.

65. For example, according to the SEC's instruction to the prospectus summary of a registration statement, a prospectus summary "should provide a brief overview of the ***key*** aspects of the offering" and "identify those aspects of the offering that are ***the most significant*** and determine how ***best to highlight*** those points in clear, plain language." 17 CFR § 229.503. (Emphasis added). In the "Prospectus Summary" of the Registration Statement, as one of the most significant aspects of the IPO, Defendants listed "Grow Our Base of Users" as the first and foremost step to realize its "Growth Strategy" and further enumerated four moves, under "Grow Our Base of Users", that the Company was taking, including to "continue to acquire new users" and "expand geographically." The Company stressed that "[w]e are focused on growing our user base around the world."

66. Additionally, the SEC Regulation S-K Item 101 (17 CFR §229.101) requires registrants to describe "information ***material*** to an understanding of the business taken as a whole" in the description of business section of a prospectus. *Id.* (Emphasis added.) Defendants, in the

"Business" segment of the Registration Statement, reiterated the importance of global user acquisition to Wish's growth strategy and particularly highlighted emerging markets, such as "countries in Africa, Latin America, and Eastern Europe", as Wish's "***key growth markets***" in which the Company was focused on acquiring users. The Registration Statement stated, in relevant part, that,

**Our Growth Strategy**

> We leverage our data and unique insights on merchants and users to extend our platform outside of our core business and drive additional growth opportunities. Our data science capabilities are a unique advantage and core to the operations of our business.
>
> **Grow Our Base of Users**
>
> - **Continue to Acquire New Users.** ***We are focused on growing our user base around the world.*** We currently serve users in over 100 countries. We estimate that there are over 1 billion households with income of less than $75,000 around the world, excluding China and India. ***We intend to grow our user base by cost effectively reaching new users through a combination of data-driven and targeted advertising campaigns***, word of mouth and other marketing efforts, as well as increasing our brand awareness.
>
> …
>
> - **Expand Geographically.** ***We will continue to expand our global footprint and enter new geographies and acquire new users in those markets. In particular, countries in Africa, Latin America, and Eastern Europe are key growth markets*** with large and growing populations as well as a significant portion of the population with lower average household incomes. Within these markets, the proliferation of consumer mobile use and improvements in internet infrastructure will help us establish and grow our business. In addition, our investments in our own logistics network will help us achieve better breadth and density of coverage in our newer regions and countries, enabling a better user experience and localized, high-quality delivery and customer service.
>
> (Emphasis added).

67. In the "Management's Discussion and Analysis of Financial Condition and Results of Operations" of the Registration Statement, disclosure required by Item 303 of Regulation S-K (17 CRF §229.303) of material information relevant to an assessment of the financial condition and

results of operations of a public company, Wish described "increase the scale and growth of [its] user and buyer base" as one of the "key elements of [its] financial model that drive [its] growth" and measured its "effectiveness in attracting and engaging users through metrics such as [its] MAUs." It stated that the Company "view[ed] the number of MAUs as key driver of revenue growth as well as a key indicator of user engagement and awareness of [its] brand."

**At Wish, Advertising Spend Positively Correlated with User Acquisition and MAUs.**

68. In the Registration Statement, Wish tied its business success directly to acquiring new users through its advertising and marketing efforts. That is, the more Wish spent on advertising, sales and marketing, the more active users it attracted. Wish represented that its "sales and marketing capabilities represent[ed] a core competency that [was] essential to the success of the Wish platform." According to the Registration Statement, Wish's "advertising costs to acquire new users" constituted 96% of its sales and marketing expenses or 87% of its operating expenses in 2019. The Registration Statement, in the relevant part, stated,

**Sales and Marketing**

> Our sales and marketing capabilities represent a ***core*** competency that is essential to the success of the Wish platform. We are focused on continuing to acquire new users efficiently, and building brand awareness and a demand generation engine. Our advertising costs to acquire new users constituted 96% of our sales and marketing expenses, and sales and marketing expenses constituted 91% of our operating expenses, in 2019. We have extensive experience in cost-effective, data-driven digital marketing and user acquisition. We also design innovative marketing programs that help increase brand awareness by targeting people who we believe have a higher propensity to engage with our platform and buy from our merchants. We continue to partner with various social-media platforms to ensure we gain exposure with broader audiences.

69. According to the Registration Statement, the Company measures its effectiveness in attracting and engaging users through metrics such as MAUs, which significantly increased by 33% from the nine months ended September 30, 2019 and to the nine months ended September 30, 2020, and attributed such increase "primarily" to the success of its promotional and marketing campaigns, which increased by 13% for the same period. The Registration Statement, in the relevant part, stated:

> **Our Financial Model**
>
> Our business benefits from powerful network effects, fueled by our data advantage and massive scale. As more users join Wish, attracted by our affordable value proposition and shopping experience, we are able to increase revenue potential for our merchants. …
>
> Our model relies on cost-effectively adding new users, converting those users into buyers and improving engagement and monetization of those buyers on Wish over time as well as adding new merchants, delivering economic success for those merchants, and having those merchants use more of our end-to-end platform.
>
> The following are ***key elements*** of our financial model that drive our growth:
>
> **Increase the scale and growth of our user and buyer base.** Attracting and engaging users have been our key areas of focus since our founding. We measure our effectiveness in attracting and engaging users through metrics such as our MAUs, which increased over 33% from the nine months ended September 30, 2019 and to the nine months ended September 30, 2020, as well as the average minutes spent per visit by user. ***These increases have primarily been driven by*** the growing popularity and recognition of our brand and platform, the user preferences for our differentiated mobile shopping experience, wide selection of attractively priced products, and ***the success of our promotional and marketing campaigns.*** (Emphasis added.)

