**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Counsel for Lead Plaintiffs and The Proposed Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| YEN HOANG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CONTEXTLOGIC, INC., PETER SZULCZEWSKI, RAJAT BAHRI, BRETT JUST, JULIE BRADLEY, ARI EMANUEL, JOE LONSDALE, TANZEEN SYED, STEPHANIE TILENIUS, HANS TUNG, JACQUELINE RESES, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., UBS SECURITIES LLC, RBC CAPITAL MARKETS, LLC, CREDIT SUISSE SECURITIES (USA) LLC, COWEN AND COMPANY, LLC, OPPENHEIMER & CO. INC., STIFEL, NICOLAUS & COMPANY, L.L.C., ACADEMY SECURITIES, INC., LOOP CAPITAL MARKETS LLC, and R. SEELAUS & CO., LLC,<br><br>Defendants. | Case No. 5:21-cv-03930-BLF<br><br>**THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 5

IV. FACTUAL ALLEGATIONS UNDER THE SECURITIES ACT ..... 13

A. Acquiring Users in Emerging Markets Was Wish's Growth Strategy and MAU Was A Key Metric for Measuring Success in User Growth in Emerging Markets ..... 13

B. At Wish, Advertising Spend Positively Correlated with User Acquisition and MAUs ..... 17

C. The Registration Statement Omitted That in the Fourth Quarter of 2020, Wish Reduced Advertising Efforts in Emerging Markets, Resulting in Declines in DAUs and MAUs ..... 19

D. Before the IPO, Wish Forecasted Continuing MAU Decline for 1Q21 Year-Over-Year ..... 29

E. Defendants Had an Affirmative Obligation to Disclose Material Risks Under SEC Regulations. ..... 30

V. MATERIALLY FALSE STATEMENTS IN THE REGISTRATION STATEMENT ..... 31

VI. THE TRUTH EMERGES ..... 33

VII. PLAINTIFFS' CLASS ACTION ALLEGATIONS ..... 42

VIII. COUNTS ..... 44

IX. PRAYER FOR RELIEF .................................................................. 46

X. JURY TRIAL DEMAND .................................................................. 46

Lead Plaintiffs Xiaoquan Yang and Alexander De Block ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their third amended complaint against Defendants ContextLogic, Inc. ("Company" or "Wish"), Peter Szulczewski ("Szulczewski"), Rajat Bahri ("Bahri"), Brett Just, Julie Bradley, Ari Emanuel, Joe Lonsdale, Tanzeen Syed, Stephanie Tilenius, Hans Tung, Jacqueline Reses, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, BofA Securities, Inc., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., UBS Securities LLC, RBC Capital Markets, LLC, Credit Suisse Securities (USA) LLC, Cowen and Company, LLC, Oppenheimer & Co. Inc., Stifel, Nicolaus & Company, L.L.C., Academy Securities, Inc., Loop Capital Markets LLC, and R. Seelaus & Co., LLC ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' allegations are based on the investigation conducted by their attorneys, which included, among other things, a review and analysis of: (i) Defendants' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) public reports and news articles; (iii) transcripts of Defendants' conference calls; (iv) interviews with former employee witnesses[1] with relevant information; and (v) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Wish, an e-commerce platform, sought to attract "underserved," "value-conscious" low-earning consumers around the world, particularly in the emerging

[1] All former employees ("FEs") are referred to in the masculine to preserve their anonymity.

markets, to its platform by "bring[ing] an affordable and entertaining mobile shopping experience to billions of consumers around the world, . . . . providing merchants access to hundreds of millions of consumers globally."

2. In its Registration Statement[2] and Prospectus, registering for sale 46 million shares of Wish's Class A common stock at an offer price of $24 per share for over $1 billion in proceeds, Wish repeatedly attributed the success of the user growth on its platform primarily to advertising. That is, the more Wish spent on advertising sales and marketing, the more active users it attracted. The Registration Statement disclosed that Wish materially increased its advertising spend for the first nine months of 2020 compared to the first nine months of 2019. Wish also repeatedly stressed the importance of "attracting and engaging users" to the Company's operation and finance and represented that the Company would continue to acquire new users particularly in, according to Wish, "key growth markets", or emerging markets, where the populations, price/value conscious, were inclined to buy un-branded items at deeply discounted prices.

3. The Registration Statement gave the investing public an impression that at the time of its initial public offering ("IPO"), to advance its primary goal to grow users worldwide, particularly in the emerging market countries, Wish was still continuing with the same adverting and marketing efforts as the Company had been making for the first nine months of 2020.

4. Unbeknownst to the investing public, starting from the beginning of the fourth quarter of 2020, two and a half months before IPO, however, Wish materially

[2] Wish filed with the SEC its Registration Statement on Form S-1/A, Registration No. 333-250531, on December 7, 2020, at 4 p.m., with an effective date of December 15, 2020, at 4:00 p.m. The SEC accepted for filing Wish's Prospectus on Form 424B4, Registration No. 333-250531, on December 16, 2020 (together, "Registration Statement").

reduced advertising expenses and the efforts to acquire customers in in India, Brazil, Columbia, the Philippines and other emerging market countries outside of Europe and North America.

5. Yet, the Registration Statement omitted to disclose, completely and accurately, the reduced advertising and marketing efforts in emerging markets in the fourth quarter of 2020 and was silent on the attendant risks that Wish's performance, particularly its user growth and MAUs, could reasonably likely suffer materially as a result. These omissions rendered the Registration Statement materially false and misleading.

6. Furthermore, the SEC Regulation S-K Item 105 (17 C.F.R. §229.105) requires registrants, such as Wish, to discuss the material factors that make an investment in the registrant or offering speculative or risky. Wish failed to disclose that its reduced advertising and efforts to acquire users in emerging markets in the fourth quarter of 2020 could reasonably likely cause a material adverse impact on MAUs and Wish performance for the fourth quarter of 2020 and subsequent quarters, rendering an investment in Wish "speculative or risky." Such omission thus violated the affirmative duty to disclose under Item 105.

7. On March 8, 2021, two and a half months later, Wish partially disclosed what the Registration Statement omitted—the reason it had reduced ad spend in emerging markets in 4Q20 and the direct, material impact on MAU. Tying its materially reduced ad spend in emerging markets directly to its total MAU decline year over year, the Company stated that "MAUs declined 10% YoY during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America where Wish temporarily de-emphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year." At the same time, however, with more than two-thirds of 1Q21 complete, Wish mislead investors, claiming that logistics in emerging markets "are now running fairly normal. In those countries they're back to historical low level returning to normal." It omitted not only

that logistics problems in emerging markets persisted, but that before the IPO, it forecasted related, continuing, material declines in MAU at least through 1Q21. In response to these partial disclosures, after a brief increase in Wish's stock price after the press release at 4:09 p.m., in reaction to the Company's 4Q 2020 disclosures, including during its earning conference call, about the impact of reduction in ad spend in emerging markets on MAU, Wish's stock price fell materially in after-market trading.

8. Those very "logistics problems," Wish's reduction in ad spend in emerging markets, and the resulting year-over-year decline in MAU, however, persisted in 1Q21. The circumstances and resulting adverse effect persisted beyond the fourth quarter of 2020 as Wish projected they would before the IPO. The logistics problems and the "de-emphasizing" strategy continued materially impacting the Company's key performance indicators, financial condition and results of operation for the next two quarters. In fact, in advance of the IPO, Wish projected for Q121 a material decline in MAU, the latter by 5.5%. Just as it had forecasted pre-IPO, on May 12, 2021, Wish announced that its MAUs declined year over year. Again, this time by an additional 7% y-o-y to just 101 million. On various occasions, Wish repeatedly attributed this further decline to its same "decision to de-emphasize user acquisition in some emerging markets outside of Europe and North America where [Wish] faced logistical challenges due to the pandemic" that Wish initiated pre-IPO. The Company also had to reduce its forward revenue guidance for the second quarter of 2021 to just $715 million to $730 million, significantly below the guidance of $735 to $750 million provided for the first quarter of 2021. On this news, Wish's stock plummeted more than 29% in one day.

9. Wish's materially false and misleading information, when exposed, damaged investors. At the time when this case was first filed, Wish's stock price had fallen by 64% from the offering price.

10. Plaintiffs bring this federal class action under §§11 and 15 of the Securities Act of 1933 ("Securities Act"), and rules promulgated thereunder, on behalf of all persons or entities that purchased or acquired Wish common stock pursuant or traceable to the Company's Registration Statement and Prospectus for the Company's IPO. Plaintiffs bring these Securities Act claims against Defendants, alleging strict liability and/or negligence. Plaintiffs specifically disclaim any allegation of fraud, recklessness or intentional misconduct concerning allegations under the Securities Act.

