United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| YEN HOANG, et al., | Case No.  21-cv-03930-BLF |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND** |
| CONTEXTLOGIC, INC., et al., | [Re: ECF No. 130] |
| Defendants. | |

This is a putative class action for violation of the Securities Act of 1933 ("Securities Act") against ContextLogic, Inc. ("Wish"), certain of its officers and directors, and underwriters of its IPO.  Plaintiffs have filed a Third Consolidated Amended Class Action Complaint alleging violations of Sections 11 and 15 of the Securities Act.  ECF No. 125 ("TAC").  Wish and its officers and directors ("Wish Defendants") filed a motion to dismiss.  ECF No. 130 ("Mot."); ECF No. 134 ("Reply").  The underwriters of Wish's IPO ("Underwriter Defendants") joined Wish's motion.  ECF No. 132.  Plaintiffs oppose the motion.  ECF No. 133 ("Opp."). For the reasons explained below, Wish's motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND.

## I.   BACKGROUND

### A.   The Parties

Defendant Wish is an e-commerce company that operates the Wish platform.  TAC ¶¶ 1, 60.  The Wish platform enables merchants to sell their products directly to global consumers.  *Id.*

Defendant Piotr Szulczewski was Wish's Chief Executive Officer ("CEO") and Chairman of Wish's Board of Directors at all relevant times.  *Id.* ¶ 18.  Defendant Rajat Bahri was Wish's Chief Financial Officer ("CFO") from 2016 through July 23, 2021.  *Id.* ¶ 19.  Defendant Brett Just has served as Wish's Chief Accounting Officer ("CAO") since November 2020.  *Id.* ¶ 20. Defendants Julie Bradley, Ari Emanuel, Joe Lonsdale, Tanzeen Syed, Stephanie Tilenius, and

Hans Tung served as directors on Wish's Board of Directors at the time of its initial public offering ("IPO"). *Id.* ¶¶ 21–26. Defendant Jaqueline Reses was identified as an incoming director of Wish at the time of the IPO and named a member of the Board of Directors on December 18, 2020. *Id.* ¶ 27.

The Underwriter Defendants are Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; BofA Securities, Inc.; Citigroup Global Markets Inc.; Deutsche Bank Securities Inc.; UBS Securities LLC; RBC Capital Markets, LLC; Credit Suisse Securities (USA) LLC; Cowen and Company, LLC; Oppenheimer & Co. Inc.; Stifel, Nicolaus & Company, Incorporated; William Blair & Company, L.L.C.; Academy Securities, Inc.; Loop Capital Markets LLC; and R. Seelaus & Company, LLC. *Id.* ¶¶ 34–48.

Lead Plaintiffs Xiaoquan Yang and Alexander De Block's Third Consolidated Class Action Complaint asserts two counts for violations of securities laws. *See* TAC. Count I alleges violations of Sections 11 of the Securities Act. *Id.* ¶¶ 123–131. Count II alleges violations of Sections 15 of the Securities Act. *Id.* ¶¶ 132–137. The complaint names as defendants Wish, 10 individuals, and 15 companies that underwrote Wish's initial public offering.

### B.    Registration Statement and Post-IPO Disclosures

In its Registration Statement for its Initial Public Offering on December 15, 2020, Wish repeatedly attributed its growth success to advertising. TAC ¶¶ 10, 59, 66. The Registration Statement represented that Wish materially increased its advertising spending for the first nine months of 2020 compared to the first nine months of 2019. *Id.* ¶¶ 69–73. Defendants also stressed the importance of "attracting and engaging users," and represented that the Company was "focused on growing [its] user base around the world," particularly in "key growth markets," or emerging markets. *Id.* ¶¶ 2, 63–69. Thus, Plaintiffs allege, the Registration Statement, affirmatively created an impression to the investing public that Wish was continuing the same advertising and marketing efforts that the Company made for the first nine months of 2020 to grow users worldwide, particularly in emerging markets. *Id.* ¶ 3.

Despite Defendants' representations in the Registration Statement that Wish had increased its advertising spend for the first nine months of 2020 and continued with acquiring customers

2

particularly in emerging markets, beginning in 4Q 2020, the Company omitted from the Registration Statement that it had reduced advertising and its efforts to acquire customers in emerging markets outside of Europe and North America, including India, Brazil, Columbia, and the Philippines. *Id.* ¶ 73. This reduction caused monthly active users ("MAUs") to materially decline in 4Q 2020. *Id.* Later, the Company attributed a 10% year-over-year ("YoY") MAU decline during the fourth quarter to its reduction of advertising and user acquisition efforts in those locations. *Id.* Although the Registration Statement disclosed several risk factors that might impact the Company's efforts to acquire users, Plaintiffs allege that Wish failed to warn of the specific risk that due to Wish's reduced advertising spend and user acquisition efforts in emerging markets in 4Q 2020, Wish's performance, particularly MAUs, could be materially adversely impacted. *Id.* ¶¶ 74–75.

On March 8, 2021, Wish disclosed that in 4Q 2020, its "MAUs declined 10% YoY during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America *where Wish temporarily de-emphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year*." *Id.* ¶ 101 (emphasis in TAC). On the same day, a Bloomberg article noted the mixed information in Wish's results of an above-estimate revenue forecast for 1Q 2021 and the material MAU decline in 4Q 2020. *Id.* ¶ 102. At the earnings call held the same day, CFO Bahri was asked to provide more details for "the pullback that you did on advertising and customer acquisition in some of those emerging markets and how we should think about the timing as you bring that back on." *Id.* ¶ 104. In response, CFO Bahri stated:

> [T]he countries like – these emerging markets, *the days to delivery was significantly large and we just felt it's not right to invest in these businesses if the consumers churn*, what's the point of investing. So maybe much all of the decline was driven by countries like India, Philippines, Colombia, some Brazil all those countries wherever be it. Now, what we're seeing is that Wish Local works very well in these markets like in Mexico, 25% of the orders are Wish Local. *And also the logistics are now running fairly normal. In those countries they're back to historical low level. So we would expect that in the next three to six months, we expect to again engage with these markets and get those MAUs back*.