70. The Registration Statement also specifically represented that the Company "anticipate[d] that sales and marketing expenses will continue to be our most significant operating expense in the future and our overall profitability will depend on the success of our investments in sales and marketing."

71. Thus, the Registration Statement correlated Wish's key metrics, including MAUs, to its advertising spend.

72. Critically, the Registration Statement disclosed that as a result of Wish's focus on growth in 2020, Wish's sales and marketing expense increased $130 million, or 13%, to $1,125 million for the nine months ended September 30, 2020, compared to $995 million for the nine months ended September 30, 2019. The Registration Statement explained that such increase in sales and marketing expenses consisted primarily of an increase in advertising spend, as "[the Company] re-focused on growth after [it] intentionally moderated user acquisition spend temporarily to focus on the launch of the logistics platform in the first half of 2019." These statements, read in the context of the Registration Statement repeatedly representing that user

acquisitions globally, particularly in emerging markets, constituted Wish's continuous efforts, gave the investing public an impression that Wish was increasing its advertising spend throughout 2020, including the fourth quarter of 2020, to expand its user acquisitions in 2020.

**The Registration Statement Omitted to Disclose That in the Fourth Quarter of 2020, Wish Reduced Advertising and Efforts in Emerging Markets, Resulting in Declines in DAUs and MAUs**

73. Despite the express representations in the Registration Statement that the Company had increased its advertising spend for the first nine months of 2020 and continued with acquiring customers particularly in emerging markets , Defendants omitted in the Registration Statement that starting from the beginning of the fourth quarter of 2020, the Company had reduced advertising and its efforts to acquire customers in emerging markets outside of Europe and North America, including India, Brazil, Columbia, and the Philippines, which could cause the MAUs to materially decline in the fourth quarter of 2020. Later, the Company attributed a 10% YoY MAU decline during the fourth quarter to their reducing advertising and user acquisition efforts in those locations.

74. Although the Registration Statement disclosed several risk factors that might impact the Company's efforts to acquire users, Wish failed to warn of the ***specific*** risk that at the time of the IPO—that due to Wish's reduced advertising spend and user acquisition efforts in emerging markets in the fourth quarter of 2020, Wish's performance, particularly MAUs, could be materially adversely impacted. The risk disclosure stated that:

> ***Our efforts to acquire new users and engage existing users may not be successful or may be more costly than we expect, which could prevent us from maintaining or increasing our revenue.***
>
> Our success depends on our ability to attract new users and engage existing users in a cost-effective manner. In order to acquire and engage users, we must, among other things, promote and sustain our platform and provide high-quality products, user experiences, and service. Our marketing efforts currently include various initiatives and consist primarily of digital marketing on a variety of social media channels, such as Facebook, search engine optimization on websites, such as Google, Bing, and Yahoo!, various branding strategies, such as our relationship with the Los Angeles Lakers and social influencers, and mobile "push" notifications, text messaging, and email. For the year ended December 31, 2019 and the nine months ended September 30, 2020, we spent $1.5 billion and $1.1 billion on sales and marketing, representing 78% and 64% of our revenue, respectively. ***We anticipate that sales and marketing expenses will continue to comprise a substantial majority of our overall operating***

> ***costs for the foreseeable future.*** We have historically acquired a significant number of our users through digital advertising on platforms and websites owned by Facebook and Google, which may terminate their agreements with us anytime. ***Our investments in sales and marketing may not effectively reach potential users, potential users may decide not to buy through us, or user spend on our platform may not yield the intended return on investment, any of which could negatively affect our financial results***.
>
> Many factors, some of which are beyond our control, may reduce our ability to acquire, maintain and further engage with users, including those described in this "Risk Factors" section and the following:
>
> - system updates to app stores and advertising platforms such as Facebook and Google, including adjustments to algorithms that may decrease user engagement or negatively affect our ability to target a broad audience;
> - changes in advertising platforms' pricing, which could result in higher advertising costs;
> - changes in digital advertising platforms' policies, such as those of Facebook and Google, that may delay or prevent us from advertising through these channels, which could result in reduced traffic to and sales on our platform;
> - changes in search algorithms by search engines;
> - inability of our email marketing messages to reach the intended recipients' inbox;
> - ineffectiveness of our marketing efforts and other spend to continue to acquire new users and maintain and increase engagement with existing users;
> - decline in popularity of, or governmental restrictions on, social media platforms where we advertise;
> - the development of new search engines or social media sites that reduce traffic on existing search engines and social media sites;
> - consumer behavior changes as a result of COVID-19; and
> - products listed by merchants on our platform that are the subject of adverse media reports, regulatory investigations, or other negative publicity.
>
> ***As a result of any of these factors or any additional factors that are outside of our control***, ***if we are unable to continue acquiring new users or increasing engagement with existing users,*** it could have a material adverse effect on our business, financial condition, results of operations, and prospects. (Emphasis added).

(Emphasis added).

75. The above risk factor's silence on Wish's reduced advertising spend and user acquisition efforts in emerging markets in the fourth quarter of 2020 prevented the investing public

from completely and accurately assessing the material risks associated with Wish's operation, performance and finance, rending the risk disclosure and the Registration Statement materially misleading and false.

76. Former Employee 1 ("FE 1"), a Financial Manager, worked at Wish from October 2017 until June 2021. FE 1 reported directly to Thomas Chuang, or Peiyen Chuang ("Chuang") who was Vice President of Finance from June 2014 to December 2019 and Vice President of Operations since December 2019. Chuang reported directly to Defendant Bahri, the Company's CFO.