## II. JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act. 15 U.S.C. §§ 77k and 77o.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act. 15 U.S.C. § 77v.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act. 15 U.S.C. § 77v because the events in question occurred in whole or in material part in this judicial district.

14. In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

15. Lead Plaintiff Xiaoquan Yang purchased Wish securities pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. Lead Plaintiff Yang's certification (Dkt. No. 28-2) has been previously filed with the Court and is incorporated by reference herein.

16. Lead Plaintiff Alexander De Block purchased Wish securities pursuant and/or traceable to the Registration Statement at artificially inflated prices during the

Class Period and suffered damages. Lead Plaintiff De Block's certification (Dkt. No. 28-2) has been previously filed with the Court and is incorporated by reference herein.

17. Defendant ContextLogic Inc. (d/b/a "Wish") is incorporated in Delaware with principal executive offices located at One Sansome Street 40th Floor, San Francisco, CA 94104. The Company's common stock trade in an efficient market on the NASDAQ under the ticker symbol "WISH."

18. Defendant Piotr Szulczewski ("Szulczewski") has served as Wish's Chief Executive Officer ("CEO") and Chairman of its Board of Directors at all relevant times. Mr. Szulczewski founded Wish in 2010 and served as CEO from July 2010 to January 2022. Prior to founding the Company, he held various positions at Google, Inc. Mr. Szulczewski holds a B.S. in mathematics and computer science from University of Waterloo. Szulczewski signed or authorized the signing of the Registration Statement filed with the SEC.

19. Defendant Rajat Bahri ("Bahri") served as Wish's Chief Financial Officer ("CFO") from December 2016 to July 23, 2021. Prior to joining the Company, Defendant Bahri served as CFO at various companies, including serving as the CFO at a public company for eight years. Defendant Bahri holds a bachelor's degree in commerce from the University of Delhi and an M.B.A. from the Fuqua School of Business at Duke University. Defendant Bahri signed or authorized the signing of the Registration Statement filed with the SEC.

20. Defendant Brett Just ("Brett Just") served as Wish's Chief Accounting Officer ("CAO") during all relevant times. Prior to taking on the role of CAO, he served as Wish's Controller from August 2019 and as Assistant Controller from September 2017. Brett Just was previously the Controller for the Internet of Things (IOT) Business Unit at Cisco Systems, Inc. from 2016 to 2017 and Assistant Controller for Jasper Wireless from 2013 to 2016, prior to its acquisition by Cisco in March 2016. Brett Just began his career in public accounting at Deloitte and Just, Gurr & Associates. He holds a B.S. in Business Economics from the University of

California, Los Angeles. Brett Just signed or authorized the signing of the Registration Statement filed with the SEC.

21. Defendant Julie Bradley ("Bradley") served as a director of Wish at the time of the IPO. Bradley signed or authorized the signing of the Registration Statement filed with the SEC.

22. Defendant Ari Emanuel ("Emanuel") served as a director of Wish at the time of the IPO. Emanuel signed or authorized the signing of the Registration Statement filed with the SEC.

23. Defendant Joe Lonsdale ("Lonsdale") served as a director of Wish at the time of the IPO. Lonsdale signed or authorized the signing of the Registration Statement filed with the SEC.

24. Defendant Tanzeen Syed ("Syed") served as a director of Wish at the time of the IPO. Syed signed or authorized the signing of the Registration Statement filed with the SEC.

25. Defendant Stephanie Tilenius ("Tilenius") served as a director of Wish at the time of the IPO. Tilenius signed or authorized the signing of the Registration Statement filed with the SEC.

26. Defendant Hans Tung ("Tung") served as a director of Wish at the time of the IPO. Tung signed or authorized the signing of the Registration Statement filed with the SEC.

27. Defendant Jacqueline Reses ("Reses") was identified as an incoming director of Wish at the time of the IPO and was named a member of the Board of Directors on December 18, 2020.

28. Defendants Szulczewski, Bahri, Just, Bradley, Emanuel, Lonsdale, Syed, Tilenius, Tung, and Reses are sometimes referred to herein collectively as the "Individual Defendants."

29. The Individual Defendants each reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

30. The senior management of Wish, including the Individual Defendants, as executive officers and authorized representatives of Wish, participated in the solicitation and sale of Wish securities to investors in the IPO, motivated in part to serve their own and the Company's financial interests.

31. The Individual Defendants, along with other Wish senior executives, attended investor roadshow presentations and met with investment analysts and large investors in the weeks leading up to the IPO to persuade investors that Wish was a worthy investment and solicit investors to purchase Wish securities in the IPO, all to further the financial interests of Wish.

32. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the Securities Act.

33. Wish is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

34. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

35. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

36. Defendant BofA Securities, Inc. ("BofA") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

37. Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

38. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

39. Defendant UBS Securities LLC ("UBS") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

40. Defendant RBC Capital Markets, LLC ("RBC") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

41. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

42. Defendant Cowen and Company, LLC ("Cowen") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

43. Defendant Oppenheimer & Co., Inc. ("Oppenheimer") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

44. Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

45. Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

46. Defendant Academy Securities, Inc. ("Academy Securities") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

47. Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

48. Defendant R. Seelaus & Co., LLC ("R. Seelaus") was an underwriter of the Company's IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Registration Statement.

49. Defendants listed in ¶¶34-48 are collectively referred to herein as the "Underwriter Defendants."

50. Defendants Goldman Sachs, J.P. Morgan and BofA acted as the representatives of all the Underwriter Defendants. Each Underwriter Defendant named herein is an investment banking firm whose activities include, inter alia, the underwriting of public offerings of securities.

51. The Underwriter Defendants participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. The Underwriter Defendants' participation in, and its solicitation of, offers in connection with the IPO was motivated by its financial interests. As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees. All the Underwriter Defendants conduct business in this District.

52. The Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

53. The Underwriter Defendants also assisted Wish and the Individual Defendants in planning the IPO. They further purported to conduct an adequate and

reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

54. In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to Wish's management, directors, and lawyers to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Wish's common stock would be sold; (iii) the language to be used in the Offering Materials; (iv) what disclosures about Wish would be made in the Offering Materials; and (v) what responses would be made to the SEC in connection with its review of the Offering Materials. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Wish's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of Wish's undisclosed then-existing information and plans and the Offering Materials' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

55. The Underwriter Defendants also demanded and obtained an agreement from Wish under which Wish agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

56. The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the IPO, so that they, and the Director Defendants, could offer to sell, and sell, Wish shares to Plaintiffs and the members of the Class pursuant (or traceable) to the Offering Materials.

57. In the Underwriting Agreement, attached to the Registration Statement, the non-lead underwriters provided the Lead Underwriters the full legal authority to act on their behalf in connection with their underwriting of the IPO. In

communications with the SEC, the Lead Underwriters stated that they are acting as representatives for all the Underwriter Defendants. Thus, the actions of the Lead Underwriters bound the non-lead Underwriter Defendants in connection with the IPO.

58. The Underwriters' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement.

## IV. FACTUAL ALLEGATIONS UNDER THE SECURITIES ACT

### A. Acquiring Users in Emerging Markets Was Wish's Growth Strategy and MAU Was A Key Metric for Measuring Success in User Growth in Emerging Markets

59. On December 15, 2020, Wish's Registration Statement became effective. Wish issued 46 million shares of common stock at $24 per share, selling them through the Underwriter Defendants and raising more than $1.1 billion in gross proceeds. On December 16, 2020, the SEC accepted for filing Defendants' Prospectus on Form 424(b)(4), soliciting purchases of Wish shares that the Underwriter Defendants had purchased from Wish.

60. Wish operates the Wish platform, enabling merchants to sell their products directly to global consumers, primarily those in emerging markets who are low earning and price conscious. According to Wish, "[w]e built Wish to serve these consumers who favor affordability over brand and convenience, and are being underserved by traditional ecommerce platforms." Under the heading, "Billions of Value-Conscious Consumers Are Underserved," the Registration Statement continued,

> Value-conscious consumers represent a large and growing portion of the global consumer population, and they have been historically underserved by traditional ecommerce. For this segment of the global population, price is often the single most important determinant when making a purchase. Forty-four percent of U.S. consumers and 85% of European consumers have a household income of less than $75,000, and we

> estimate that there are over 1 billion households with income of less than $75,000 around the world, excluding China and India. Additionally, in the emerging economies of Africa, the Middle East, Latin America, and Eastern Europe, where the average household income is approximately $18,000, affordability will be the key element for users shopping online for the first time. We believe that the next billion ecommerce customers will be these value-conscious consumers.