*Id.* (emphasis in TAC). Plaintiffs allege that this "de-emphasizing" strategy continued to

United States District Court
Northern District of California

materially impact the Company's performance for the next two quarters.  *Id.* ¶¶ 8, 105.

On May 12, 2021, Wish announced its 1Q 2021 financial results in a Form 8-K, disclosing that Wish's MAUs declined by an additional 7%, and again attributing the additional decline to its de-emphasizing strategy in some emerging markets.  *Id.* ¶ 106.  In a shareholder letter attached to the Form 8-K (the "Shareholder Letter"), Defendants disclosed:

> In *some emerging markets* where we believe users have lower LTV, we *temporarily decreased our advertising spend*. Also, across all markets, we are de-emphasizing low value items, which tend to have higher conversion rates but unfavorable economics. *As a result, total monthly active users, or MAUs, declined 7 percent year over year to 101 million* and LTM active buyers decreased 3 percent year over year to 61 million. We expect to re-engage users in some emerging markets once we have a more reliable logistics offering, which had be impacted by the effects of the pandemic, and a scaled Wish Local Network.

*Id.* (emphasis in TAC).  Wish also filed a Form 10-Q that day, which stated:

> … We view the number of MAUs as key driver of revenue growth as well as a key indicator of user engagement and awareness of our brand. MAUs decreased approximately 7% from the three months ended March 31, 2020 to the three months ended March 31, 2021, *primarily driven by the decision to de-emphasize user acquisition in some emerging markets outside of Europe and North America where we faced logistical challenges due to the pandemic* and to emphasize higher LTV users within the same value-conscious consumer category in many of the more developed markets.

*Id.* ¶ 108 (emphasis in TAC).  On an investor call that evening, Defendant Bahri stated:

> *As a reminder, we temporarily decrease our advertising spend in some emerging markets where as a result of logistical challenges due to pandemic, we were unable to provide a positive customer experience, and the economics in those markets were not credible.* We expect to reengage users in some of these emerging markets where we believe we can generate favorable economics once we have a more reliable logistics offering and a scaled Wish Local network to support increased monetization efforts. In addition, across all markets, we are deemphasizing low-value items, which tend to have high conversion rates, but unfavorable economics then shift individually.

*Id.* ¶ 109 (emphasis in TAC).  On that same call, Defendant Szulczewski stated:

> So in our shareholder letter, we actually broke out the core marketplace revenue by geography.  So as we noted before, *due to the logistics -- poor logistics performance and, ultimately, the customer experience in some of the emerging markets like South America and others, we've actually pulled back from those regions*.

United States District Court
Northern District of California

United States District Court
Northern District of California

*Id.* ¶ 110 (emphasis in TAC).

When markets opened the following day, Wish's stock fell more than 29%, from a close of $11.47 per share on May 12, 2021, to close at $8.11 per share on May 13, 2021. *Id.* ¶ 111.

### C.    Alleged False Statement

Plaintiffs allege that the following statement from the Registration Statement about Wish's efforts to acquire and engage users was false or misleading:

> ***Our efforts to acquire new users and engage existing users may not be successful or may be more costly than we expect, which could prevent us from maintaining or increasing our revenue.***
>
> Our success depends on our ability to attract new users and engage existing users in a cost-effective manner.  In order to acquire and engage users, we must, among other things, promote and sustain our platform and provide high-quality products, user experiences, and service.  Our marketing efforts currently include various initiatives and consist primarily of digital marketing on a variety of social media channels, such as Facebook, search engine optimization on websites, such as Google, Bing, and Yahoo!, various branding strategies, such as our relationship with the Los Angeles Lakers and social influencers, and mobile "push" notifications, text messaging, and email.  For the year ended December 31, 2019 and the nine months ended September 30, 2020, we spent $1.5 billion and $1.1 billion on sales and marketing, representing 78% and 64% of our revenue, respectively.  ***We anticipate that sales and marketing expenses will continue to comprise a substantial majority of our overall operating costs for the foreseeable future.***  We have historically acquired a significant number of our users through digital advertising on platforms and websites owned by Facebook and Google, which may terminate their agreements with us anytime. ***Our investments in sales and marketing may not effectively reach potential users, potential users may decide not to buy through us, or user spend on our platform may not yield the intended return on investment, any of which could negatively affect our financial results.***
>
> Many factors, some of which are beyond our control, may reduce our ability to acquire, maintain and further engage with users, including those described in this "Risk Factors" section and the following:
>
> - system updates to app stores and advertising platforms such as Facebook and Google, including adjustments to algorithms that may decrease user engagement or negatively affect our ability to target a broad audience;
> - changes in advertising platforms' pricing, which could result in higher advertising costs;
> - changes in digital advertising platforms' policies, such as those of Facebook and Google, that may delay or prevent us from advertising through these channels, which could result in reduced traffic to and sales on our platform;
> - changes in search algorithms by search engines;

5

United States District Court
Northern District of California

- inability of our email marketing messages to reach the intended recipients' inbox;
- ineffectiveness of our marketing efforts and other spend to continue to acquire new users and maintain and increase engagement with existing users;
- decline in popularity of, or governmental restrictions on, social media platforms where we advertise;
- the development of new search engines or social media sites that reduce traffic on existing search engines and social media sites;
- consumer behavior changes as a result of COVID-19; and
- products listed by merchants on our platform that are the subject of adverse media reports, regulatory investigations, or other negative publicity.