77. FE 1 worked on the operational side and had unfettered access to Company financial data, all Company spending and costs and Profit and Loss statements ("P&L"), all contracts negotiated and operations on a daily basis. In addition, he had access to financial data regarding sales and MAU growth. FE 1 also managed the cost side of the finances including head count forecasting. FE 1 states he had access to HR databases and compiled accounts, worked with recruiters and built out contracts. FE 1's job responsibilities also included working with Department Heads to evaluate contracts under negotiation. Every month, FE 1 consolidated and built financial forecast line items for the P&L related to costs. FE 1 worked out of the Wish headquarters in San Francisco.

78. According to FE1, the Finance team at the San Francisco headquarters consisted of a small number of workers, who all worked at an open office space. FE1's desk was immediately opposite Defendant Bahri's, so FE1 and Defendant Bahris faced each other. FE1 spoke with Defendant Bahri many times every day. FE 1 worked closely with Defendant Bahri, as often Defendant Bahri ignored FE 1's direct report, Chuang, seeking out FE 1 directly. For example, according to FE 1, Defendant Bahri came to him and asked for a list of headcount forecasts to determine whom to lay off to save on costs. Chief Accounting Officer Defendant Brett Just's desk sat immediately behind FE1's desk. FE 1 recalls that Defendant Bahri was a careful and focused manager who sought to be aware, in detail, of the Company's finances. It is this that caused Defendant Bahri to avoid interacting with FE 1's direct report, Chuang, and to seek out FE 1 directly. As an example, when Defendant Bahri needed to negotiate certain deals, he talked with FE 1

directly. As another example, Defendant Bahri directly emailed to FE 1 with questions, specifically during the IPO.

79. According to FE1, Wish was a data driven high-tech company and used synchronized business analytic software to monitor the activities on its platform. The Company's Datawarehouse grabbed information about every transaction on its platform in real time as they were happening. The Datawarehouse hosted all the underlying raw transactional, operational and financial data that the Company had. Both before and at the time of the IPO, Wish used Looker and Tableau, user interface software that enabled employees to populate raw data from the Datawarehouse into usable format that Wish developed and customized to inform its personnel. According to FE1, Looker and Tableau, or "Dashboard" as Wish called them, showed the same contents, including advertising spend and both were actively running at the time of the IPO; at the time of the IPO, Wish was planning to transition from Looker to Tableau.

80. According to FE 1, Looker and Tableau contained all the metrics concerning Wish's operation and finance, including key metrics such as MAUs and advertising spend, and refreshed the data "instantaneously" so the data were always up to date.

81. An internal Company document, entitled "Narrative Topic: Commissions Revenue" (hereinafter "Commissions Revenue Narrative"), which Wish gave to FE1 during his employment, confirms the software infrastructure that FE1 describes. Wish's logo "Wish" is displayed on the upper right corner of each page of the Commissions Revenue Narrative. According to FE1, CAO Defendant Brett Just ordered the compilation of the Commissions Revenue Narrative and had it distributed among the Finance Department employees. According to FE1, this was a key document that laid out the workflow that the Finance Department and data analysts must follow concerning collecting, compiling, reviewing, commenting, reconciling, and presenting to the CFO revenue-related data shown in the Wish's software. The Commissions Revenue Narrative shows that it was last updated in "Q4'FY19". According to FE1, this version of the Commissions Revenue Narrative was still applicable at the time of the IPO.

82. In the "System" section, the Commissions Revenue Narrative states that:

- ***Datawarehouse is the Company's main database that contains the entire universe of transactional data*** such as end-user's information, product listings, order management and checkout, refunds related information, Merchants-related information etc. Note that the data contained within this database is ***dynamic***. The Engineering Team provides all its engineers access to this database. The data management is also performed within Datawarehouse whereby large streams of data is organized into meaningful information that is ***utilized by the Company for financial reporting, metrics analysis***, etc. Composed of:

  a. MongoDB which is the live and dynamic database where Wish checkout resides;

  b. TreasureData or TD which is the static snapshot of MongoDB; and

  c. Redshift which is like TD, …

- NetSuite: …
- ***Tableau: Tableau is the User Interface that contains specific reporting sourced from TreasureData.***
- Cron Job: a scheduled script run at the back end that fetches data in report format from various sources such as MongoDB, TD or Redshift and ***sends reports to the intended users' emails, on a regular cadence***.

(Emphasis added.)

83. According to the "Product Data Glossary," a document that Defendant Brett Just had ordered created and distributed in the Finance Department, including FE1, the first dashboard shown on Looker/Tableau on each Wish's employee, including the Individual Defendants, was "Commerce Stats Dashboard," which "dashboard is meant to track the high-level commerce metrics across the entire company." The "Product Data Glossary" describes the "Looks" of this dashboard as a "Commerce Stats Chart" that contains the most important 35 KPIs to the Company, including "GMV"[2], "Marketing Spend", "GMV Over Marketing", "Revenue Over Marketing", "Revenue", "DAU", "7 Day DAU Average", "GMV per DAU", "Revenue per DAU", "Revenue Minus Marketing per DAU" as the first, third, fourth, fifth, sixth, fifteenth, sixteenth, twenty-fifth, twenty-

[2] According to *Investopedia*, gross merchandise value or GMV is the total value of merchandise sold over a given period of time through a customer-to-customer (C2C) exchange site. It is a measure of the growth of the business or use of the site to sell merchandise owned by others. According to FE 1, Wish tracked in real time Gross Merchandise Value or GMV—which included information of commissions earned for each transaction and the amount transacted on the platform.

ninth and thirtieth metrics. The "Product Data Glossary" further explains "Marketing Spend" as "Amount of money spent on ads." The "Product Data Glossary" shows that Wish's user interfaces (Looker and Tableau dashboards) were tracking, and showing Wish's employees, via several key metrics, the impact of advertising dollars on user acquisition and retention in real time before the IPO and at the time of the IPO. According to FE 1, everyone, including the executives, had the dashboard open on their own computers all the time.