61. According to Wish, most of its merchants are based in China. The unbranded products can be discounted in excess of 85% compared to branded alternatives. Growing users in emerging markets where income generally is lower than in North America and Europe, therefore, was among Wish's most important means of growth and critical to its key performance indicators or KPIs. In the Registration Statement, Wish touted itself as one of the largest and fastest growing global ecommerce platforms, claiming to have achieved "massive growth and scale" since its founding in 2010. The Company presented the "Key Milestones" for the massive growth in its user platform expansion primarily in the form of MAUs or monthly active buyers. It claimed that as of September 30, 2020, the Company had over 100 million MAUs in over 100 countries.

62. Wish defined MAUs as the number of unique users that visited the Wish platform, either on its mobile app, mobile web, or on a desktop, during a month. MAUs for a given reporting period equaled the average of the MAUs for that period. The Company claimed to identify active users by a unique email address. According to Wish, the change in MAUs in a reporting period captured both the inflow of new users as well as the outflow of existing users who did not visit the platform in a given month.

63. Wish measured its "effectiveness in attracting and engaging users through metrics such as [its] MAUs." The Company listed MAUs as part of the financial information and data in the Registration Statement and classified MAUs as one of the key metrics to "measure [its] performance, identify trends affecting [its] business, and make strategic decisions."

64. In the Registration Statement, Defendants repeatedly stressed the importance of acquiring users, as reflected by MAUs, to Wish's operation and finance, and highlighted their plan to expand the Company's user base, numerically and geographically, particularly in emerging markets, as the primary operational goal.

65. For example, according to the SEC's instruction to the prospectus summary of a registration statement, a prospectus summary "should provide a brief overview of the ***key*** aspects of the offering" and "identify those aspects of the offering that are ***the most significant*** and determine how ***best to highlight*** those points in clear, plain language." 17 CFR § 229.503. (Emphasis added). In the "Prospectus Summary" of the Registration Statement, as one of the most significant aspects of the IPO, Defendants listed "Grow Our Base of Users" as the first and foremost step to realize its "Growth Strategy" and further enumerated four moves, under "Grow Our Base of Users", that the Company was taking, including to "continue to acquire new users" and "expand geographically." The Company stressed that "[w]e are focused on growing our user base around the world."

66. Additionally, the SEC Regulation S-K Item 101 (17 CFR §229.101) requires registrants to describe "information ***material*** to an understanding of the business taken as a whole" in the description of business section of a prospectus. *Id.* (Emphasis added). Defendants, in the "Business" segment of the Registration Statement, reiterated the importance of global user acquisition to Wish's growth strategy and particularly highlighted emerging markets, such as "countries in Africa, Latin America, and Eastern Europe," as Wish's "***key growth markets***" in which the Company was focused on acquiring users. The Registration Statement stated, in relevant part, that,

**Our Growth Strategy**

> We leverage our data and unique insights on merchants and users to extend our platform outside of our core business and drive additional growth opportunities. Our data science capabilities are a unique advantage and core to the operations of our business.

**Grow Our Base of Users**

- **Continue to Acquire New Users.** ***We are focused on growing our user base around the world.*** We currently serve users in over 100 countries. We estimate that there are over 1 billion households with income of less than $75,000 around the world, excluding China and India. ***We intend to grow our user base by cost effectively reaching new users through a combination of data-driven and targeted advertising campaigns***, word of mouth and other marketing efforts, as well as increasing our brand awareness.

…

- **Expand Geographically.** ***We will continue to expand our global footprint and enter new geographies and acquire new users in those markets. In particular, countries in Africa, Latin America, and Eastern Europe are key growth markets*** with large and growing populations as well as a significant portion of the population with lower average household incomes. Within these markets, the proliferation of consumer mobile use and improvements in internet infrastructure will help us establish and grow our business. In addition, our investments in our own logistics network will help us achieve better breadth and density of coverage in our newer regions and countries, enabling a better user experience and localized, high-quality delivery and customer service.

(Emphasis added).

67. In the "Management's Discussion and Analysis of Financial Condition and Results of Operations" of the Registration Statement, disclosure required by Item 303 of Regulation S-K (17 CRF §229.303) of material information relevant to an assessment of the financial condition and results of operations of a public company, Wish described "increase the scale and growth of [its] user and buyer base" as one of the "key elements of [its] financial model that drive [its] growth" and measured its "effectiveness in attracting and engaging users through metrics such as [its] MAUs."

It stated that the Company "view[ed] the number of MAUs as key driver of revenue growth as well as a key indicator of user engagement and awareness of [its] brand."

**B. At Wish, Advertising Spend Positively Correlated with User Acquisition and MAUs**

68. In the Registration Statement, Wish tied its business success directly to acquiring new users through its advertising and marketing efforts. That is, the more Wish spent on advertising, sales and marketing, the more active users it attracted. Wish represented that its "sales and marketing capabilities represent[ed] a core competency that [was] essential to the success of the Wish platform." According to the Registration Statement, Wish's "advertising costs to acquire new users" constituted 96% of its sales and marketing expenses or 87% of its operating expenses in 2019. The Registration Statement, in the relevant part, stated,

> **Sales and Marketing**
>
> Our sales and marketing capabilities represent a ***core*** competency that is essential to the success of the Wish platform. We are focused on continuing to acquire new users efficiently, and building brand awareness and a demand generation engine. Our advertising costs to acquire new users constituted 96% of our sales and marketing expenses, and sales and marketing expenses constituted 91% of our operating expenses, in 2019. We have extensive experience in cost-effective, data-driven digital marketing and user acquisition. We also design innovative marketing programs that help increase brand awareness by targeting people who we believe have a higher propensity to engage with our platform and buy from our merchants. We continue to partner with various social-media platforms to ensure we gain exposure with broader audiences.

69. According to the Registration Statement, the Company measures its effectiveness in attracting and engaging users through metrics such as MAUs, which significantly increased by 33% from the nine months ended September 30, 2019 and to the nine months ended September 30, 2020, and attributed such increase

"primarily" to the success of its promotional and marketing campaigns, which increased by 13% for the same period. The Registration Statement, in the relevant part, stated:

> **Our Financial Model**
>
> Our business benefits from powerful network effects, fueled by our data advantage and massive scale. As more users join Wish, attracted by our affordable value proposition and shopping experience, we are able to increase revenue potential for our merchants. …
>
> Our model relies on cost-effectively adding new users, converting those users into buyers and improving engagement and monetization of those buyers on Wish over time as well as adding new merchants, delivering economic success for those merchants, and having those merchants use more of our end-to-end platform.
>
> The following are ***key elements*** of our financial model that drive our growth:
>
> **Increase the scale and growth of our user and buyer base.** Attracting and engaging users have been our key areas of focus since our founding. We measure our effectiveness in attracting and engaging users through metrics such as our MAUs, which increased over 33% from the nine months ended September 30, 2019 and to the nine months ended September 30, 2020, as well as the average minutes spent per visit by user. ***These increases have primarily been driven by*** the growing popularity and recognition of our brand and platform, the user preferences for our differentiated mobile shopping experience, wide selection of attractively priced products, and ***the success of our promotional and marketing campaigns.*** (Emphasis added.)

70. The Registration Statement also specifically represented that the Company "anticipate[d] that sales and marketing expenses will continue to be our most significant operating expense in the future and our overall profitability will depend on the success of our investments in sales and marketing."

71. Thus, the Registration Statement correlated Wish's key metrics, including MAUs, to its advertising spend.

72. Critically, the Registration Statement disclosed that because Wish's focus on growth in 2020, Wish's sales and marketing expense increased $130 million, or 13%, to $1,125 million for the nine months ended September 30, 2020, compared to $995 million for the nine months ended September 30, 2019. The Registration Statement explained that such increase in sales and marketing expenses consisted primarily of an increase in advertising spend, as "[the Company] re-focused on growth after [it] intentionally moderated user acquisition spend temporarily to focus on the launch of the logistics platform in the first half of 2019." These statements, read in the context of the Registration Statement repeatedly representing that user acquisitions globally, particularly in emerging markets, constituted Wish's continuous efforts, gave the investing public an impression that Wish was increasing its advertising spend throughout 2020, including the fourth quarter of 2020, to expand its user acquisitions in 2020.