*As a result of any of these factors or any additional factors that are outside of our control, if we are unable to continue acquiring new users or increasing engagement with existing users, it could have a material adverse effect on our business, financial condition, results of operations, and prospects.*

TAC ¶¶ 74, 98 (quoting Registration Statement) (emphasis in TAC).

### D.    Previous Allegations and Motion Practice

This is the Plaintiffs' third amended complaint and the Wish Defendants' third motion to dismiss. The Court granted Defendants' motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("CAC") on March 10, 2023. ECF No. 98 ("1st MTD Order"). The Court then granted in part and denied in part the Wish Defendants' motion to dismiss Plaintiffs' Second Consolidated Amended Class Action Complaint ("SAC") on December 22, 2023. ECF No. 124 ("2nd MTD Order"). Three issues from the previous orders are relevant to the instant order: the Item 105 allegation, the alleged false statement ("Statement Two" in the SAC), and the negative causation defense.

In the 1st MTD Order, the Court, *inter alia*, granted Defendants' motion to dismiss Plaintiffs' Item 105 allegations in the CAC brought under the theory that Wish "'failed to disclose, . . . that in the fourth quarter of 2020 . . . [Wish] had pulled back advertising in India, Brazil, the Philippines and other emerging market countries outside of Europe and North America.'" 1st MTD Order at 22 (quoting CAC ¶ 120). The Court reasoned in part that Plaintiffs alleged "no facts to suggest that Defendants knew at the time of IPO that the reduction in advertising made investment in Wish risky or would have a material effect on Wish's financial position[.]" *Id.* at 23. In the 2nd MTD Order, the Court denied Defendants' motion to dismiss the Item 105 claim,

United States District Court
Northern District of California

reasoning that Plaintiffs "added substantial allegations that employees regularly monitored MAUs and advertising spend" which was sufficient to allege that "Defendants had knowledge of Q4 MAUs" and "Wish employees and executives" had "real-time knowledge of churn." 2nd MTD Order at 24.

In addition to the Item 105 Claim, the SAC also alleged Section 11 and 15 claims relating to five false statements. In the 2nd MTD Order, the Court granted Defendants' motion to dismiss Plaintiffs' claims for four of the alleged false statements, but denied the motion with respect to "Statement Two." 2nd MTD Order at 27. The Court reasoned:

> [D]espite the Registration Statement's hypothetical language that efforts "may not be successful," "may be more costly," and "may not yield the intended return on investment," the March 2021 statements and disclosures, together with allegations of Defendants real-time knowledge during Q4 2021 support an allegation that Defendants knew that efforts to acquire and engage users were ***already*** proving unsuccessful, proving costly, and not yielding the return on investment.

*Id.* at 19; *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023), *cert. granted in part sub nom. Facebook, Inc. v. Amalgamated Bank*, No. 23-980, 2024 WL 2883752 (U.S. June 10, 2024); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702–05 (9th Cir. 2021). "Statement 2" from the SAC is the sole remaining alleged false statement in the TAC.

But the Court also granted Defendants' motion to dismiss all claims in the SAC under the negative causation defense. *Id.* at 27–28. The Court found that "the alleged May disclosures 'reveal[] nothing about what was allegedly misrepresented' in the Registration Statement." *Id.* at 26 (quoting *In re Shoretel, Inc. Sec. Litig.*, No. 08-0271-CRB, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009)). The Court credited Defendants' alternative explanation for the price decrease in May as sufficient to show negative causation: the stock price went up for the two weeks following the March disclosures, "there were no later disclosures regarding the Q4 2020 decrease in advertising spend in emerging markets," and in May, "Wish disclosed disappointing Q1 2021 results including a decline in MAUs and a decrease in future sales guidance." *Id.* at 26–27. The Court, however, recognized that Plaintiffs offered a May 2021 Shareholder Letter in their opposition that could support their causation theory. *Id.* at 27. Plaintiffs argued that the

Shareholder Letter was "evidence that a continuation of the de-emphasis strategy caused the drop in stock price." *Id.* at 26. The Court did not consider the Shareholder Letter because Plaintiffs did not allege it in the SAC, but wrote, the "Shareholder Letter may support Plaintiffs' theory of loss causation or Plaintiffs may be able to allege additional facts to overcome Defendants' alternative explanation." *Id.* at 27. On that basis, "the Court [allowed] one final opportunity to amend the complaint." *Id.*

## II.   LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

Section 11 of the Securities Act creates a private remedy for any purchaser of a security if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. §77k(a). "The section

United States District Court
Northern District of California

was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983) (footnotes omitted)). "As long as 'a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case.'" *Id*. (quoting *Huddleston*, 459 U.S. at 382); 15 U.S.C. §77k(b).

"Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 179 (2015). "Either way, the buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." *Id*. "Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Hildes*, 734 F.3d at 859 (quoting *Huddleston*, 459 U.S. at 382). Additionally, "Section 11 lacks a scienter requirement." *Id*. at 860. Thus, "[t]he standard for Section 11 falsity is more lenient than pleading a Rule 10(b)(5) violation" pursuant to the Securities Exchange Act of 1934 ("Exchange Act"). *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1257 (N.D. Cal. 2019). "When a Section 11 complaint does not sound in fraud, it must only meet Rule 8(a)'s ordinary notice pleading requirements." *Id*. Accordingly, "Section 11 'places a relatively minimal burden on a plaintiff.'" *Hildes*, 734 F.3d at 859 (quoting *Huddleston*, 459 U.S. at 382).