84. According to FE 1, Defendant Szulczekewski controlled advertising spend. Every time FE1 saw discrepancies between the actual advertising spends and the budgets and asked the employees who were responsible for the spend about the discrepancies, the unvaried responses FE 1 received was that "Peter [*i.e.*, CEO Defendant Szulczekewski] overrode it."

85. According to FE1, a material reduction in advertising spend correlated to material decline in new customers. According to FE1, decreasing advertising specifically in some emerging markets outside of Europe and North America correlated directly to a material decrease in user acquisitions and, in turn, lower KPIs including MAUs. According to FE1, Wish is a high-tech company and everything is in the cloud; in order to understand Wish's operational and financial performance, there is nothing else for the executives, including Defendants Szulczekewski and Bahri, to look at besides the data shown on the dashboards. Indeed, as stated in the Registration Statement, "[the Company's] technology and data science capabilities drive all aspects of [its] business."

86. According to FE1, Szulczekewski discussed advertising spend daily over Slack,[3] and he was aware of any and all issues. Defendant Szulczekewski, FE 1 recalls, led all efforts to boost MAU through advertising spend. Defendant Bahri worked closely with Defendant Szulczekewski on all aspects of the Company's advertising spend from the medium to the spend. According to FE 1, Defendant Szulczekewski closely monitored customer acquisition costs ("CAC").

87. Since August 2020, the MAU data's rapid variability forced Defendants Szulczekewski, Bahri, and Head of Financial Planning and Analysis Oliver to review and to track

[3] Slack is a messaging program designed specifically for the office.

MAU data and other data on the Google Sheets at least daily. According to FE 1, Wish used Google sheet, which contained historic operational data, to generate performance forecast. All engaged in daily discussions, FE 1 recalls, about MAU and other data, in particular after Defendants determined to take the Company public when the Company's valuation depended on that data.

88. Former Employee 2 ("FE 2") was a Senior Treasury and Payment Service Manager at Wish from November 2017 until November 2021. FE 2 reported directly to Walter Boileau, VP and Treasurer. Boileau reported directly to Defendant Bahri. In addition to other basic treasury functions, FE 2 oversaw the Company's bank accounts, managing incoming cash. FE 2 confirms that while the Engineers and Data Team actively managed the MAU data, it forwarded that data in real time to the Finance. According to FE2, FE 1 was in the best position to know generally and specifically about MAU data as the Finance function published that data in real time to Defendants and the Company's senior executives.

89. Former Employee 3 ("FE 3") worked at Wish from November 2017 to May 2022. FE 3 worked at Wish as a Senior Data Analyst from November 2017 to May 2019. In this role he built fraud detection models to identify fraudulent transactions prior to the product's shipment and reported to Tab Stang, Senior Data Science Manager. From May 2019 to January 2021, FE 3 worked as a Senior Data Scientist and studied anomalies to identify business functions behaving badly or irregularly. In this role, he combed through data to identify suspicious atypical orders and provided suggestions to combat fraudulent activities. In this role, FE 3 reported to Pai Lu, Chief Data Officer. From January 2021 to March 2022, FE 3 was a Data Science Manager. From March 2022 to May 2022, he was promoted to be a Senior Data Science Manager and worked closely with the analytics teams in support of the Product Team. FE 3 has a PhD degree in Economics and has studied data science and mathematics. FE 3 is qualified to conduct MAU forecasting. FE 3 worked at the Wish headquarters in San Francisco. During his entire tenure at Wish, to perform his analytical work, FE 3 had real time access to the MAU data that he understood as well or better than any other Company employee.

90. Corroborating FE 1, FE 3 confirms that there was a positive correlation between the advertising spend and KPIs. FE 3 confirms that in the first half of 2019, to increase the margins, the

Company materially reduced advertising, showing a profit but materially impacting KPIs. In the second half of 2019, however, Wish restored its advertising spend, with a corresponding increase in MAU.

91. Former Employee 4 ("FE 4") was a Senior Manager-Program Management at Wish from January 2020 to June 2022. He worked in Logistic Operations and reported directly to Thomas Chung, VP of Operations, who in turn reported directly to the CTO Farhang Kasssaei. He also reported to the Head of Global Logistics for a couple of months. FE 4 worked at the Wish headquarters in San Francisco for a short time, then after Covid, was assigned to work remotely. As a Senior Program Manager, FE 4 worked in Logistic Operations where the main goal was to provide strategy and support in fulfilling customer orders. FE 4 states that he did the work of a typical Program Manager, designing solutions to better serve the merchants. His work included creating strategies that best suited specific countries throughout Wish's extensive geographical span. According to FE 4, the overall goals were focused on both the merchant and customer. Part of the strategy in his department was creating a program that offered a mandatory service to the merchants, and after they opted in, ensuring a faster delivery to the customer. As the lead on the A plus Logistics Program Team, FE 4's focus was on consumer order fulfillment. FE 4 states that the Logistics Program helped to support merchant deliveries all over the world, ensuring timely delivery of the products to the end country. FE 4 managed the logistics for getting the product from the merchant warehouse to the customer. This included last mile delivery experience. FE 4 managed several initiatives across several countries.