### C. The Registration Statement Omitted That in the Fourth Quarter of 2020, Wish Reduced Advertising Efforts in Emerging Markets, Resulting in Declines in DAUs and MAUs

73. Despite the express representations in the Registration Statement that the Company had increased its advertising spend for the first nine months of 2020 and continued with acquiring customers particularly in emerging markets, Defendants omitted in the Registration Statement that starting from the beginning of the fourth quarter of 2020, the Company had reduced advertising and its efforts to acquire customers in emerging markets outside of Europe and North America, including India, Brazil, Columbia, and the Philippines, which could cause the MAUs to materially decline in the fourth quarter of 2020. Later, the Company attributed a 10% YoY MAU decline during the fourth quarter to their reducing advertising and user acquisition efforts in those locations.

74. Although the Registration Statement disclosed several risk factors that might impact the Company's efforts to acquire users, Wish failed to warn of the

***specific*** risk that at the time of the IPO—that due to Wish's reduced advertising spend and user acquisition efforts in emerging markets in the fourth quarter of 2020, Wish's performance, particularly MAUs, could be materially adversely impacted. The risk disclosure stated that:

> ***Our efforts to acquire new users and engage existing users may not be successful or may be more costly than we expect, which could prevent us from maintaining or increasing our revenue.***
>
> Our success depends on our ability to attract new users and engage existing users in a cost-effective manner. In order to acquire and engage users, we must, among other things, promote and sustain our platform and provide high-quality products, user experiences, and service. Our marketing efforts currently include various initiatives and consist primarily of digital marketing on a variety of social media channels, such as Facebook, search engine optimization on websites, such as Google, Bing, and Yahoo!, various branding strategies, such as our relationship with the Los Angeles Lakers and social influencers, and mobile "push" notifications, text messaging, and email. For the year ended December 31, 2019 and the nine months ended September 30, 2020, we spent $1.5 billion and $1.1 billion on sales and marketing, representing 78% and 64% of our revenue, respectively. ***We anticipate that sales and marketing expenses will continue to comprise a substantial majority of our overall operating costs for the foreseeable future.*** We have historically acquired a significant number of our users through digital advertising on platforms and websites owned by Facebook and Google, which may terminate their agreements with us anytime. ***Our investments in sales and marketing may not effectively reach potential users, potential users may decide not to buy through us, or user spend on our platform may not yield the intended return on investment, any of which could negatively affect our financial results***.
>
> Many factors, some of which are beyond our control, may reduce our ability to acquire, maintain and further engage with users, including those described in this "Risk Factors" section and the following:
>
> - system updates to app stores and advertising platforms such as Facebook and Google, including adjustments to algorithms that may decrease user engagement or negatively affect our ability to target a broad audience;

- changes in advertising platforms' pricing, which could result in higher advertising costs;
- changes in digital advertising platforms' policies, such as those of Facebook and Google, that may delay or prevent us from advertising through these channels, which could result in reduced traffic to and sales on our platform;
- changes in search algorithms by search engines;
- inability of our email marketing messages to reach the intended recipients' inbox;
- ineffectiveness of our marketing efforts and other spend to continue to acquire new users and maintain and increase engagement with existing users;
- decline in popularity of, or governmental restrictions on, social media platforms where we advertise;
- the development of new search engines or social media sites that reduce traffic on existing search engines and social media sites;
- consumer behavior changes as a result of COVID-19; and
- products listed by merchants on our platform that are the subject of adverse media reports, regulatory investigations, or other negative publicity.

***As a result of any of these factors or any additional factors that are outside of our control*****,** ***if we are unable to continue acquiring new users or increasing engagement with existing users,*** it could have a material adverse effect on our business, financial condition, results of operations, and prospects. (Emphasis added).

(Emphasis added).

75. The above risk factor's silence on Wish's reduced advertising spend and user acquisition efforts in emerging markets in the fourth quarter of 2020 prevented the investing public from completely and accurately assessing the material risks associated with Wish's operation, performance, and finance, rendering the risk disclosure and the Registration Statement materially misleading and false.

76. Former Employee 1 ("FE 1"), a Financial Manager, worked at Wish from October 2017 until June 2021. FE 1 reported directly to Thomas Chuang, or Peiyen

Chuang ("Chuang") who was Vice President of Finance from June 2014 to December 2019 and Vice President of Operations since December 2019. Chuang reported directly to Defendant Bahri, the Company's CFO.

77. FE 1 worked on the operational side and had unfettered access to Company financial data, all Company spending and costs and Profit and Loss statements ("P&L"), all contracts negotiated and operations daily. In addition, he had access to financial data regarding sales and MAU growth. FE 1 also managed the cost side of the finances including head count forecasting. FE 1 states he had access to HR databases and compiled accounts, worked with recruiters and built out contracts. FE 1's job responsibilities also included working with Department Heads to evaluate contracts under negotiation. Every month, FE 1 consolidated and built financial forecast line items for the P&L related to costs. FE 1 worked out of the Wish headquarters in San Francisco.

78. According to FE1, the Finance team at the San Francisco headquarters consisted of a small number of workers, who all worked at an open office space. FE1's desk was immediately opposite Defendant Bahri's, so FE1 and Defendant Bahri faced each other. FE1 spoke with Defendant Bahri many times every day. FE 1 worked closely with Defendant Bahri, as often Defendant Bahri ignored FE 1's direct report, Chuang, seeking out FE 1 directly. For example, according to FE 1, Defendant Bahri came to him and asked for a list of headcount forecasts to determine whom to lay off to save on costs. Chief Accounting Officer Defendant Brett Just's desk sat immediately behind FE1's desk. FE 1 recalls that Defendant Bahri was a careful and focused manager who sought to be aware, in detail, of the Company's finances. It is this that caused Defendant Bahri to avoid interacting with FE 1's direct report, Chuang, and to seek out FE 1 directly. As an example, when Defendant Bahri needed to negotiate certain deals, he talked with FE 1 directly. As another example, Defendant Bahri directly emailed to FE 1 with questions, specifically during the IPO.

79. According to FE1, Wish was a data driven high-tech company and used synchronized business analytic software to monitor the activities on its platform. The Company's Datawarehouse grabbed information about every transaction on its platform in real time as they were happening. The Datawarehouse hosted all the underlying raw transactional, operational, and financial data that the Company had. Both before and at the time of the IPO, Wish used Looker and Tableau, user interface software that enabled employees to populate raw data from the Datawarehouse into usable format that Wish developed and customized to inform its personnel. According to FE1, Looker and Tableau, or "Dashboard" as Wish called them, showed the same contents, including advertising spend, and both were actively running at the time of the IPO; at the time of the IPO, Wish was planning to transition from Looker to Tableau.

80. According to FE 1, Looker and Tableau contained all the metrics concerning Wish's operation and finance, including key metrics such as MAUs and advertising spend, and refreshed the data "instantaneously" so the data were always up to date.

81. An internal Company document, entitled "Narrative Topic: Commissions Revenue" (hereinafter "Commissions Revenue Narrative"), which Wish gave to FE1 during his employment, confirms the software infrastructure that FE1 describes. Wish's logo "Wish" is displayed on the upper right corner of each page of the Commissions Revenue Narrative. According to FE1, CAO Defendant Brett Just ordered the compilation of the Commissions Revenue Narrative and had it distributed among the Finance Department employees. According to FE1, this was a key document that laid out the workflow that the Finance Department and data analysts must follow concerning collecting, compiling, reviewing, commenting, reconciling, and presenting to the CFO revenue-related data shown in the Wish's software. The Commissions Revenue Narrative shows that it was last updated in

"Q4'FY19." According to FE1, this version of the Commissions Revenue Narrative was still applicable at the time of the IPO.

82. In the "System" section, the Commissions Revenue Narrative states that:

- ***Datawarehouse is the Company's main database that contains the entire universe of transactional data*** such as end-user's information, product listings, order management and checkout, refunds related information, Merchants-related information etc. Note that the data contained within this database is ***dynamic***. The Engineering Team provides all its engineers access to this database. The data management is also performed within Datawarehouse whereby large streams of data is organized into meaningful information that is ***utilized by the Company for financial reporting, metrics analysis***, etc. Composed of:

    a. MongoDB which is the live and dynamic database where Wish checkout resides;

    b. TreasureData or TD which is the static snapshot of MongoDB; and

    c. Redshift which is like TD, …

- NetSuite: …
- ***Tableau: Tableau is the User Interface that contains specific reporting sourced from TreasureData.***
- Cron Job: a scheduled script run at the back end that fetches data in report format from various sources such as MongoDB, TD or Redshift and ***sends reports to the intended users' emails, on a regular cadence***.