## III.    DISCUSSION

### A.    Judicial Notice

A court generally cannot consider materials outside the pleadings on a motion to dismiss for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). A court may, however, consider items of which it can take judicial notice without converting the motion to dismiss into one for summary judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994). A court may take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by

United States District Court
Northern District of California

resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. A court may additionally take judicial notice of "'matters of public record' without converting a motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)). Under the incorporation by reference doctrine, courts may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)) (alteration in original).

Defendants seek notice of Exhibits 1 through 5 at ECF No. 130-1. Defendant argues that "the Court may consider Exhibits 1, 2, 3, and 5 because they are incorporated by reference in the Complaint" and that "[t]he Court previously took judicial notice of and/or deemed incorporated by reference Exhibits 1 through 4." ECF No. 130-2. Plaintiffs do not oppose the request.

The Court grants judicial notice of Defendants' exhibits. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (granting judicial notice of publicly available financial documents such as SEC filings); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (granting judicial notice of publicly available articles or other news releases of which the market was aware). The Court does not take notice of the truth of any of the facts asserted in these documents. *See City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *23 (N.D. Cal. Dec. 17, 2019).

### B.    Negative Causation Defense

Defendants renew their argument that the negative causation defense defeats all of Plaintiffs' claims. Defendants argue that there is no loss caused by the disclosures on March 8, 2021 because the stock price actually rose in after-hours trading that day, the next day, and over the next two weeks. Mot. at 7–8. Defendants argue that Plaintiffs again "failed to link the May 2021 stock drop to any revelation about a reduction in advertising spend that had not already been disclosed in the March 8, 2021 corrective disclosure." *Id.* at 9 (quoting 2nd MTD Order). Defendants also argue that Plaintiffs fail to plead materiality, *id.* at 11, and that the TAC

introduces new theories of falsity. *Id.* at 12–14.

Plaintiffs respond that they adequately allege that the "March 8 disclosures contemporaneously contained 'continued misrepresentations to blunt the effect of the corrections'" and other confounding information. Opp. at 7 (quoting *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173 (C.D. Cal. 2008)). Plaintiffs further argue that the intraday price movements on March 8, 2021 "confirm the effect of confounding information upon Wish's stock price," *id.* at 10 (capitalization modified), and that when the truth was "fully and finally disclosed to the market" on May 12, 2021, the stock price plummeted. *Id.* at 14 (internal quotation omitted).

Defendants reply that "Plaintiffs for the first time claim that Wish decided before the IPO not only to de-emphasize ad spend in Q4 2020, but also that 'Wish projected that it would persist in 2021 and materially impact MAUs at least through Q1 2021[,]'" a theory that "appears nowhere in the TAC." Reply at 5 (quoting Opp. at 6). Defendants also contend that Plaintiffs improperly rely on the "touches upon" legal standard from the Ninth Circuit's 2013 decision in *Hildes*, 734 F.3d at 859, which they argue was "expressly rejected" by the Supreme Court in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). Reply at 2.

### 1. Legal Standard

As a threshold matter, the Court addresses Defendants' arguments about the legal standard for the negative causation defense. A Section 11 claim can be defeated by an affirmative defense that allows defendants "to prove that the plaintiff's loss, or some portion thereof, was not caused by the alleged misstatements or omissions in the registration statement." *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *27 (N.D. Cal. Oct. 1, 2015); *see* 15 U.S.C. § 77k(e). "The defendant has the burden of proof on this defense[,]" and courts have characterized the burden as a "heavy" one. *Hildes*, 734 F.3d at 860 (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir. 1994)). A "defendant must show that the depreciation in value of a plaintiff's stock resulted from factors other than the alleged material misstatement." *Hildes*, 734 F.3d at 860 (internal quotation marks omitted). A plaintiff is not required to plead loss causation in the complaint, and courts generally will not decide this issue at the motion to dismiss phase unless, "the facts as alleged by plaintiffs, and documents which the court may take judicial notice of,

11

establish the . . . defense as a matter of law. . . ."  *In re Velti*, 2015 WL 5736589, at *27; *Shoretel*, 2009 WL 248326, at *4–5.  "Overcoming a negative causation defense requires merely that 'the misrepresentation touches upon the reasons for an investment's decline in value.'"  *Hildes*, 734 F.3d at 860 (quoting *In re Worlds of Wonder*, 35 F.3d at 1422).

Defendants take issue with the "touches upon" standard set out in *Hildes*, 734 F.3d at 859. Defendants argue the Supreme Court expressly rejected the *Hildes* standard eight years prior in *Dura* when it wrote, "[t]o 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires."  544 U.S. at 343; Reply at 2.

Defendants' argument is not persuasive.  In *Dura*, the Supreme Court specifically addressed "fraud-on-the-market cases" such as Section 10(b) claims, which require the plaintiff to plead and prove that "defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  544 U.S. at 346.  Unlike fraud-on-the-market claims, Section 11 claims do not require a plaintiff to allege loss causation.  *In re Velti*, 2015 WL 5736589, at *28.  Instead, negative causation is an affirmative defense to such claims.  Because *Dura* and *Hildes* address different claims, the Court rejects Defendants' arguments that the "touches upon" standard set out by the Ninth Circuit in *Hildes* was expressly rejected by *Dura*. Furthermore, Defendants point to no case overruling *Hildes* or calling that standard into question. Rather, courts continue to apply the *Hildes* "touches upon" standard in Section 11 cases.  *Alich v. Opendoor Techs. Inc.*, No. CV-22-01717-PHX-MTL, 2024 WL 2153529 (D. Ariz. May 14, 2024); *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017 (N.D. Cal. 2016).  This Court is bound by Ninth Circuit precedent and will not ignore, absent explicit authority otherwise, that the standard it set forth in *Hildes* (eight years *after* the Supreme Court's *Dura* decision) is still good law.