92. According to FE 4, Wish used Tableau for business intelligence/data analysis. Everyone in the Company had the Dashboard on their computer screen that provided daily updates on MAU, GMV and other data, which were easily accessed. The Dashboard was where all the data was stored and was updated daily. FE 4 states that he attended small group meetings with Defendant Szulczekewski. There were also cross function meetings, and "All Hands" preceding the IPO. Confirming FE 1 and FE 3, according to FE 4, Defendant Szulczekewski managed advertising expenses leading and controlling the discussions about advertising at strategy.

93. FE 4 states that he saw Wish's monthly and quarterly operational and financial data, including MAUs, in real time, through the Company's centralized Dashboard. According to FE 4, the Dashboard was a way for everyone to track the MAU numbers. According to FE 4, the Dashboard also showed advertising spend and GMV. FE 4 states that the Company tracked advertising spend impacts on customer acquisitions and retention prior to the IPO. FE 4 states that during his employment, he was particularly interested in the advertising spend data and constantly review such data on the Dashboard because advertising spend was available on the Dashboard. According to FE 4, he specifically remembers that right before the Thanksgiving Holiday in November of 2020, Wish was pouring a couple of million dollars a day into ads. FE 4 states that he knows this because she saw the advertising spend data on the Dashboard.

94. Based on FE 4's statements, Wish, therefore, must have decreased its advertising spend in October because Wish materially increased its advertising spend in the second half of November and December. Furthermore, because the decrease in advertising spending in October was so material, an increase in advertising spending in the 2020 winter holiday season could not make up the advertising spend shortfall that Wish created in October 2020.

**Defendants Had an Affirmative Obligation to Disclose Material Risks Under SEC Regulations.**

95. Pursuant to the SEC Regulation S-K Item 105, registrants, such as Wish, are obligated to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105. The presentation of risks that could apply generically to any registrant or any offering is discouraged. *Id*. Where a summary of risk factors is required, the issuer should provide "a series of concise, bulleted or numbered statements that is no more than two pages summarizing the principal factors that make an investment in the registrant or offering speculative or risky." *Id.*

**MATERIALLY FALSE STATEMENTS IN THE REGISTRATION STATEMENT AND PROSPECTUS**

96. When describing the material information about the Company's business, the Registration Statement stated, in relevant part, that:

**Our Growth Strategy**

We leverage our data and unique insights on merchants and users to extend our platform outside of our core business and drive additional growth opportunities. Our data science capabilities are a unique advantage and core to the operations of our business.

**Grow Our Base of Users**

- **Continue to Acquire New Users.** ***We are focused on growing our user base around the world.*** We currently serve users in over 100 countries. We estimate that there are over 1 billion households with income of less than $75,000 around the world, excluding China and India. We intend to grow our user base by cost effectively reaching new users through a combination of data-driven and targeted advertising campaigns, word of mouth and other marketing efforts, as well as increasing our brand awareness.

…

- **Expand Geographically.** ***We will continue to expand our global footprint and enter new geographies and acquire new users in those markets. In particular, countries in Africa, Latin America, and Eastern Europe are key growth markets*** with large and growing populations as well as a significant portion of the population with lower average household incomes. Within these markets, the proliferation of consumer mobile use and improvements in internet infrastructure will help us establish and grow our business. In addition, our investments in our own logistics network will help us achieve better breadth and density of coverage in our newer regions and countries, enabling a better user experience and localized, high-quality delivery and customer service.

(Emphasis added).

97. These statements were incomplete, inaccurate and materially false and misleading because they failed to disclose that starting from the beginning of the fourth quarter of 2020, the Company had reduced advertising in India, Brazil, the Philippines and other emerging market countries outside of Europe and North America, causing MAUs to materially decline in the fourth quarter. The de-emphasizing strategy in emerging markets, including Brazil and Columbia, two countries in Latin America represented by Wish as "key growth markets", directly contradicted the Company's representations that it continued to user acquisition efforts in "key growth market" countries in Africa, Latin America, and Eastern Europe. Because (i) Wish had increased its advertising spend and sales and marketing efforts in the first nine months of the 2020 immediately

before the IPO, (ii) the Registration Statement represented the positive correlation between advertising spend and user acquisition for Wish's business, (iii) the Registration Statement represented that Wish was continuing to advance its goal to expand users particularly in emerging markets, the above statements created a false impression in the investing public that Wish was continuing its advertising spending and marketing efforts in emerging markets so it could expand its user acquisitions in emerging markets, Wish's key growth markets, when in fact, the Company had reduced its efforts to acquire users in emerging markets/key growth markets. Such silence deprived the investing public of knowing the complete and accurate picture of Wish's material operation moves and decisions in order to accurately assess the material risks associated with Wish's operation, performance and finance, rending the Registration Statement materially misleading and false.