(Emphasis added.)

83. According to the "Product Data Glossary," a document that Defendant Brett Just had ordered created and distributed in the Finance Department, including FE1, the first dashboard shown on Looker/Tableau on the computer screen of each Wish's employee, including the Individual Defendants, was "Commerce Stats Dashboard," which "dashboard is meant to track the high-level commerce metrics

across the entire company." The "Product Data Glossary" describes the "Looks" of this dashboard as a "Commerce Stats Chart" that contains the most important 35 KPIs to the Company, including "GMV"[3], "Marketing Spend", "GMV Over Marketing", "Revenue Over Marketing", "Revenue", "DAU", "7 Day DAU Average", "GMV per DAU", "Revenue per DAU", "Revenue Minus Marketing per DAU" as the first, third, fourth, fifth, sixth, fifteenth, sixteenth, twenty-fifth, twenty-ninth and thirtieth metrics. The "Product Data Glossary" further explains "Marketing Spend" as "Amount of money spent on ads." The "Product Data Glossary" shows that Wish's user interfaces (Looker and Tableau dashboards) were tracking, and showing Wish's employees, via several key metrics, the impact of advertising dollars on user acquisition and retention in real time before the IPO and at the time of the IPO. According to FE 1, everyone, including the executives, had the dashboard open on their own computers all the time.

84. According to FE 1, Defendant Szulczewski controlled advertising spend. Every time FE1 saw discrepancies between the actual advertising spends and the budgets and asked the employees who were responsible for the spend about the discrepancies, the unvaried responses FE 1 received was that "Peter [*i.e.*, CEO Defendant Szulczewski] overrode it."

85. According to FE1, a material reduction in advertising spend correlated to a material decline in new customers. According to FE1, decreasing advertising specifically in some emerging markets outside of Europe and North America correlated directly to a material decrease in user acquisitions and, in turn, lower KPIs including MAUs. According to FE1, Wish is a high-tech company, and everything is in the cloud; in order to understand Wish's operational and financial performance,

[3] According to *Investopedia*, gross merchandise value or GMV is the total value of merchandise sold over a given period of time through a customer-to-customer (C2C) exchange site. It is a measure of the growth of the business or use of the site to sell merchandise owned by others. According to FE 1, Wish tracked in real time Gross Merchandise Value or GMV—which included information of commissions earned for each transaction and the amount transacted on the platform.

there is nothing else for the executives, including Defendants Szulczewski and Bahri, to look at besides the data shown on the dashboards. Indeed, as stated in the Registration Statement, "[the Company's] technology and data science capabilities drive all aspects of [its] business."

86. According to FE1, Szulczewski discussed advertising spend daily over Slack,[4] and he was aware of any and all issues. Defendant Szulczewski, FE 1 recalls, led all efforts to boost MAU through advertising spend. Defendant Bahri worked closely with Defendant Szulczewski on all aspects of the Company's advertising spend from the medium to the spend. According to FE 1, Defendant Szulczewski closely monitored customer acquisition costs ("CAC").

87. Since August 2020, the MAU data's rapid variability forced Defendants Szulczewski, Bahri, and Head of Financial Planning and Analysis Oliver to review and to track MAU data and other data on the Google Sheets at least daily. According to FE 1, Wish used Google sheet, which contained historic operational data, to generate performance forecast. All engaged in daily discussions, FE 1 recalled, about MAU and other data, in particular after Defendants determined to take the Company public when the Company's valuation depended on that data.

88. Former Employee 2 ("FE 2") was a Senior Treasury and Payment Service Manager at Wish from November 2017 until November 2021. FE 2 reported directly to Walter Boileau, VP and Treasurer. Boileau reported directly to Defendant Bahri. In addition to other basic treasury functions, FE 2 oversaw the Company's bank accounts, managing incoming cash. FE 2 confirmed that while the Engineers and Data Team actively managed the MAU data, it forwarded that data in real time to the Finance. According to FE2, FE 1 was in the best position to know generally and specifically about MAU data as the Finance function published that data in real time to Defendants and the Company's senior executives.

[4] Slack is a messaging program designed specifically for the office.

89. Former Employee 3 ("FE 3") worked at Wish from November 2017 to May 2022. FE 3 worked at Wish as a Senior Data Analyst from November 2017 to May 2019. In this role he built fraud detection models to identify fraudulent transactions prior to the product's shipment and reported to Tab Stang, Senior Data Science Manager. From May 2019 to January 2021, FE 3 worked as a Senior Data Scientist and studied anomalies to identify business functions behaving badly or irregularly. In this role, he combed through data to identify suspicious atypical orders and provided suggestions to combat fraudulent activities. FE 3 reported to Pai Lu, Chief Data Officer. From January 2021 to March 2022, FE 3 was a Data Science Manager. From March 2022 to May 2022, he was promoted to be a Senior Data Science Manager and worked closely with the analytics teams in support of the Product Team. FE 3 has a PhD degree in Economics and has studied data science and mathematics. FE 3 is qualified to conduct MAU forecasting and worked at the Wish headquarters in San Francisco. During his entire tenure at Wish, to perform his analytical work, FE 3 had real time access to the MAU data that he understood as well or better than any other Company employee.

90. Corroborating FE 1, FE 3 confirmed that there was a positive correlation between the advertising spend and KPIs. FE 3 confirmed that in the first half of 2019, to increase the margins, the Company materially reduced advertising, showing a profit but materially impacting KPIs. In the second half of 2019, however, Wish restored its advertising spend, with a corresponding increase in MAU.

91. Former Employee 4 ("FE 4") was a Senior Manager-Program Management at Wish from January 2020 to June 2022. He worked in Logistic Operations and reported directly to Thomas Chung, VP of Operations, who in turn reported directly to the CTO Farhang Kassaei. He also reported to the Head of Global Logistics for a couple of months. FE 4 worked at the Wish headquarters in San Francisco for a short time, then after Covid, was assigned to work remotely. As a Senior Program Manager, FE 4 worked in Logistic Operations where the main goal

was to provide strategy and support in fulfilling customer orders. FE 4 stateed that he did the work of a typical Program Manager, designing solutions to better serve the merchants. His work included creating strategies that best suited specific countries throughout Wish's extensive geographical span. According to FE 4, the overall goals were focused on both the merchant and customer. Part of the strategy in his department was creating a program that offered a mandatory service to the merchants, and after they opted in, ensuring a faster delivery to the customer. As the lead on the A plus Logistics Program Team, FE 4's focus was on consumer order fulfillment. FE 4 states that the Logistics Program helped to support merchant deliveries all over the world, ensuring timely delivery of the products to the end country. FE 4 managed the logistics for getting the product from the merchant warehouse to the customer, including last mile delivery experience. FE 4 managed several initiatives across several countries.

92. According to FE 4, Wish used Tableau for business intelligence/data analysis. Everyone in the Company had the Dashboard on their computer screen that provided daily updates on MAU, GMV and other data, which were easily accessed. The Dashboard was where all the data was stored and was updated daily. FE 4 stated that he attended small group meetings with Defendant Szulczewski. There were also cross function meetings, and "All Hands" preceding the IPO. Confirming the accounts of FE 1 and FE 3, according to FE 4, Defendant Szulczewski managed advertising expenses leading and controlling the discussions about advertising at strategy.

93. FE 4 stated that he saw Wish's monthly and quarterly operational and financial data, including MAUs, in real time, through the Company's centralized Dashboard. According to FE 4, the Dashboard was a way for everyone to track the MAU numbers. According to FE 4, the Dashboard also showed advertising spend and GMV. FE 4 stated that the Company tracked advertising spend impacts on customer acquisitions and retention prior to the IPO. FE 4 states that during his employment, he was particularly interested in the advertising spend data and constantly reviewed

such data on the Dashboard because advertising spend was available on the Dashboard. According to FE 4, he specifically remembered that right before the Thanksgiving Holiday in November of 2020, Wish was pouring a couple of million dollars a day into ads. FE 4 stated that he knows this because he saw the advertising spend data on the Dashboard.

94. Based on FE 4's statements, Wish, therefore, must have decreased its advertising spend in October because Wish materially increased its advertising spend in the second half of November and December. Furthermore, because the decrease in advertising spending in October was so material, an increase in advertising spending in the 2020 winter holiday season could not make up the advertising spend shortfall that Wish created in October 2020.