### 2.  Loss Based Only on March 8, 2021 Disclosures

Next, the Court addresses Defendants' argument that there is no loss attributable to the March 8, 2021 corrective disclosures.  The parties do not dispute that "Wish's stock price closed at $15.94 before [the March 8, 2021] announcement, increased to close at $16.99 the next day, and continued to trade above $15.94 until March 25, 2021, more than two weeks later."  Mot. at 7–8; TAC ¶ 101; ECF Nos. 125-1, 125-2.  Defendants have shown that the stock price went up

United States District Court
Northern District of California

United States District Court
Northern District of California

following the March 8, 2021 news, which alone is enough to carry the heavy burden required to establish the negative causation defense, at least with respect to disclosures made on March 8, 2021. If the stock price does not go down, there is no loss. *Hildes*, 734 F.3d at 860 (A "defendant must show that the depreciation in value of a plaintiff's stock resulted from factors other than the alleged material misstatement.") (internal quotations omitted).

Plaintiffs make two arguments to try to account for this glaring shortcoming in their theory of loss: 1) Defendants tempered any decline in Wish's stock price in March 2021 by concurrently issuing positive statements, Opp. at 7–10; and 2) the intraday after-hours price movements on March 8, 2021 defeat Defendants' negative causation defense. *Id.* at 10–12. Both fail.

Plaintiffs first argue that on March 8, 2021, Defendants published good news to blunt the bad news of decreased MAUs. Opp. at 7. Plaintiffs allege that the majority of disclosures made in a Form 8-K filed at 4:09 p.m. on March 8, 2021 were positive news, though the 8-K did include news of the Q4 MAU decrease of 10% YoY. TAC ¶ 101. Plaintiffs argue that this news contained "(1) statements regarding an overwhelmingly positive revenue growth; (2) forecasting on a tremendously positive outlook for 1Q21; and (3) Bahri's reassurance that logistics were now 'normal' and that, in the emerging market countries, delivery times were 'back to historical low level.'" Opp. at 7 (citing TAC ¶¶ 101–104).

Plaintiffs cite no authority for their novel take that good news in SEC filings issued alongside a corrective disclosure defeats a negative causation defense when the stock price goes up. Rather, *Hildes* requires "depreciation in value" as a predicate to defeat a negative causation defense. 734 F.3d at 860. Plaintiffs point to *In re DDi Corp. Sec. Litig.*, but there, the court rejected a negative causation defense because the complaint was "at least ambiguous as to whether the [truth emerged] before or after the [price drop]." No. CV 03-7063 NM, 2005 WL 3090882, at *15 (C.D. Cal. July 21, 2005). Here, there is no ambiguity as to when the stock price dropped because after the March 8, 2021 disclosure, the price increased and stayed up for more than two weeks following the disclosure. Plaintiffs also cite out-of-circuit 10(b) cases where the defendants tried to minimize the impact of bad news, but in both cases the defendants did not just disclose positive news, they also allegedly sought to deceive the market. *See Swack v. Credit Suisse First*

13

*Bos.*, 383 F. Supp. 2d 223, 240 (D. Mass. 2004) (Section 10(b) fraud case where individual defendants conspired to issue research reports that artificially inflated stock value); *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 711−12 (S.D. Tex. 2006) (Section 10(b) fraud case where press release announcing accounting restatement was "incomplete and deceptive"). Here, Plaintiffs do not claim that the good news was false or that the statement regarding logistics was false. Opp. at 20. In sum, Plaintiffs' argument that good news can defeat a negative causation defense where the stock price goes up fails because, quite simply, the Defendants' burden is always met when the stock price goes up after the disclosure.

Second, Plaintiffs argue that price movement on March 8, 2021 in after-hours trading defeats the negative causation defense. Opp. at 10. After the markets closed, the Wish stock price fluctuated during after-hours trading, first spiking upwards, then decreasing over roughly two hours (while staying above the close-of-market price), then increasing again to end the day. ECF No. 125-1. Plaintiffs home in on the roughly two-hours when the stock price decreased from its highest point as evidence of loss. Plaintiffs' theory is that the good news released at 4:09 p.m. caused the stock price to first increase significantly, then fall over the next several hours on the evening of March 8, 2021, "[a]s the market digested the material." TAC ¶ 102. As Plaintiffs acknowledged at the hearing, the stock price was still higher at the end of March 8, 2021 than it was before the corrective disclosure, *see* ECF No. 125-1, the stock closed higher at the end of the day on March 9, 2021, and the stock traded higher until March 25, 2021. ECF No. 130-1 at 221.

As Plaintiffs note, courts in the Second Circuit "have frequently allowed cases to proceed under theories based on intraday price fluctuations." *In re VimpelCom, Ltd.*, No. 1-15-CV-8672 (ALC), 2016 WL 5390902, at *3 (S.D.N.Y. Sept. 26, 2016) (collecting cases). But this Court is not bound by out-of-circuit decisions. Regardless, there is no way to construe Plaintiffs' allegations as evidence of a stock price decrease. Plaintiffs allege loss based on a cherry-picked two-hour timeframe that conveniently follows that day's after-market high. No persuasive authority supports using that brief period to measure loss. Under Plaintiffs' rationale (or lack thereof), any minor fluctuation in a stock price and any small window of trading when price decreases could defeat a negative causation defense. And as the Court explained in the hearing for

14

United States District Court
Northern District of California

the second motion to dismiss, regarding after-hours trading, "if you gave back most of the gains, then there's still some gain left" and "the stock still went up." ECF No. 120 (Nov. 2, 2023 Hr'g Tr.) at 36−37. Not only did the stock price increase during after-hours trading, it closed higher the next day, and traded above the March 8, 2021 price for over two weeks following the disclosure. By all reasonable objective metrics, the Wish stock price increased following the news on March 8, 2021.