98. The Registration Statement further stated, in relevant part, that:

> ***Our efforts to acquire new users and engage existing users may not be successful or may be more costly than we expect, which could prevent us from maintaining or increasing our revenue.***
>
> Our success depends on our ability to attract new users and engage existing users in a cost-effective manner. In order to acquire and engage users, we must, among other things, promote and sustain our platform and provide high-quality products, user experiences, and service. Our marketing efforts currently include various initiatives and consist primarily of digital marketing on a variety of social media channels, such as Facebook, search engine optimization on websites, such as Google, Bing, and Yahoo!, various branding strategies, such as our relationship with the Los Angeles Lakers and social influencers, and mobile "push" notifications, text messaging, and email. For the year ended December 31, 2019 and the nine months ended September 30, 2020, we spent $1.5 billion and $1.1 billion on sales and marketing, representing 78% and 64% of our revenue, respectively. ***We anticipate that sales and marketing expenses will continue to comprise a substantial majority of our overall operating costs for the foreseeable future.*** We have historically acquired a significant number of our users through digital advertising on platforms and websites owned ***by Facebook and Google, which may terminate their agreements with us anytime. Our investments in sales and marketing may not effectively reach potential users, potential users may decide not to buy through us, or user spend on our platform may not yield the intended return on investment, any of which could negatively affect our financial results***.
>
> Many factors, some of which are beyond our control, may reduce our ability to acquire, maintain and further engage with users, including those described in this "Risk Factors" section and the following:

- system updates to app stores and advertising platforms such as Facebook and Google, including adjustments to algorithms that may decrease user engagement or negatively affect our ability to target a broad audience;
- changes in advertising platforms' pricing, which could result in higher advertising costs;
- changes in digital advertising platforms' policies, such as those of Facebook and Google, that may delay or prevent us from advertising through these channels, which could result in reduced traffic to and sales on our platform;
- changes in search algorithms by search engines;
- inability of our email marketing messages to reach the intended recipients' inbox;
- ineffectiveness of our marketing efforts and other spend to continue to acquire new users and maintain and increase engagement with existing users;
- decline in popularity of, or governmental restrictions on, social media platforms where we advertise;
- the development of new search engines or social media sites that reduce traffic on existing search engines and social media sites;
- consumer behavior changes as a result of COVID-19; and
- products listed by merchants on our platform that are the subject of adverse media reports, regulatory investigations, or other negative publicity.

***As a result of any of these factors or any additional factors that are outside of our control***, if we are unable to continue acquiring new users ***or increasing engagement with existing users***, it could have a material adverse effect on our business, financial condition, results of operations, and prospects. (Emphasis added).

(Emphasis added).

99. The above risk disclosure was incomplete, inaccurate and materially false and misleading because it failed to disclose that starting from the beginning of the fourth quarter of 2020, Wish reduced advertising spend and user acquisition efforts in emerging markets. Because (i) Wish had increased its advertising spend and sales and marketing efforts in the first nine months of the 2020 immediately before the IPO, (ii) the Registration Statement represented the positive correlation between advertising spend and user acquisition for Wish's business, (iii) the Registration Statement represented that Wish was continuing to advance its goal to expand users particularly in emerging markets, the above risk disclosure created a false impression in the investing public that Wish was

continuing its advertising spending and marketing efforts in emerging markets so it could expand its user acquisitions in emerging markets, Wish's key growth markets, when in fact, the Company had reduced its efforts to acquire users in emerging markets/key growth markets. The risk disclosure failed to warn that the specific "de-emphasizing" strategy would reasonably likely to cause Wish's operating results, including MAU, in the fourth quarter of 2020 and following quarters to materially fluctuate. Such silence deprived the investing public of knowing the complete and accurate picture of Wish's material operation moves and decisions to accurately assess the material risks associated with Wish's operation, performance and finance, rending the risk disclosure and the Registration Statement materially misleading and false.

100. The Registration Statement further stated, in relevant part, that:

**Our Growth Strategy**

**Grow Our Base of Users**

- Continue to Acquire New Users. ***We are focused on growing our user base around the world***. We currently serve users in over 100 countries. We estimate that there are over 1 billion households with income of less than $75,000 around the world, excluding China and India. (Emphasis added).

- Drive User Conversion. We have over 12 million monthly active buyers13 and over 100 million monthly active users on the platform. We will continue to drive greater user engagement and convert more active users on our platform to become active buyers by utilizing our data science and introducing more interactive and entertaining features.

- Drive Profitable Lifetime Value from Existing Users. We plan to continue to improve the engagement and monetization of our users on our platform to maximize their lifetime value. We plan to achieve this goal by:

    - Using our data science to drive personalization of our platform;

    - Continuing to offer attractive discounts and value, an entertaining user experience, and robust user-generated content; and

    - Improving our ease of use by investing in our user support and logistics infrastructure to enable faster deliveries and localization of our platform.

- Expand Geographically. ***We intend to continue to expand our global footprint and enter new geographies and acquire new users in those markets***. (Emphasis added).

101. These statements were incomplete, inaccurate and materially false and misleading because they failed to disclose, that starting from the beginning of the fourth quarter of 2020, the Company had reduced advertising in India, Brazil, the Philippines and other emerging market countries outside of Europe and North America, causing MAUs to materially decline in the fourth quarter. Because (i) Wish had increased its advertising spend and sales and marketing efforts in the first nine months of the 2020 immediately before the IPO, (ii) the Registration Statement represented the positive correlation between advertising spend and user acquisition for Wish's business, (iii) the Registration Statement represented that Wish was continuing to advance its goal to expand users particularly in emerging markets, the above statements created a false impression in the investing public that Wish was continuing its advertising spending and marketing efforts globally, particularly in emerging markets, so it could expand its user acquisitions in emerging markets, Wish's key growth markets, when in fact, the Company had reduced its efforts to acquire users in emerging markets/key growth markets. Such silence deprived the investing public of knowing the complete and accurate picture of Wish's material operation moves and decisions to accurately assess the material risks associated with Wish's operation, performance and finance, rending the Registration Statement materially misleading and false.