### D. Before the IPO, Wish Forecasted Continuing MAU Decline for 1Q21 Year-Over-Year

95. Before the IPO, in the context of logistics problems that caused Wish to reduce ad spend in emerging markets, in turn materially reducing MAU in 4Q20, year-over year, Wish forecasted a material decline in MAU for 1Q21, year-over year. Wish's "Consolidated_October 2020 v2," immediately accessible on Looker and Tableau during that period ("October 2020 Consolidated Metrics"), contains over 20 tabs. These tabs encompass various aspects of Wish's operations and finances, including such tabs as "Financials", "MAUs", "LTM Buyer Couts", "Quarterly Cohorts (PL)", "Forecsts --→", "P&L Fcst", "BS Fcst", "Interest Income Forecast", "Logistics Data", "CAC", "Ads", "Summary", "LTC", "LTV (Total CAC)", "Quarterly Cohorts", "Annual Cohorts", "Buyer Cohort Comparison", among others. Each tab is dedicated to specific metrics relevant to Wish's performance.

96. The October 2020 Consolidated Metrics contains a tab titled "Financials (Analyst),"[5] presenting both actual and forecasted data for, among other performance metrics, MAU. As demonstrated in the chart below, MAU data show that immediately before the IPO—after logistics problems caused Wish to reduce ad spend in emerging markets that, in turn, had caused a material decline in MAU—Wish forecasted a material decrease in MAUs for 1Q2021, 103 million, down from 109 million in 1Q20, a year-over-year reduction of 5.5%. The relevant figures extracted from the "Financials (Analyst)" tab of the October 2020 Consolidated Metrics spreadsheet regarding MAUs are as follows:

| Quarter | MAUs (in million) |
|---|---|
| Q1 2020 (Actual) | 109 |
| Q2 2020 (Actual) | 116 |
| Q3 2020 (Actual) | 100 |
| Q4 2020 (Estimated) | 120 |
| Q1 2021 (Estimated) | 103 |
| Q2 2021 (Estimated) | 110 |
| Q3 2021 (Estimated) | 121 |
| Q4 2021 (Estimated) | 127 |

**E. Defendants Had an Affirmative Obligation to Disclose Material Risks Under SEC Regulations.**

97. SEC Regulation S-K Item 105, obligates registrants like Wish to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105. The presentation of risks that could apply generically to any registrant or any offering is discouraged. *Id.* Where a summary of risk factors is required, the issuer should provide "a series of concise, bulleted or numbered statements that is

[5] Plaintiffs will provide a screen capture of the Financials (Analyst) tab to Defendants shortly after they file this Third Amended Complaint.

no more than two pages summarizing the principal factors that make an investment in the registrant or offering speculative or risky." *Id*.

## V. MATERIALLY FALSE STATEMENTS IN THE REGISTRATION STATEMENT

98. When describing the material information and risks about the Company's business, the Registration Statement stated, in relevant part, that:

> ***Our efforts to acquire new users and engage existing users may not be successful or may be more costly than we expect, which could prevent us from maintaining or increasing our revenue.***
>
> Our success depends on our ability to attract new users and engage existing users in a cost-effective manner. In order to acquire and engage users, we must, among other things, promote and sustain our platform and provide high-quality products, user experiences, and service. Our marketing efforts currently include various initiatives and consist primarily of digital marketing on a variety of social media channels, such as Facebook, search engine optimization on websites, such as Google, Bing, and Yahoo!, various branding strategies, such as our relationship with the Los Angeles Lakers and social influencers, and mobile "push" notifications, text messaging, and email. For the year ended December 31, 2019 and the nine months ended September 30, 2020, we spent $1.5 billion and $1.1 billion on sales and marketing, representing 78% and 64% of our revenue, respectively. ***We anticipate that sales and marketing expenses will continue to comprise a substantial majority of our overall operating costs for the foreseeable future.*** We have historically acquired a significant number of our users through digital advertising on platforms and websites owned by Facebook and Google, which may terminate their agreements with us anytime. ***Our investments in sales and marketing may not effectively reach potential users, potential users may decide not to buy through us, or user spend on our platform may not yield the intended return on investment, any of which could negatively affect our financial results***.
>
> Many factors, some of which are beyond our control, may reduce our ability to acquire, maintain and further engage with users, including those described in this "Risk Factors" section and the following:

- system updates to app stores and advertising platforms such as Facebook and Google, including adjustments to algorithms that may decrease user engagement or negatively affect our ability to target a broad audience;
- changes in advertising platforms' pricing, which could result in higher advertising costs;
- changes in digital advertising platforms' policies, such as those of Facebook and Google, that may delay or prevent us from advertising through these channels, which could result in reduced traffic to and sales on our platform;
- changes in search algorithms by search engines;
- inability of our email marketing messages to reach the intended recipients' inbox;
- ineffectiveness of our marketing efforts and other spend to continue to acquire new users and maintain and increase engagement with existing users;
- decline in popularity of, or governmental restrictions on, social media platforms where we advertise;
- the development of new search engines or social media sites that reduce traffic on existing search engines and social media sites;
- consumer behavior changes as a result of COVID-19; and
- products listed by merchants on our platform that are the subject of adverse media reports, regulatory investigations, or other negative publicity.

***As a result of any of these factors or any additional factors that are outside of our control, if we are unable to continue acquiring new users or increasing engagement with existing users, it could have a material adverse effect on our business, financial condition, results of operations, and prospects.*** (Emphasis added).

99. The above risk disclosure was incomplete, inaccurate, and materially false and misleading because it failed to disclose that starting from the beginning of the fourth quarter of 2020, Wish reduced ad spend and user acquisition efforts in emerging markets. Because (i) Wish had increased its advertising spend and sales and marketing efforts in the first nine months of the 2020 immediately before the IPO, (ii)

the Registration Statement represented the positive correlation between advertising spend and user acquisition for Wish's business, (iii) the Registration Statement represented that Wish was continuing to advance its goal to expand users particularly in emerging markets, the above risk disclosure created a false impression in the investing public that Wish was continuing its advertising spending and marketing efforts in emerging markets so it could expand its user acquisitions in emerging markets, Wish's key growth markets, when in fact, the Company had reduced its efforts to acquire users in emerging markets/key growth markets. The risk disclosure failed to warn that the specific "de-emphasizing" strategy, resulting from material, persistent logistics problems in emerging markets, would reasonably likely cause Wish's MAU in the fourth quarter of 2020 and following quarters to decline materially. Such silence deprived the investing public of knowing the complete and accurate picture of Wish's material operation moves and decisions to accurately assess the material risks associated with Wish's operations, performance, and finance, rendering the risk disclosure and the Registration Statement materially misleading and false.

100. Additionally, the Registration Statement failed to disclose, pursuant to Item 105, that in the fourth quarter of 2020, the Company reduced advertising and its efforts to acquire users in emerging markets, causing an ongoing adverse impact on MAUs and Wish's performance, which could reasonably like cause a material adverse impact on MAUs and Wish performance for the fourth quarter of 2020 and subsequent quarters because the Registration Statement represented the positive correlation between advertising spend and user acquisition for Wish's business, rendering an investment in Wish shares "speculative or risky". Such omission thus violated the affirmative duty to disclose under Item 105.

## VI. THE TRUTH EMERGES

101. On March 8, 2021, immediately after the market closed, at 4:09 p.m. ET, Wish reported its 4Q20 and FY20 financial results for the period ended December 31,

2020, on a Form 8-K ("4Q20 Form 8-K")[6]. The vast majority of the 4Q20 Form 8-K emphasized Wish's positive performance and financial results for 4Q2020 and the financial year 2020. The 4Q20 Form 8-K featured three bolded subtitles drawing attention to the significant year over year operational improvement, stating, "Delivered Record High Q4 2020 Revenue, Representing Growth of 38% Year Over Year; Q4 Core Marketplace Revenue Per Active Buyer Increased 66% Year Over Year; Expecting Nearly 70% Year Over Year Revenue Growth for Q1 2021." Amid the positive narrative, however, the 4Q20 Form 8-K discreetly disclosed a brief yet material adverse revelation. It revealed that that, in the fourth quarter of 2020, Wish's "MAUs declined 10% YoY during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America where ***Wish temporarily de-emphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year***." (Emphasis added).