Plaintiffs cite *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021), for the proposition that "[a] rebound, in and of itself [ ] is not determinative." Opp. at 11. But *Wochos* says no such thing. Instead, the court held that loss causation was not alleged in a 10(b) case despite an initial drop in price, writing that "[t]he quick and sustained price recovery after the modest October 9 drop refutes the inference that the alleged concealment of this particular fact caused any material drop in the stock price." *Wochos*, 985 F.3d at 1198. Much like *Wochos*, here, the modest decrease over two hours of after-hours trading was followed by an increase in stock price both the next day and over the next two weeks, which is strong evidence of negative causation.

Because the Wish stock price went up in the after-hours trading following the disclosure and traded above the March 8, 2021 price for over two weeks, the Court finds that Defendants have met their burden for establishing a negative causation defense based only on disclosures made on March 8, 2021. *Hildes*, 734 F.3d at 860.

### 3.  Loss Based on May 12, 2021 "Corrective" Disclosures

In the prior order, the Court concluded that Plaintiffs had failed to plead that the May 12, 2021 disclosures related to the challenged portions the Registration Statement. 2nd MTD Order at 26. The Court noted that the May 12, 2021 disclosure announced that MAUs had declined in Q1 2021 and its forward guidance had fallen short. *Id.* The Court thus found that Defendants had met their heavy burden to establish the negative causation defense. *Id.* at 27–28. The Court allowed Plaintiffs "one final opportunity to amend the complaint" to plead facts linking the May 2021 stock drop to any new revelation about a reduction in advertising spend. *Id.* at 27.

In the TAC, Plaintiffs have pled that the Shareholder Letter disclosed information that was

15

absent in the March 8, 2021 disclosure. TAC ¶¶ 108–110. Plaintiffs' new theory is that the March 8, 2021 disclosures were only partial disclosures and that the stock price did not drop until the "full truth" came out in corrective disclosures made on May 12, 2021. *See* Opp. at 12–14.

Defendants argue that "Plaintiffs fail to plead any new disclosures in May that allegedly corrected statements in the Registration Statement that had not already been disclosed in March." Mot. at 9. Defendants also argue that Plaintiffs' corrective disclosure theory improperly relies on newly alleged theories of falsity. *Id.* at 12; Reply at 5.

Plaintiffs' opposition outlines their theory connecting the March 8, 2021 and May 12, 2021 disclosures. Plaintiffs argue that "Defendants' partial correction [on March 8, 2021] disclosed the reduction in advertising spend as a 4Q20 issue, indicating that logistics problems had been resolved[.]" Opp. at 6. Plaintiffs allege Defendant Bahri stated that "in the next three to six months" Wish expected "to again engage with [emerging] markets and get those MAUs back." TAC ¶ 104. According to Plaintiffs, the May 12, 2021 disclosures revealed, for the first time, that:

> (1) Wish had not limited the pre-IPO de-emphasizing strategy to 4Q20, and that the strategy was not temporary or resolving, but was ongoing as the logistics problems persisted; and (2) Wish's pre-IPO forecast ([TAC ¶¶] 96, 99) showed that Defendants believed that Wish would continue the strategy in 2021 with the adverse consequence of a material decline in MAUs resulting from the pre-IPO strategy of reduced advertising spend persisting.

*Id.* at 13. Thus, Plaintiffs argue, "on May 12, 2021, Wish finally revealed the full truth of the circumstances that existed pre-IPO that the Registration Statement omitted." *Id.* Plaintiffs also argue that their "allegations do not constitute new falsity allegations, but rather demonstrate that Defendants' negative causation argument fails." *Id.* at 20.

Defendants reply that Plaintiffs plead nowhere "that Wish decided *before* the IPO that it would cut advertising spending the quarter *after* the IPO." Reply at 6. Defendants argue the May 12, 2021 disclosure is not "corrective" because the "disclosure on March 8, 2021 told investors exactly what Plaintiffs now claim was first revealed two months later: that Wish would ***not resume*** ad spending in Q1 2021 in these few emerging markets." *Id.* at 7 (emphasis added).

Where the "alleged corrective disclosures do not reasonably evidence the alleged misstatements or omissions, and the complaint points to no additional indications of loss

16

causation, the face of the complaint demonstrates negative causation." *In re Velti*, 2015 WL 5736589, at \*28 (quoting *Brown v. Ambow Educ. Holding Ltd.*, No. 12-cv-05062, 2014 WL 523166, at \*14–16 (C.D. Cal. Feb. 6, 2014)) (cleaned up). Put another way, a disclosure is not corrective if "it reveals nothing about what was allegedly misrepresented in or omitted from the Registration Statement." *Shoretel*, 2009 WL 248326, at \*5.

After an exhaustive review of the TAC at the hearing, Plaintiffs acknowledge that they only argue that there is one piece of new information disclosed on May 12, 2021 that diverged from the March 8, 2021 disclosure: that Wish continued to reduce advertising spend due to persisting logistics problems.