102. The Registration Statement further stated in Risk Factors that:

***Our quarterly and annual operating results may fluctuate, which could cause our stock price to decline.***

Our quarterly and annual operating results may fluctuate for a variety of reasons, many of which are beyond our control. These reasons include those described in this "Risk Factors" section as well as the following:

- our user acquisition strategies;
- selling prices on our platform and the percentage of revenue we retain from the sale of products;
- mix of products listed on our platform;
- fraud, including the sale of counterfeit goods, and refunds, including our response to these areas;
- fraud, including the sale of counterfeit goods, and refunds, including our response to these areas;

- the level of merchant advertising on our platform;
- disruptions in supply or shipment of products listed on our platform, especially from China where most of our merchants are currently located;
- the actions of app stores and advertising platforms such as Facebook and Google;
- seasonality;
- fluctuations in exchange rates;
- the amount and timing of our other operating expenses;
- the impact of competitive developments and our response to those developments;
- changes in carrier policies and pricing and resulting higher logistics costs;
- actual or perceived disruptions or defects in our platform, such as data security breaches or outages;
- changes in laws and regulations that impact our business;
- changes in tax laws in the jurisdictions in which we operate; and
- general political, economic, and market conditions, particularly those affecting our industry.

Fluctuations in our quarterly and annual operating results may cause those results to fall below the expectations of analysts or investors, which could cause the price of our Class A common stock to decline. Fluctuations in our results could also cause a number of other problems. For example, analysts or investors might change their models for valuing our Class A common stock, we could experience short-term liquidity issues, our ability to retain or attract key personnel may diminish, and other unanticipated issues may arise.

In addition, we believe that our quarterly and annual operating results may vary in the future and that period-to-period comparisons of our operating results may not be meaningful. For example, our historical growth may have overshadowed the seasonal effects on our historical operating results. These seasonal effects may become more pronounced over time, which could also cause our operating results to fluctuate. You should not rely on the results of one quarter or one year as an indication of future performance.

103. This risk disclosure was materially false and misleading because it was vague and inaccurate and failed to completely inform the investing public that starting from the beginning of the fourth quarter of 2020, the Company had reduced advertising in India, Brazil, the Philippines and other emerging market countries outside of Europe and North America, causing MAUs to materially decline in the fourth quarter. The de-emphasizing strategy in emerging markets, including Brazil and Columbia, two countries in Latin America represented by Wish as "key growth markets", directly contradicted the Company's representations that it continued to user acquisition efforts in emerging markets, including "key growth market" countries in Africa, Latin America, and Eastern

Europe. Because (i) Wish had increased its advertising spend and sales and marketing efforts in the first nine months of the 2020 immediately before the IPO, (ii) the Registration Statement represented the positive correlation between advertising spend and user acquisition for Wish's business, (iii) the Registration Statement represented that Wish was continuing to advance its goal to expand users particularly in emerging markets, the above statements created a false impression in the investing public that Wish was continuing its advertising spending and marketing efforts so it could expand its user acquisitions in emerging markets, Wish's key growth markets, when in fact, the Company had reduced its efforts to acquire users in emerging markets/key growth markets. Such silence deprived the investing public of knowing the complete and accurate picture of Wish's material operation moves and decisions to accurately assess the material risks associated with Wish's operation, performance and finance, rending the risk disclosure and the Registration Statement materially misleading and false. The risk disclosure failed to warn that the specific "de-emphasizing" strategy would reasonably be likely to cause Wish's operating results in the fourth quarter of 2020 and following quarters to materially fluctuate.

104. The Registration Statement further stated in Management's Discussion And Analysis Of Financial Condition And Results Of Operations that:

> **Invest in our sales and marketing engine**. We have made significant investments in our data science which underpins all aspects of our operations including marketing and user acquisition. By leveraging our unique and scaled data set and algorithms, ***our goal is to execute cost-effective and successful digital marketing strategies to acquire new users and re-engage existing users on the Wish platform.*** We consider our user acquisition expertise a strong competitive advantage and have invested in this capability over time to continue to drive user and revenue growth. ***We will need to continue to invest in our marketing efforts to attract new users and increase user engagement.***

105. These statements were materially false and misleading because the Registration Statement failed to disclose that starting from the beginning of the fourth quarter of 2020, the Company had reduced advertising in India, Brazil, the Philippines and other emerging market countries outside of Europe and North America, causing MAUs to materially decline in the fourth quarter. This specific "de-emphasizing" strategy directly contradicted the impression the above statements gave to the investing public that Wish was continuing to invest in its marketing efforts

to attract new users and increase user engagement. Because (i) Wish had increased its advertising spend and sales and marketing efforts in the first nine months of the 2020 immediately before the IPO, (ii) the Registration Statement represented the positive correlation between advertising spend and user acquisition for Wish's business, (iii) the Registration Statement represented that Wish was continuing to advance its goal to expand users particularly in emerging markets, the above statements created a false impression in the investing public that Wish was continuing its advertising spending and marketing efforts so it could expand its user acquisitions in emerging markets, Wish's key growth markets ,when in fact, the Company had reduced its efforts to acquire users in emerging markets/key growth markets. Such silence deprived the investing public of knowing the complete and accurate picture of Wish's material operation moves and decisions to accurately assess the material risks associated with Wish's operation, performance and finance, rending the Registration Statement materially misleading and false.