102. Between the issuance of the press release at 4:09 p.m. and the 5 p.m. earnings conference call, investors reacted positively to the Company's 4Q20 results, bidding up the price of Wish's common stock, reaching a high of $17.65 by 4:17 p.m. *See*, Exhibit 1[7] (price movement graph for March 8, 2021); Exhibit 2[8] (intraday minute-by-minute stock price for March 8, 2021). As the market digested the material, adverse information from Wish's Q421 disclosures, Wish's stock price declined. After Wish's 5:00 p.m. 4Q20 earnings call, as Bloomberg described in an articles titled "Wish Revenue Beats Estimates, Worries Linger About Growth," uploaded on March 8, 2021, at 6:38 p.m., "[d]iscount online retailer Wish gave a revenue forecast for the current quarter that beat analyst estimates" and "[t]he shares jumped as much

[6] 4Q20 Form 8-K is incorporated herein by reference in its entirety.

[7] Exhibit 1, is incorporated herein by reference in its entirety.

[8] Exhibit 2, is incorporated herein by reference in its entirety.

as 10% in extended trading after the results were released, ***but gave most of those gains back as investors focused on the decline in the website's users***." (emphasis added). Exhibits 1 and 2 support that investors responded negatively to Defendants' disclosures about the material decline in users and its cause.

103. Indeed, during Wish's March 8, 2021, 5:00 p.m., 4Q20 and FY20 earnings conference call, in prepared remarks, Defendant Bahri stated:

> Moving on to user metrics. At Wish, we always aspire to grow our user base efficiently with a focus on high LTV customers. We ended 2020 with more than 107 million monthly active users, or MAUs, an increase of 19% year over year. In addition, LTM active buyers increased 5% year over year to 64 million. ***During the holiday season, we decided to deemphasize customer acquisition in some emerging markets outside of Europe and North America where we faced logistical challenges due to the pandemic that resulted in unfavorable unit economics and a customer experience that did not meet our standards. This decision led to an MAU decline of 10% year over year in Q4, and we expect to reemphasize these markets as we continue to improve our logistics and further roll out our Wish Local offering***.
>
> In our main markets, we know that our customers were disproportionately impacted by the effects of the pandemic, leaving many with less discretionary income. To be most effective with our advertising approach, we began emphasizing higher LTV customers within the same value-conscious consumer category. (Emphasis added).

104. More, during the March 8, 2021, conference call, in response to analysts' questions, Defendants discussed the material user decline and its cause. JP Morgan analyst Doug Anmuth asked Defendant Bahri to provide more details for "the pullback that you did on advertising and customer acquisition in some of those emerging markets and how we should think about the timing as you bring that back on." In response, Defendant Bahri stated that:

> [T]he countries like – these emerging markets, ***the days to delivery was significantly large and we just felt it's not right to invest in these businesses if the consumers churn***, what's the point of investing. So maybe much all of the decline was driven by countries like India, Philippines, Colombia, some Brazil all those countries wherever be it.

> Now, what we're seeing is that Wish Local works very well in these markets like in Mexico, 25% of the orders are Wish Local. ***And also the logistics are now running fairly normal. In those countries they're back to historical low level. So we would expect that in the next three to six months, we expect to again engage with these markets and get those MAUs back***.

(Emphasis added).

105. The "de-emphasizing" strategy in emerging markets that Wish implemented during the fourth quarter of 2020, resulting from "logistical challenges," continued impacting the Company's user metrics adversely.

106. On May 12, 2021, immediately after the market closed, at 4:09 p.m. ET, Wish filed a Form 8-K ("1Q21 Form 8-K"),[9] reporting its 1Q21 financial results for the interim period ended March 31, 2021. The 1Q21 Form 8-K also attached and incorporated their 1Q21 Shareholder Letter that Wish simultaneously posted on its website ("1Q21 Shareholder Letter"). In the Shareholder Letter, published before their earnings conference call later that afternoon, Defendants blamed the 1Q21 material MAU decline on a temporary decrease in advertising as Wish de-emphasized lower LTV users—an issue they had not mentioned in their March 8, 2021, disclosures—stating:

> We continue to strategically focus on acquiring and retaining high LTV users within the value-conscious consumer category.
>
> As a result, Q1 Core Marketplace Revenue per Active Buyer increased by 76% year over year. In addition, the percentage of orders with a transaction value above $20 increased by 54 percent year over year in Q1.
>
> In ***some emerging markets*** where we believe users have lower LTV, we ***temporarily decreased our advertising spend***. Also, across all markets, we are de-emphasizing low value items, which tend to have higher conversion rates but unfavorable economics. ***As a result, total monthly***

[9] The 1Q21 Form 8-K is incorporated herein by reference in its entirety.

> ***active users, or MAUs, declined 7 percent year over year to 101 million*** and LTM active buyers decreased 3 percent year over year to 61 million. We expect to re-engage users in some emerging markets once we have a more reliable logistics offering, which had be impacted by the effects of the pandemic, and a scaled Wish Local Network.

(Emphasis added).

107. However, more than two months into Q12021, on March 8, 2021, Defendants Bahri stated that ". . . the logistics are now running fairly normal. In those countries they're back to historical low level." Directly contrary to Defendant Bahri's March 8, 2021, statement, however, according to Wish's own 1Q21 Shareholder Letter, the very unreliability of logistics in emerging markets that caused Wish to reduce its ad spend in those markets persisted in 1Q21, causing another material decline in MAU ***that Wish had forecasted before the IPO***. Thus, the March 8, 2021, disclosures only partially revealed material adverse information that existed prior to the IPO, but that the Registration Statement did not disclose.

108. Also on May 12, 2021, at 4:22 p.m. ET, Wish filed its quarterly report on a Form 10-Q for 1Q21 ("1Q21 10-Q").[10] Directly at odds with their Shareholder Letter—and their claim on March 8, 2021 that logistical challenges had eased, enabling Wish to re-engage with emerging markets—Defendants disclosed that the same "logistical challenges" that caused them to reduce add spend in emerging markets before the IPO persisted in 1Q2021. Indeed, the 1Q21 10-Q attributed the continuing MAU decline in 1Q21, again, to the Company's de-emphasizing advertising and customer acquisition in certain emerging market before the IPO. Specifically, the 1Q21 Form 10-Q stated:

> … We view the number of MAUs as key driver of revenue growth as well as a key indicator of user engagement and awareness of our brand.
>
> MAUs decreased approximately 7% from the three months ended March 31, 2020 to the three months ended March 31, 2021, ***primarily***

[10] The 1Q21 10-Q is incorporated herein by reference in its entirety.

> ***driven by the decision to de-emphasize user acquisition in some emerging markets outside of Europe and North America where we faced logistical challenges due to the pandemic*** and to emphasize higher LTV users within the same value-conscious consumer category in many of the more developed markets.

(Emphasis added).

109. Confirming that the same logistical issues that caused them to deemphasize ad spend in emerging markets before the IPO, leading to materially lower MAU, year-over-year, persisted in 1Q21, Defendants addressed the issue during their May 12, 2021, 5:00 p.m. earnings call for 1Q21 ("1Q21 Earnings Call"). Defendant Bahri admitted that the Company's de-emphasizing of advertising and customer acquisition in certain emerging market initiated in 4Q20, leading up to the IPO, continued materially negatively impacting the MAU in 1Q21. On March 8, 2021, Defendants had stated that "what we're seeing is that Wish Local works very well in these markets" and "the logistics are now running fairly normal. In those countries they're back to historical low level." On May 12, 2021, however, they admitted that the same problems that caused them to reduce ad spend in emerging markets persisted. According to Defendant Bahri, due to the uncertainty surrounding the resolution of ongoing logistical challenges, Wish had never established a specific timetable for re-engaging users in emerging markets after suspending ad spending in those regions in 4Q20 prior to the IPO. Specifically, Defendant Bahri stated:

> Turning now to our user metrics. Our strategy has always been to grow our user base efficiently with a focus on high LTV users. Q1 MAUs of 101 million were down 7% year-over-year. However, Q1 core marketplace revenue per active buyer increased 76% year-over-year as a result of our strategic focus on acquiring higher LTV users.
>
> ***As a reminder, we temporarily decrease our advertising spend in some emerging markets where as a result of logistical challenges due to pandemic, we were unable to provide a positive customer experience, and the economics in those markets were not credible.*** We expect to reengage users in some of these emerging markets where we believe

> we can generate favorable economics once we have a more reliable logistics offering and a scaled Wish Local network to support increased monetization efforts. In addition, across all markets, we are deemphasizing low-value items, which tend to have high conversion rates, but unfavorable economics then shift individually.

(Emphasis added).