On March 8, 2021, Wish disclosed that the 4Q 2020 MAU decline "was primarily in some emerging markets outside of Europe and North America where Wish temporarily de-emphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year." TAC ¶ 101. When asked about the pullback, CFO Bahri stated:

> So maybe much all of the decline was driven by countries like India, Philippines, Colombia, some Brazil all those countries wherever be it. . . . *And also the logistics are now running fairly normal. In those countries they're back to historical low level.  So we would expect that in the next three to six months, we expect to again engage with these markets and get those MAUs back*.

*Id*. ¶ 104 (emphasis in TAC).

Two months later, on May 12, 2021, Wish announced additional MAU decline in Q1 2021, and attributed it, again, to de-emphasis in some emerging markets. *Id.* ¶ 106. Defendants wrote in the Shareholder Letter:

> In some emerging markets where we believe users have lower LTV, we temporarily decreased our advertising spend. . . . *We expect to re-engage* users in some emerging markets *once we have a more reliable logistics offering*, which had [been] impacted by the effects of the pandemic, and a scaled Wish Local Network.

*Id*. (emphasis modified). Wish's Form 10-Q, filed on May 12, 2021, stated that the continued decrease was driven in part "by the decision to de-emphasize user acquisition in some emerging markets outside of Europe and North America where we faced logistical challenges due to the pandemic[.]" *Id*. ¶ 108. On the investor call that evening, Defendant Bahri stated:

United States District Court
Northern District of California

> As a reminder, ***we temporarily decrease our advertising spend in some emerging markets*** where as a result of logistical challenges due to pandemic, we were unable to provide a positive customer experience, and the economics in those markets were not credible. ***We expect to reengage users in some of these emerging markets*** where we believe we can generate favorable economics ***once we have a more reliable logistics offering*** and a scaled Wish Local network to support increased monetization efforts.

*Id*. ¶ 109 (emphasis modified).  On that same call, Defendant Szulczewski stated, "***due to the logistics -- poor logistics performance*** and, ultimately, the customer experience in some of the emerging markets like South America and others, ***we've actually pulled back from those regions***."  *Id*. ¶ 110 (emphasis modified).  Plaintiffs further allege that "[i]n the wake of Wish's May 12, 2021, disclosures, . . . analysts attributed that decline [in stock price] in material part because of reduced MAU resulting in material part from logistics problems that caused a reduction in ad spend in emerging markets."  *Id*. ¶ 112.  Specifically, Credit Suisse analysts wrote, "***Despite improving time-to-door days, logistics bottlenecks remain across many emerging market economies.***"  *Id.* (emphasis in TAC); *see also id*. ¶ 114 (similar analysis by Deutsche Bank).

More succinctly, Plaintiffs allege that on March 8, 2021, Wish disclosed it had reduced its ad spend in 4Q 2020 due to logistics problems and that logistics in emerging markets had normalized.  TAC ¶ 104.  Wish disclosed it expected to re-engage users in those markets in the next three to six months.  *Id.*  Then, Plaintiffs allege, on May 12, 2021, Defendants disclosed that "logistical challenges" persisted, leading to additional decreases in advertising.  TAC ¶ 106–108.

The key issue is whether the May 12, 2021 disclosure—that persisting logistics problems caused a continued reduction in advertising spend—"reveals" anything new.  *Shoretel*, 2009 WL 248326, at *5.

Plaintiffs allege that on March 8, 2021, Wish disclosed that it had reduced advertising spend because it faced logistics problems.  TAC ¶ 101 (Form 8-K disclosure: "Wish temporarily deemphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year"); *id.* ¶ 103 (Defendant Bahri: ". . . [Wish] decided to deemphasize customer acquisition in some emerging markets outside of Europe and North America where we faced logistical challenges . . ."); *id.* ¶ 104 (Defendant Bahri: ". . . [Wish] just

18

United States District Court
Northern District of California

United States District Court
Northern District of California

felt it's not right to invest in these businesses if the consumers churn, . . .").

Plaintiffs claim that the March 8, 2021 corrective disclosure was only partial, and that the full truth emerged on May 12, 2021. Plaintiffs allege that on May 12, 2021, Wish "confirm[ed] that the same logistical issues . . . caused them to deemphasize ad spend." TAC ¶ 109 (Defendant Bahri: "As a reminder, we temporarily decrease our advertising spend in some emerging markets where as a result of logistical challenges . . . "); *id.* ¶ 110 (Defendant Szulczewski: "So it's easier to get an MAU or a sign-up or even a buyer but tend to have lower retention, especially when the capacity of those logistics work and infrastructure was severely impacted by the pandemic").

Comparing the March 8 disclosures to the May 12 disclosures shows that these alleged facts were disclosed on March 8, 2021, TAC ¶¶ 101, 103–104. The fact that logistics problems caused reductions in advertising spend and would cause a delay of three to six months after March 8, 2021 before the advertising spend would be resumed was disclosed on March 8, 2021, so it could not have been first revealed on May 12, 2021. The information was thus not "reveal[ed]" on May 12, 2021. *Shoretel*, 2009 WL 248326, at *5.