106. The Registration Statement failed to disclose, pursuant to Item 105, that in the fourth quarter of 2020, the Company reduced advertising and its efforts to acquire users in emerging markets, causing an ongoing adverse impact on MAUs and Wish's performance, which could reasonably like cause a material adverse impact on MAUs and Wish performance for the fourth quarter of 2020 and subsequent quarters because the Registration Statement represented the positive correlation between advertising spend and user acquisition for Wish's business, rendering an investment in Wish shares "speculative or risky". Such omission thus violated the affirmative duty to disclose under Item 105.

## THE TRUTH BEGAN TO EMERGE

107. On March 8, 2021, immediately after the market closed, at 4:09pm, Wish reported its 4Q20 and FY20 financial results for the period ended December 31, 2020 on a Form 8-K, disclosing that, in the fourth quarter of 2020, its "MAUs declined 10% YoY during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America where ***Wish temporarily de-emphasized advertising and customer acquisition*** as the company worked through logistics challenges it faced earlier in the year." (Emphasis added).

108. The media was quick to analyze the Company's announcement. On the same day of March 8, 2021, at 6:38pm, Bloomberg published a report entitled "Wish Revenue Beats Estimates, Worries Linger About Growth", directing the market's attention to the MAU decline. The report noted that "[d]iscount online retailer Wish gave a revenue forecast for the current quarter that beat analyst estimates" and "[t]he shares jumped as much as 10% in extended trading after the results were released, but gave most of those gains back as investors focused on the decline in the website's users."

109. At the Earnings Call for 4Q20 And FY20 Financial Results held on March 8, 2021, Defendant Bahri was asked to provide more details for "the pullback that you did on advertising and customer acquisition in some of those emerging markets and how we should think about the timing as you bring that back on". In response, Defendant Bahri stated that:

> the countries like – these emerging markets, the days to delivery was significantly large and we just felt it's not right to invest in these businesses if the consumers churn, what's the point of investing. So maybe much all of the decline was driven by countries like India, Philippines, Colombia, some Brazil all those countries wherever be it. Now, what we're seeing is that Wish Local works very well in these markets like in Mexico, 25% of the orders are Wish Local. And also the logistics are now running fairly normal. In those countries they're back to historical low level. So we would expect that in the next three to six months, we expect to again engage with these markets and get those MAUs back.

110. The "de-emphasizing" strategy that Wish took in the fourth quarter of 2020 continued to adversely impact the Company's performance. On May 12, 2021, Wish announced its 1Q21 financial results for the interim period ended March 31, 2021, and filed a Form 10-Q for the quarterly period ended March 31, 2021. Again, Wish's MAUs declined, this time by an additional 7% to just 101 million. The Company's forward sales guidance also fell short, with its 2Q21 revenue guidance of just $715 million to $730 million coming in significantly below the guidance of $735 to $750 million provided for 1Q21. On this news, Wish's stock cratered more than 29%, falling from $11.47per share on May 12, 2021, to close at $8.11 per share, on a high trading volume, on May 13, 2021.

**EVENTS AFTER THE IPO**

111. When Plaintiff Yen Hoang filed this case, Wish's stock price had fallen by 64%, significantly damaging investors.

112. After the IPO, the Company's MAUs continued to significantly decline. A summary of the MAUs and revenue is as follows:

| | 1Q2021 | | 2Q2021 | 3Q2021 | 4Q2021 | 1Q2022 |
|---|---|---|---|---|---|---|
| **MAU** | 101 | | 90 | 60 | 45 | 27 |
| **Revenue** | $772 | | $656 | $368 | $289 | $189 |

(In millions)

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

113. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the Class. Excluded from the Class are Defendants, the officers and directors of Wish, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

114. The Class members are so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Wish or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

115. Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

116. Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.

117. Common questions of law and fact exist as to all Class members and predominate

over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the Securities Act;

b. whether the Registration Statement misrepresented material facts;

c. whether the Registration Statement omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether the Class members have sustained damages and, if so, what is the proper measure of damages.

118. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**Violations of Section 11 of the Securities Act**
**Against All Defendants Concerning**
**the Registration Statement**

119. Plaintiffs repeat and re-allege the allegations set forth herein as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct.

120. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

121. The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

122. The Defendants named in this Count signed the Registration Statement and/or was a director at the time of the filing of the Registration Statement.

123. Defendants are strictly liable and/or negligent to Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

124. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

125. Plaintiffs acquired Wish common shares pursuant to the Registration Statement.

126. At the time of their purchases of Wish common shares, Plaintiffs and members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

127. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**COUNT II**
**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

128. Plaintiffs repeat and re-allege the allegations set forth herein as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct.

129. This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants, each of whom was a control person of Wish during the relevant period.

130. The Individual Defendants were in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statement.

131. None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

132. Plaintiffs and the Class have sustained damages. The value of Wish common shares has declined substantially due to the Securities Act violations alleged herein.

133. This claim is brought within one year after discovery of the untrue statements and/or

omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

a. declaring this action to be a proper class action, designating Xiaoquan Yang and Alexander De Block as Lead Plaintiffs and certifying them as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Plaintiffs' co-counsel as Co-Class Counsel;

b. awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

c. awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated; April 10, 2023

Respectfully Submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

Laurence M. Rosen
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jing Chen
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jchen@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**

/s/ *Ex Kano S. Sams, II*
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

***Co-Counsel for Lead Plaintiffs and The Proposed Class***

**LAW OFFICES OF HOWARD G. SMITH**

Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

***Additional Counsel***

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned, say:

I am not a party to the above case and am over eighteen years old. On April 10, 2023, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 10, 2023, at Los Angeles, California.

*/s/ Jacob Goldberg*
Jacob Goldberg