110. Also in the 1Q21 Earnings Call, when asked about the global engagement trends in 1Q21 and the 2Q21 in progress, Defendant Szulczewski confirmed that as a result of the same poor logistics performance that existed before the IPO, Wish had not started re-engaging in emerging markets, resulting in substantially similar year-over-year MAU decline. Specifically, Defendant Szulczewski stated:

> So in our shareholder letter, we actually broke out the core marketplace revenue by geography. So as we noted before, ***due to the logistics -- poor logistics performance and, ultimately, the customer experience in some of the emerging markets like South America and others, we've actually pulled back from those regions.*** Those regions typically have very desirable or attractive acquisition metrics. So it's easier to get an MAU or a sign-up or even a buyer but tend to have lower retention, especially when the capacity of those logistics work and infrastructure was severely impacted by the pandemic and just sort of stretched way too thin. So if you look at kind of like our core marketplace revenue by geography and its growth in Q1, like Europe and North America actually grew 48% year-over-year, where South America declined 22% year-over-year, and the rest of the world was at about like plus 19% or 20% year-over-year.

(Emphasis added).

111. In response to these May 12, 2021, public disclosures revealing that Wish had been continuing its policy of deemphasizing ad spend in emerging market initiated pre-IPO due to the persisting logistics problems and had not planned to re-engage user acquisition and retention in emerging markets, which primarily caused Wish's 7% year-over-year MAU decline, Wish's stock cratered more than 29%, falling from a close of $11.47 per share on May 12, 2021, to close at $8.11 per share, on a high trading volume, on May 13, 2021.

112. In the wake of Wish's May 12, 2021, disclosures, as investors bid down Wish's stock price in response, analysts attributed that decline in material part because of reduced MAU resulting in material part from logistics problems that caused a reduction in ad spend in emerging markets. For example, in its "Investment Case" of its May 13, 2021, report,[11] noting "better than expected 1Q21 revenue and adj. EBITDA," Credit Suisse analysts wrote:

> Wish produced better than expected 1Q21 revenue and adj. EBITDA given higher AOVs and stronger logistics. MAUs/Active Buyers fell short as mgmt. deemphasizes emerging markets on delivery/logistics headwinds. Further, the 2Q21 adjusted EBITDA guidance range of ($60)mm-($55)mm is below both our and consensus estimates, we believe due to 1) lower order volume, partially offset by higher ASPs and 2) increased logistics costs as Wish invests in its emerging market operations. ***Despite improving time-to-door days, logistics bottlenecks remain across many emerging market economies***. In response, Wish has invested in support of its Wish Express/Local offering by onboarding incremental store partners – which resulted in Wish Local accounting for 9% of total order volume in April (vs 7.2% for 1Q21). Ongoing investments in more localized headcount will also continue in 2Q21 and beyond. ***We expect the ongoing efforts to reduce the aforementioned delivery headwinds to start exerting a more meaningful improvement in delivery times starting in 2H21, and hence we anticipate a resumption of monthly active user as well as active buyer growth by 2022***. Our price target as a result declines to $24 vs prior $31, given the delayed growth trajectory for 2H21 and we maintain our Outperform rating based on the following thesis points: 1) targeting a large and underserved addressable market earning less than $75,000 in annual income, 2) underpenetrated addressable population across all geographic regions, and 3) rising monetization with improved product enhancements.

(Emphasis added).

[11] On May 13, 2021, Credit Suisse issued an analyst report about Wish, titled "Customer Acquisition Retreat Until Logistics Headwinds Are Resolved."

113. Thus, Credit Suisse analysts noted that the very circumstances—logistics headwinds—that caused Wish to reduce ad spend materially in emerging markets and to suffer material MAU decline in Q420 persisted and would impact Wish into 2022. The Registration Statement improperly omitted those material facts and circumstances.

114. Similarly, in a May 12, 2021,[12] report, noting a 7% decline year-over-year, Deutsche Bank analysts wrote:

> WISH shares are down from their recent highs in part due to overall market multiples softening, ***but more importantly, from investor concerns regarding the business model and attractiveness of the demographic the platform intends to serve***. Even since the IPO, the company's focus has changed to targeting higher LTV consumers and reducing marketing spend on emerging markets as well as for lower-priced items. This quarter, while the trends seem to be heading in the right direction, ***we still did not get sense that growth should accelerate meaningfully post 2Q (which understandably is a tough comp) as comps ease; which would be surprising to investors who are looking at the large TAM, with hundreds of millions of value-conscious consumers, a much more streamlined logistics network, and the company's ability to "create" demand via its highly personalized streams***. S&M spend, as % of Core Marketplace + ProductBoost revenue increased to 88% from 77% in the year ago period. ***Although this came in below the 95% in 4Q20, it is clear that MAUs, active buyers, and revenue decline when the company reduces marketing spend***. There, of course, must be some correlation with shipping times, but Wish's ability to forward place items and then create the demand for them – or to get people to spend less for items that will take longer to arrive – is a basic tenet of the business model. This in turn raises questions around the long-term margin targets and around how fast the company can achieve them. Plus, GMV growing slower than Core Marketplace revenue, along with the company discussing dynamics like the seasonality of revenue in the next few quarters, are more typically signs of a more mature business, in our view, not one that is looking at a massive TAM. (Emphasis added).

[12] On May 12, 2021, Deutsche Bank issued an analyst report about Wish, titled "1Q21 Quick Look."

115. Later in May 2021, Credit Suisse issued another analyst report,[13] summarizing its "series of investor meetings with Wish's CEO Peter Szulczewski, CFO Raj Bahri, and Investor Relations head Dennis Walsh." Discussing its "investment case," Credit Suisse noted Wish's acknowledgement that the logistics headwinds plagued Wish "through 2020," well before the IPO, and persisted, writing:

> We hosted a series of investor meetings with Wish's CEO Peter Szulczewski, CFO Raj Bahri, and Investor Relations head Dennis Walsh. We came away with an updated viewpoint that in addition to what we have previously highlighted as part of the investment thesis that Wish is levered to the underserved lower-income global e-commerce population, it should also be viewed as a COVID-19 reopening stock as management continues to take proactive steps to mitigate ***the logistics headwinds it encountered through 2020*** (***and to some degree even now***). We maintain our Outperform rating and $24 price target.

(Emphasis added).

116. When Plaintiff Yen Hoang filed this case, Wish's stock price had fallen by 64%, significantly damaging investors.

## VII. PLAINTIFFS' CLASS ACTION ALLEGATIONS

117. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the Class. Excluded from the Class are Defendants, the officers and directors of Wish, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

118. The Class members are so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs

---

[13] On May 20, 2021, Credit Suisse issued an analyst report, titled "Wish, Inc. This is a Hidden Reopening Stock."

believe there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Wish or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

119. Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

120. Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.

121. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the Securities Act;

b. whether the Registration Statement misrepresented material facts;

c. whether the Registration Statement omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether the Class members have sustained damages and, if so, what is the proper measure of damages.

122. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. COUNTS

**COUNT I**
**Violations of Section 11 of the Securities Act**
**Against All Defendants Concerning**
**the Registration Statement**

123. Plaintiffs repeat and re-allege the allegations set forth herein as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct.

124. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

125. The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

126. The Defendants named in this Count signed the Registration Statement and/or was a director at the time of the filing of the Registration Statement.

127. Defendants are strictly liable and/or negligent to Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

128. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

129. Plaintiffs acquired Wish common shares pursuant to the Registration Statement.

130. At the time of their purchases of Wish common shares, Plaintiffs and members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

131. This claim is brought within one year after discovery of the untrue

statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**COUNT II**
**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

132. Plaintiffs repeat and re-allege the allegations set forth herein as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct.

133. This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants, each of whom was a control person of Wish during the relevant period.

134. The Individual Defendants were in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statement.

135. None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

136. Plaintiffs and the Class have sustained damages. The value of Wish common shares has declined substantially due to the Securities Act violations alleged herein.

137. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

a. declaring this action to be a proper class action, designating Xiaoquan Yang and Alexander De Block as Lead Plaintiffs and certifying them as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Plaintiffs' co-counsel as Co-Class Counsel;

b. awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

c. awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## X. JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: February 15, 2024

Respectfully Submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

Laurence M. Rosen
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jing Chen
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jchen@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**

/s/ *Ex Kano S. Sams II*
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

***Co-Counsel for Lead Plaintiffs and The Proposed Class***

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

***Additional Counsel***

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned, say:

I am not a party to the above case and am over eighteen years old. On February 15, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 15, 2024, in Jenkintown, Pennsylvania.

*/s/ Jacob Goldberg*
Jacob Goldberg