Plaintiffs also allege that the May 12, 2021 statements disclose that the logistics problems had persisted. As Plaintiffs allege, Wish disclosed on March 8, 2021 that logistics were "running fairly normal," TAC ¶ 104, then revealed on May 12, 2021 that logistics problems persisted. TAC ¶ 106 (". . . once we have a more reliable logistics offering, . . ."); *id.* ¶ 109 (same). It is important to note that Plaintiffs do not claim that Wish's characterization of the logistics in March was false. Opp. at 20. This revelation about the post-IPO state of logistics has nothing to do with alleged omissions from the Registration Statement. As discussed above, the Court allowed Plaintiffs' two claims to proceed on the theory of omission limited to the effect of decreased advertising spend in Q4 2020 on MAUs. *See* 2nd MTD Order at 19, 23. Logistics problems may have caused a decrease in advertising spend, but Plaintiffs never alleged that a component of the omission was a failure to disclose the reason for the advertising spend reduction. Similarly, here, the TAC does not allege that the Registration Statement unlawfully omitted information about the impact of logistics on advertising spend. Opp. at 20 ("Plaintiffs do not . . . base their falsity claims upon Wish's October 2020 internal forecast of MAU declines."); *id.* ("These allegations do not

United States District Court
Northern District of California

constitute new falsity allegations[.]"). Furthermore, the Court agrees with Defendants that Plaintiffs plead nowhere "that Wish decided *before* the IPO that it would cut advertising spending the quarter *after* the IPO." Reply at 6.

Both the March 8, 2021 and May 12, 2021 disclosures about the state of logistics in emerging markets revealed that logistical problems caused a reduction in advertising spend in Q4 2020 and also discussed post-IPO, on-the-ground logistics realities. There is no question that Plaintiffs allege that Wish corrected the Registration Statement on March 8, 2021 by disclosing a Q4 2020 reduction in advertising spend that impacted MAUs. In addition to the advertising spend disclosure, Wish also disclosed information about the current state of logistics on March 8, 2021. Then on May 12, 2021, Wish again disclosed additional information, this time about the current state of logistics in May. But nothing new about the pre-IPO state of logistics was disclosed in May. *Shoretel*, 2009 WL 248326, at *5.

Even if the May 12, 2021 disclosure contained new information, that information does not relate to the charged omission—that the Registration Statement omitted information about a Q4 2020 reduction in advertising spend. Plaintiffs do not allege that logistics on the ground in March and May relate back to pre-IPO information in the Registration statement. Opp. at 20; *see* Reply at 6. Nor do Plaintiffs allege that Wish was obligated to disclose the reason for reduced advertising spend. Opp. at 20. Thus, even if the information was new, it would still "reveal[] nothing about what was allegedly misrepresented in or omitted from the Registration Statement." *Shoretel*, 2009 WL 248326, at *5.

Thus, nothing related to pre-IPO activity is revealed on May 12, 2021, therefore nothing "touches upon the reasons" for the May drop in Wish's stock price. *Hildes*, 734 F.3d at 860.

The final issue is whether further amendment is warranted. Plaintiffs have requested leave to amend, Opp. at 22, but acknowledged at the hearing that no other information was revealed by Wish on May 12, 2021. Thus, no additional facts could cure Plaintiffs' failure to tie the May stock drop to revelations about the Registration Statement. Amendment would be futile.

### 4. Loss Related to Damages

Finally, the Court addresses Plaintiffs' argument that "whether Wish's stock price

increased in March 2021 is not dispositive because damages under the Securities Act are calculated based upon the filing date of Plaintiffs' complaint." Opp. at 14 (capitalization modified).

Damages and causation are separate requirements of a Section 11 claim. The statute separately addresses the distinct issues of recoverable damages and loss causes. *Compare* 15 U.S.C. § 77k(e) (measuring recoverable damages as "the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and . . . the value thereof as of the time such suit was brought . . . ." ) *with id.* (defining the negative causation defense: "if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, . . . such portion of or all such damages shall not be recoverable."). These are simply distinct requirements, and the statutory damages formula does not pose an impediment to dismissal on negative causation grounds.

*        *        *

As discussed above, Defendants have met their burden in demonstrating that the March 8, 2021 disclosures and May 12, 2021 disclosures about persistent logistics problems did not cause a drop in Wish's stock price. Furthermore, Because the parties do not address it, the Court again credits Defendants' alternative explanation for the price decrease in May as sufficient to show negative causation: the stock price went up for the two weeks following the March disclosures, "there were no later disclosures regarding the Q4 2020 decrease in advertising spend in emerging markets," and in May, "Wish disclosed disappointing Q1 2021 results including a decline in MAUs and a decrease in future sales guidance." 2nd MTD Order at 26–27. As such, the Court finds that Defendants have met their burden in establishing a negative causation defense, *Hildes*, 734 F.3d at 860, and that amendment would be futile. Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiffs' Section 11 claims WITHOUT LEAVE TO AMEND.

### C.    Materiality

Defendants argue that "[t]he TAC should be dismissed for the independent reason that Plaintiffs do not plead facts establishing the materiality of the alleged omission about advertising

21

spend in emerging markets." Mot. at 11–12. Plaintiffs respond that "Defendants ignore the fact that the Court extensively analyzed the materiality" in its prior order. Opp. at 18.

The Court agrees with Plaintiffs that it already addressed this issue in its previous order, where it found that Plaintiffs plausibly alleged materiality. *See* 2nd MTD Order at 18.

### D.   Section 15 Claim

Because Plaintiffs fail to plead an underlying violation of Section 11, the Court similarly GRANTS Defendants' motion to dismiss Plaintiffs' Section 15 claims WITHOUT LEAVE TO AMEND. *See Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *27 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x 239 (9th Cir. 2019).

## IV.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Defendants' motion to dismiss Plaintiffs' Section 11 (Count I) claims under the negative causation defense is GRANTED WITHOUT LEAVE TO AMEND.

2. Defendants' motion to dismiss Plaintiffs' Section 15 (Count II) claims for failure to plead an underlying violation of Section 11 is GRANTED WITHOUT LEAVE TO AMEND.

3. Plaintiffs' claims are dismissed WITH PREJUDICE.

Dated: August 22, 2024

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California